# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 25-cv-13816 <br> (Hon. Leo T. Sorokin) |
| WILLIAM FRANCIS GALVIN, in his official capacity as Secretary of the Commonwealth of Massachusetts, | |
| Defendant. | |

## MOTION OF COMMON CAUSE, JANE DOE INC., AND JUAN PABLO JARAMILLO TO DISMISS THE COMPLAINT

Common Cause, Jane Doe Inc., and Juan Pablo Jaramillo (collectively, "Intervenors") move to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. As set forth more fully in the memorandum of law filed concurrently with this motion as well as the exhibits appended thereto, Plaintiff the United States has failed to state a claim for entitlement to the complete and unredacted Massachusetts voter file pursuant to the Civil Rights Act of 1960, 52 U.S.C. § 20701 *et seq*.

Intervenors reserve the right to file a separate response to the United States' motion to compel (ECF No. 6).

## CONCLUSION

The Court should dismiss the Complaint.

Dated: December  22  , 2025                    Respectfully submitted,

                                              /s/____Suzanne Schlossberg_____

Ari J. Savitzky*
Theresa J. Lee*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
asavitzky@aclu.org
tlee@aclu.org
slakin@aclu.org

Megan Keenan*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street NW
Washington, DC 20005
Tel.: (202) 457-0800
mkeenan@aclu.org

*application for admission pro hac vice
forthcoming

Jessie J. Rossman (BBO # 670685)
Suzanne Schlossberg (BBO #703914)
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
Tel.: (617) 482-3170
jrossman@aclum.org
sschlossberg@aclum.org

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 25-cv-13816 |
| | (Hon. Leo T. Sorokin) |
| WILLIAM FRANCIS GALVIN, in his official capacity as Secretary of the Commonwealth of Massachusetts, | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS OF COMMON CAUSE, JANE DOE INC., AND JUAN PABLO JARAMILLO**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

LEGAL STANDARD........................................................................................................... 7

ARGUMENT ....................................................................................................................... 8

    I.    THE UNITED STATES'S DEMAND FOR RECORDS FAILS TO MEET THE
REQUISITE STATUTORY REQUIREMENTS OF THE CRA.................................................. 9

    II.    THE UNITED STATES'S DEMAND IS INVALID BECAUSE IT DOES NOT ALLOW
FOR REDACTIONS AND MODIFICATIONS TO PROTECT THE PRIVACY AND
CONSTITUTIONAL RIGHTS OF VOTERS. ...................................................................... 15

CONCLUSION.................................................................................................................... 19

## TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ............................................................................ 7, 8

*Ayers-Schaffner v. DiStefano,*
   37 F.3d 726 (1st Cir. 1994) .................................................................. 1

*Becker v. United States,*
   451 U.S. 1306 (1981) ........................................................................... 9

*Burdick v. Takushi,*
   504 U.S. 428 (1992) ............................................................................. 1

*Corner Post, Inc. v. Board of Governors of the Fed. Rsrv. Sys.,*
   603 U.S. 799 (2024) ............................................................................. 15

*Coro, Inc. v. F.T.C.,*
   338 F.2d 149 (1st Cir. 1964)................................................................. 11

*F.D.I.C. v. Wentz,*
   55 F.3d 905 (3d Cir. 1995) ................................................................... 11

*Niz-Chavez v. Garland,*
   593 U.S. 155 (2021) ............................................................................. 15

*PA Fair Elections v. Pa. Department of State,*
   337 A.3d 598 (Pa. Commw. Ct. 2025) ................................................ 6

*Project Vote/Voting for Am., Inc. v. Long,*
   682 F.3d 331 (4th Cir. 2012) ................................................ 16, 17, 18, 19

*Pub. Int. Legal Found. v. Boockvar,*
   431 F. Supp. 3d 553 (M.D. Pa. 2019).................................................. 17

*Pub. Int. Legal Found., Inc. v. Bellows,*
   92 F.4th 36 (1st Cir. 2024)................................................................... 17

*Pub. Int. Legal Found. v. Schmidt,*
   No. 23-1590 (3d Cir. Nov. 6, 2023) .................................................... 18

*Pub. Int. Legal Found., Inc. v. Matthews,*
   589 F. Supp. 3d 932 (C.D. Ill. 2022),.................................................. 17

*State of Ala. ex rel. Gallion v. Rogers,*
   187 F. Supp. 848 (M.D. Ala. 1960) ..................................................... 1

*Sugarloaf Funding, LLC v. U.S. Dep't of Treasury,*

584 F.3d 340 (1st Cir. 2009) ................................................................................... 11

*Torrens v. Lockheed Martin Servs. Grp., Inc.*,

396 F.3d 468 (1st Cir. 2005) ................................................................................. 14

*Town of Sanford v. United States*,

140 F.3d 20 (1st Cir. 1998) ................................................................................... 14

*Yick Wo v. Hopkins*,

118 U.S. 356 (1886) ............................................................................................... 1

**Statutes**

5 U.S.C. § 552a ...................................................................................................... 15

52 U.S.C. § 20501 ............................................................................................. 1, 14

52 U.S.C. § 20507 .......................................................................................... passim

52 U.S.C. § 20701 ......................................................................................... 1, 8, 9

52 U.S.C. § 20704 ................................................................................................... 3

52 U.S.C. § 20901 ................................................................................................... 1

52 U.S.C. § 21083 ................................................................................................. 14

52 U.S.C. § 21085 ........................................................................................... 12, 14

950 CMR 49.00 ..................................................................................................... 18

G. L. c. 214, § 1B ................................................................................................. 17

G. L. c. 51, §§ 4(d) ............................................................................................... 18

G. L. c. 93H, §§ 1, 2 ............................................................................................ 17

G. L. c. 51, §§ 4(d) ............................................................................................... 18

**Other Authorities**

Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*, N.Y. TIMES, Oct. 22, 2025, https://www.nytimes.com/2025/10/22/us/politics/trump-election-deniers-voting-security.html 5

Andy Kroll & Nick Surgey, *Inside Ziklag, the Secret Organization of Wealthy Christians Trying to Sway the Election and Change the Country*, PROPUBLICA, July 13, 2024, https://www.propublica.org/article/inside-ziklag-secret-christian-charity-2024-election ........... 6

Carter Walker, *Efforts to Challenge Pennsylvania Voters' Mail Ballot Applications Fizzle*, SPOTLIGHT PA, Nov. 8, 2024, https://www.spotlightpa.org/news/2024/11/mail-ballot-application-challenges-pennsylvania-fair-elections/ ................................................................................................................ 6

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html. ........................................................................................................ 4

Doug Bock Clark, *She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*, PROPUBLICA, Aug. 26, 2025, https://www.propublica.org/article/heather-honey-dhs-election-security .................................... 6

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAGAZINE, Nov. 16, 2025, https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html .................................................................................... 5

Hansi Lo Wang, *Thousands of Pennsylvania Voters Have Had Their Mail Ballot Applications Challenged*, NPR, Nov. 5, 2024, https://www.npr.org/2024/11/04/nx-s1-5178714/pennsylvania-mail-ballot-voter-challenges-trump ............................................................................................................................................... 6

Jen Fifield, *Pa.'s Heather Honey, Who Questioned the 2020 Election, Is Appointed to Federal Election Post*, PA. CAPITAL-STAR, Aug. 27, 2025, https://penncapital-star.com/election-2025/pa-s-heather-honey-who-questioned-the-2020-election-is-appointed-to-federal-election-post .............................................................................. 5

Jonathan Shorman, *Trump's DOJ offers states 'confidential' deal to wipe voters flagged by feds as ineligible*, STATELINE, Dec. 18, 2025, https://stateline.org/2025/12/18/trumps-doj-offers-states-confidential-deal-to-wipe-voters-flagged-by-feds-as-ineligible/. ........................... 6, 7, 14

Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, NPR, June 29, 2025, https://www.npr.org/2025/06/29/nx-s1-5409608/citizenship-trump-privacy-voting-database ... 6

Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, Brennan Ctr. for Just., *Tracker of Justice Department Requests for Voter Information* (updated Dec. 5, 2025), https://perma.cc/A73C-8YDZ. ............................................................................................................. 2

Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*, DEMOCRACY DOCKET, June 12, 2025, https://www.democracydocket.com/news-alerts/dhs-said-to-brief-cleta-mitchells-anti-voting-group-on-checking-citizenship-for-voters ................................................................................... 6

Press Release, U.S. Dep't of Just., *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025), https://perma.cc/F5MD-NWHD ................................................................................................ 4

Press Release, Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security ....... 5

Press Release, U.S. Dep't of Justice, *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025), https://www.justice.gov/opa/pr/justice-department-sues-oregon-and-maine-failure-provide-voter-registration-rolls ............................. 4

Press Release, U.S. Dep't of Justice, *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025); Press Release, U.S. Dep't of Justice, *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025)... 4

Press Release, U.S. Dep't of Justice, *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025), https://www.justice.gov/opa/pr/justice-department-sues-six-states-failure-provide-voter-registration-rolls ............................................................. 4

*Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624–27 (6th Cir. 2025) ................................. 12

Sarah Lynch, *US Justice Dept Considers Handing over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025, https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09.. 5

U.S. Dep't of Just., Civ. Rts. Div., *Federal Law Constraints on Post-Election "Audits"* (Jul. 28, 2021), https://perma.cc/74CP-58EH .............................................................................. 1

U.S. Dep't of Just., *United States Announces Settlement with Kentucky Ensuring Compliance with Voter Registration List Maintenance Requirements* (July 5, 2018) https://perma.cc/G2EZUUA5 ........................................................................................... 13

U.S. Dep't of Justice, *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025), https://www.justice.gov/opa/pr/justice-department-sues-four-additional-states-and-one-locality-failure-comply-federal ........................................................................................... 4

U.S. Dep't of Justice, *Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025), https://www.justice.gov/opa/pr/justice-department-sues-four-states-failure-produce-voter-rolls ........................................................................................... 4

**Rules**

Fed. R. Civ. P. 12(b)(6) ........................................................................................................ 7

**Reports**

House Report No. 86-956 (1959).............................................................................. 1, 8

## INTRODUCTION

In this action, the United States seeks to compel the disclosure of sensitive personal voter data to which it is not entitled, using the civil rights laws as a pretext. But neither the information requests propounded by the U.S. Department of Justice ("DOJ") on the Commonwealth of Massachusetts, nor the Complaint itself, satisfies the core statutory requirement that any federal demand for information under the Civil Rights Act of 1960 include a disclosure of "the basis and the purpose" for the federal data request. 52 U.S.C. § 20703. As a result, the United States fails to state a claim for which relief can be provided under that statute. Dismissal should be granted.

The right to vote "'is of the most fundamental significance under our constitutional structure.'" *Ayers-Schaffner v. DiStefano*, 37 F.3d 726, 727 (1st Cir. 1994) (quoting *Burdick v. Takushi,* 504 U.S. 428, 433 (1992)). It is "preservative of all other rights" because it serves as a check against tyrannical rule while simultaneously ensuring the competition of ideas amongst our elected officials. *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

Congress has repeatedly legislated to protect the franchise, including through Title III of the Civil Rights Act of 1960 ("CRA"), 52 U.S.C. § 20701 *et seq.*, as well as the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq.*, and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901 *et seq*. The very purpose of these statutes is to ensure that all eligible Americans—especially racial minorities and voters with disabilities—have the opportunity to participate in free, fair, and secure elections. As DOJ itself has explained, Title III of the CRA, the election records provision invoked in the Complaint here, was designed to "secure a more effective protection of the right to vote." U.S. Dep't of Just., Civ. Rts. Div., *Federal Law Constraints on Post-Election "Audits"* (Jul. 28, 2021), https://perma.cc/74CP-58EH (citing *State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960) and H.R. Rep. No. 86-956 (1959)).

The United States' demand for Massachusetts's unredacted voter file—which contains sensitive personal information such as residential addresses, full birth dates, driver's license numbers, and Social Security numbers from every voter in the state—undermines these statutes' core objectives by *decreasing* access to the franchise and is contrary to law.

Although the public disclosure of carefully redacted state voting records can help ensure transparency and the accuracy of the voter rolls, demanding the production of unredacted voter records, thereby revealing protected personal identifying information such as driver's license numbers and social security numbers, would only deter voter participation and undermine the right to vote. Especially so here, where the United States' *actual* reason for the data demand, which it never disclosed in its request but which has been widely reported, is to create an unauthorized and unlawful national voter database, and to use this illicit tool to illegally target and challenge voters.

For good reason, there is no statutory right to demand the type of sensitive voter information at issue here without fully and accurately setting forth "the basis and the purpose" for the data request. Because the Complaint fails to establish United States' entitlement to a complete, unredacted, non-public Massachusetts voter file, this Court should dismiss this action.

## BACKGROUND

Beginning in May 2025, Plaintiff the United States, through its Department of Justice ("DOJ"), began sending letters to election officials in at least forty states, making escalating demands for the production of statewide voter registration databases, with plans to gather data from all fifty states. *See* Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, Brennan Ctr. for Just., *Tracker of Justice Department Requests for Voter Information* (updated Dec. 5, 2025), https://perma.cc/A73C-8YDZ.

On July 22, 2025, DOJ sent a letter to the Secretary for the Commonwealth of Massachusetts, William F. Galvin ("Secretary Galvin") demanding an electronic copy of Massachusetts's entire statewide voter registration list. Compl. ¶¶ 18–19; Decl. of Eric Neff, Exhibit No. 1, Letter of Michael Gates to the Hon. William Galvin dated July 22, 2025, Dkt. No. 7-1 ("July 22 Letter").  DOJ specifically requested that the electronic voter file be produced with "all fields" included. *Id.* The July 22 Letter did not claim any statutory basis for the request.  *Id.* It also propounded several questions regarding Massachusetts's voter registration and list maintenance procedures.  *Id.* at 2.  It also requested that Massachusetts provide information about purported "registered voters identified as ineligible to vote" due to being non-citizens or due to a felony conviction.  *Id.* at 2.  DOJ asked Massachusetts to respond within 14 days.  *Id.*

In response, an official from Secretary Galvin's Elections Division informed the Department of Justice that 60 days would be required for a response. Compl. ¶ 20; Decl. of Eric Neff, Exhibit No. 2, Letter of Michelle Tassinari dated August 7, 2025, Dkt. No. 7-2.

One week later, DOJ sent another letter, demanding an earlier response and reiterating its demand for the full electronic voter file.  Compl. ¶¶ 21–24.  DOJ again stated that the production "must contain all fields, including the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number." Decl. of Eric Neff, Exhibit No. 3, Letter of Harmeet K. Dhillon to the Hon. William Galvin dated Aug. 14, 2025, Dkt. No. 7-3 ("Aug. 14 Letter").  DOJ dismissed any potential privacy issues because the Civil Rights Act of 1960 prohibited sharing the information DOJ sought directly with the public. *See id.* at 3 (citing 52 U.S.C. § 20704); *accord* Compl. ¶ 23.

DOJ's August 14 letter for the first time cited the NVRA, HAVA, and Title III of the CRA as specific authority for its records request. Aug. 14 Letter at 1–3. It stated that "[t]he purpose of

this request is to ascertain Massachusetts's compliance with the list maintenance requirements of the NVRA and HAVA," but did not elaborate further or reference any purported compliance deficiencies by Massachusetts with respect to those statutes' voter list maintenance requirements. Compl. ¶ 22; Aug. 14 Letter at 1–3.

When Massachusetts did not provide the requested information, the United States filed this lawsuit—one of at least twenty-two that DOJ has initiated recently against states and election officials—seeking to compel the production of this sensitive voter data.[1]

Notably, according to public reporting, DOJ's requests for private, sensitive voter data from Massachusetts and other states do not appear to relate to list maintenance under the NVRA and HAVA. Rather, they appear to be connected with novel efforts by the United States to construct a national voter database, and to otherwise use untested forms of database matching in order to scrutinize state voter rolls. According to this reporting, DOJ employees "have been clear that they are interested in a central, federal database of voter information." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html. DOJ is coordinating these novel efforts with the federal Department of Homeland Security ("DHS"), according to reported statements from DOJ and DHS. *Id.*; *see also, e.g.*, Jonathan Shorman, *DOJ*

---

[1] *See* Press Release, U.S. Dep't of Justice, *Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025), https://www.justice.gov/opa/pr/justice-department-sues-four-states-failure-produce-voter-rolls; Press Release, U.S. Dep't of Justice, J*ustice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025), https://www.justice.gov/opa/pr/justice-department-sues-four-additional-states-and-one-locality-failure-comply-federal; Press Release, U.S. Dep't of Just., *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025), https://perma.cc/F5MD-NWHD; Press Release, U.S. Dep't of Just., *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025), https://perma.cc/7J99-WGBA; Press Release, U.S. Dep't of Just., *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025), https://perma.cc/M69P-YCVC.

*is Sharing State Voter Roll Lists with Homeland Security*, Stateline, Sept. 12, 2025,

https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security;

Sarah Lynch, *US Justice Dept Considers Handing over Voter Roll Data for Criminal Probes,*

*Documents Show*, Reuters, Sept. 9, 2025, https://www.reuters.com/legal/government/us-justice-

dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09.  One article

extensively quoted a recently-departed lawyer from DOJ's Civil Rights Division describing DOJ's

aims in this case and others like it:

> We were tasked with obtaining states' voter rolls, by suing them if necessary.
> Leadership said they had a DOGE person who could go through all the data and
> compare it to the Department of Homeland Security data and Social Security
> data. . . . I had never before told an opposing party, Hey, I want this information
> and I'm saying I want it for this reason, but I actually know it's going to be used
> for these other reasons. That was dishonest. It felt like a perversion of the role of
> the Civil Rights Division.

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. Times Magazine,

Nov.  16,  2025,  https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-

department-staff-attorneys.html.

  According to additional public reporting, these efforts are being conducted with the

involvement of self-proclaimed "election integrity" advocates within and outside the government

who have previously sought to disenfranchise voters and overturn elections. Those advocates

include Heather Honey, who sought to overturn the result of the 2020 presidential election in

multiple states and now serves as DHS's "deputy assistant secretary for election integrity."[2] Also

---

[2] *See* Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*, N.Y. Times, Oct. 22, 2025, https://www.nytimes.com/2025/10/22/us/politics/trump-election-deniers-voting-security.html (documenting "ascent" of election denier Honey); Jen Fifield, *Pa.'s Heather Honey, Who Questioned the 2020 Election, Is Appointed to Federal Election Post*, Pa. Capital-Star, Aug. 27, 2025, https://penncapital-star.com/election-2025/pa-s-heather-honey-who-questioned-the-2020-election-is-appointed-to-federal-election-post; Doug Bock Clark, *She Pushed to Overturn Trump's*

involved is Cleta Mitchell, a private attorney and leader of a national group called the "Election Integrity Network," who has, among other things, promoted the use of artificial intelligence to challenge registered voters.[3] These actors and their associates have previously sought to compel states to engage in aggressive purges of registered voters, and have abused voter data to make mass challenges to disenfranchise voters in other states. *See, e.g.*, *PA Fair Elections v. Pa. Dep't of State*, 337 A.3d 598, 600 n.1 (Pa. Commw. Ct. 2025) (determining that complaint brought by group affiliated with current DHS official Honey, challenging Pennsylvania's voter roll maintenance practices pursuant to the federal Help America Vote Act, was meritless).[4]

Here, DOJ's actions also indicate that it may target specific groups of voters in its use of the requested data. *See also, e.g.*, Jonathan Shorman, *Trump's DOJ offers states 'confidential'*

---

*Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*, PROPUBLICA, Aug. 26, 2025, https://www.propublica.org/article/heather-honey-dhs-election-security.

[3] *See, e.g.*, Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*, DEMOCRACY DOCKET, June 12, 2025, https://www.democracydocket.com/news-alerts/dhs-said-to-brief-cleta-mitchells-anti-voting-group-on-checking-citizenship-for-voters; *see also* Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, NPR, June 29, 2025, https://www.npr.org/2025/06/29/nx-s1-5409608/citizenship-trump-privacy-voting-database (reporting that Mitchell had received a "full briefing" from federal officials); *see also* Andy Kroll & Nick Surgey, *Inside Ziklag, the Secret Organization of Wealthy Christians Trying to Sway the Election and Change the Country*, PROPUBLICA, July 13, 2024, https://www.propublica.org/article/inside-ziklag-secret-christian-charity-2024-election ("Mitchell is promoting a tool called EagleAI, which has claimed to use artificial intelligence to automate and speed up the process of challenging ineligible voters.").

[4] *See* Carter Walker, *Efforts to Challenge Pennsylvania Voters' Mail Ballot Applications Fizzle*, SPOTLIGHT PA, Nov. 8, 2024, https://www.spotlightpa.org/news/2024/11/mail-ballot-application-challenges-pennsylvania-fair-elections/ (describing mass-challenges and noting connection to Honey and her organization "PA Fair Elections"); *see also* Jeremy Roebuck and Katie Bernard, *'I Can't Think of Anything Less American': Right-Wing Activists' Effort to Nullify Hundreds of Pa. Votes Met with Skepticism*, PHILA. INQUIRER, Nov. 1, 2024, https://www.inquirer.com/politics/election/heather-honey-pa-fair-elections-vote-challenges-pennsylvania-20241101.html (noting sworn testimony regarding PA Fair Elections' involvement in the challenges); Hansi Lo Wang, *Thousands of Pennsylvania Voters Have Had Their Mail Ballot Applications Challenged*, NPR, Nov. 5, 2024, https://www.npr.org/2024/11/04/nx-s1-5178714/pennsylvania-mail-ballot-voter-challenges-trump (same).

*deal to wipe voters flagged by feds as ineligible*, STATELINE, Dec. 18, 2025,

https://stateline.org/2025/12/18/trumps-doj-offers-states-confidential-deal-to-wipe-voters-

flagged-by-feds-as-ineligible/.  In its initial July 22 Letter to Secretary Galvin, and in letters to

other states requesting the same private voter data, DOJ requested information about how

election officials, among other things, process applications to vote by mail; identify and remove

duplicate registrations; and verify that registered voters are not ineligible to vote, such as due to a

felony conviction or lack of citizenship.[5]

## LEGAL STANDARD

A court must dismiss a complaint if, accepting all well-pleaded factual allegations as true,

it does not "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *Ashcroft v.

Iqbal*, 556 U.S. 662, 678 (2009). When considering a motion to dismiss, a court need not accept

the complaint's legal conclusions. *Iqbal*, 556 U.S. at 678. A complaint must state a "plausible claim

for relief" and contain more than "[t]hreadbare recitals of the elements of a cause of action,

supported by mere conclusory statements." *Id.* at 678–79.

In order to analyze a motion to dismiss, this Court must "isolate and ignore statements in

the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action

elements," and then "take the complaint's well-pled (*i.e.,* non-conclusory, non-speculative) facts

---

[5] *See, e.g.*, Br. in Supp. of Mot. to Intervene as Defs., Exhibit No. 1, Letter from Maureen Riordan to Sec'y of State Al Schmidt (June 23, 2025), *United States v. Pennsylvania*, No. 25-cv-01481 (W.D. Pa. Oct. 9, 2025), Dkt. No. 37-1 (Pennsylvania); Mot. for Leave to File Mot. to Dismiss, Exhibit A, Letter from Michael E. Gates to Sec'y of State Jocelyn Benson (July 21, 2025), *United States v. Benson*, No. 25-cv-01148 (W.D. Mich. Nov. 25, 2025), Dkt. No. 34-3 (Michigan); Decl. of Thomas H. Castelli in Supp. of State Defs.' Mot. to Dismiss, Exhibit No. 1, Letter from Michael E. Gates to Sec'y of State Tobias Read (July 16, 2025), *United States v. Oregon*, No. 25-cv-01666 (D. Or. Nov. 17, 2025), Dkt. No. 33-1 (Oregon); Decl. of Malcolm A. Brudigam in Supp. of Defs.' Mot. to Dismiss, Exhibit No. 1, Letter from Michael E. Gates to Sec'yy of State Shirley Weber (July 10, 2025), *United States v. Weber*, No. 25-cv-09149 (C.D. Cal. Nov. 7, 2025), Dkt. No. 37-2 (California).

as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012) (citations omitted). "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job that compels" courts "'to draw on' [their] 'judicial experience and common sense.'" *Id.* (citing *Iqbal*, 556 U.S. at 678–79). To perform this review, courts can also "consider (a) implications from documents attached to or fairly incorporated into the complaint, (b) facts susceptible to judicial notice, and (c) concessions in plaintiff's response to the motion to dismiss." *Id.* at 55–56 (1st Cir. 2012) (quotation marks and citations omitted).

## ARGUMENT

The complaint does not plausibly articulate a claim for relief because the United States' demand for Massachusetts's full and unredacted electronic voter file exceeds its statutory authority under the CRA.  Against the backdrop of the Jim Crow era, Congress enacted the CRA, including Title III's public records provisions, to facilitate federal investigations of civil rights violations preventing eligible citizens from voting due to discrimination. H.R. Rep. No. 86-956 at 7 (1959) (indicating the purpose of Title III "is to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race"). Title III allows federal officials to inspect "records and papers which come into [the] possession [of state election officials] relating to any application, registration, payment of poll tax, or other act requisite to voting."  52 U.S.C. § 20701.  But the Attorney General's access to these records is not unbounded. If the Attorney General makes a demand for records, she must provide "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703.[6]

---

[6] In a motion to compel filed alongside the Complaint, the United States claims that Title III of the CRA "displaces the Federal Rules of Civil Procedure by creating a 'special statutory

The United States fails to state a claim under the CRA for at least two distinct reasons. *First*, as set forth in the Complaint, and as reflected in the requests themselves, DOJ failed to set forth a statutorily sufficient statement of "the basis and the purpose" of its demand for Massachusetts's full and unredacted state voter registration list. Compl. ¶¶ 1–4, 18–23. *Second*, to the extent United States might be entitled to any records under the CRA, those records would need to be redacted to protect the privacy and constitutional rights of Massachusetts voters. State and federal law would require such redaction, and nothing in the CRA prevents the appropriate redaction of the sensitive personal information of voters. The United States' CRA claim seeking the unredacted records is thus legally deficient for that reason as well.

## I.    THE UNITED STATES'S DEMAND FOR RECORDS FAILS TO MEET THE REQUISITE STATUTORY REQUIREMENTS OF THE CRA.

Title III of the CRA sets out requirements regarding federal election records, including a requirement in Section 301 for officers of elections to "retain and preserve, for a period of twenty-two months from the date of any" federal election, "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," with certain exceptions regarding delivery and designation of custodians. 52 U.S.C. § 20701. Section 303 requires that "[a]ny record or paper" retained and preserved under

---

proceeding'" whereby the records it seeks can be summarily obtained at the outset of the case. Mem. of Law in Supp. of the United States' Mot. to Compel Prod. of Records, Dkt. 7 ("Mot. to Compel") at 5; *see also* Compl. ¶¶ 1–4. This claim rests entirely on a small set of non-binding cases decided more than sixty years ago, in the early 1960's, in a different circuit and a drastically different historical context, including primarily *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962). *See* Mot. to Compel; *see also* Compl. ¶¶ 1–4.  The United States is wrong.  Summary resolution of this case, with no discovery into whether it has a proper statutory basis for its demand, flies in the face of a half-century of subsequent precedent as well as the Federal Rules. *See, e.g.*, *Becker v. United States*, 451 U.S. 1306, 1307–1308 (1981).  Intervenors reserve the right to respond separately to the United States' motion to compel and request the opportunity to do so on the same schedule as Defendant Secretary Galvin if their motion to intervene is granted.

Section 301 "shall, upon demand in writing by the Attorney General or [her] representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or [her] representative." *Id.* § 20703. "This demand *shall* contain a statement of *the basis <u>and</u> the purpose* therefor." *Id.* (emphasis added). Here, DOJ failed to provide "a statement of the basis and the purpose" for the Massachusetts requests sufficient to support disclosure of the unredacted voter file.[7] *Id.*; *see* Compl. ¶¶ 18–23.

Consistent with the statutory text, contemporaneous case law immediately following the enactment of Title III of the CRA consistently treated "the basis" and "the purpose" as two related, but distinct, concepts. *See Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963). The "basis" is the statement of *why* the Attorney General believes there may be a violation of federal civil rights law in the first place, whereas the "purpose" explains *how* the requested records would help the Attorney General ultimately determine if there is, in fact, a violation of the law. *Kennedy* 306 F.2d at 229 n.6.

The basis and purpose requirements under the CRA are critical safeguards. They prevent the statute from being used for a fishing expedition to obtain records for reasons that are speculative, unrelated to the CRA's aims, or otherwise impermissible or contrary to law. The statutory basis and purpose requirements therefore are not perfunctory but require a specific statement as to the reason for requesting the information and how that information will aid in the

---

[7] Intervenors assume for purposes of this Motion that the statewide electronic voter file may constitute a "record" or "paper" "relating to any application, registration, payment of poll tax, or other act requisite to voting" that has "come into [the Secretary's] possession. 52 U.S.C. § 20701. However, no court has ever addressed the question.

investigatory analysis. That is consistent with other federal statutes allowing federal agencies to obtain records in service of investigations, where courts have found that the test of whether federal demands for records are enforceable includes an evaluation of whether the underlying investigation is "conducted pursuant to a legitimate purpose," *Sugarloaf Funding, LLC v. U.S. Dep't of Treasury*, 584 F.3d 340, 345 (1st Cir. 2009) (citing *United States v. Powell*, 379 U.S. 48, 57 (1964)); *see also, e.g.*, *F.D.I.C. v. Wentz*, 55 F.3d 905, 908 (3d Cir. 1995) (information sought pursuant to an administrative subpoena must e relevant to the inquiry and not unduly burdensome); *Coro, Inc. v. F.T.C.*, 338 F.2d 149, 153 (1st Cir. 1964) (federal authority to obtain information via administrative subpoena is "not license[] for extended fishing expeditions.").

As set forth below, the United States failed to articulate in its demand and in the Complaint "the basis and the purpose" for its request for Massachusetts voters' sensitive voter information. The United States' demand fails to meet this requirement of the CRA for at least four distinct reasons. These failures warrant dismissal of the case.

*First*, the United States simply has not stated a "basis" for its demand. The United States alleges that the "purpose" of its request seeking "an electronic copy of Massachusetts's complete and current [voter registration list]" was "to ascertain Massachusetts's compliance with the list maintenance requirements of the NVRA and HAVA." Compl. ¶ 22; August 14 Letter at 2. But neither the Complaint nor the August 14 Letter that invoked the CRA supply a "basis" for why the United States believes Massachusetts's list maintenance procedures might violate the NVRA or HAVA in the first place. The Complaint alleges that DOJ is investigating Massachusetts's compliance with the NVRA and HAVA based on a review of the Election Administration and Voting Survey 2024 Comprehensive Report from the U.S. Election Assistance Commission ("2024 EAVS Report"), which includes States' "reported data on their efforts to keep voter registration

lists current and accurate, known as list maintenance." Compl. ¶¶ 16–19. But the August 14 Letter making DOJ's formal CRA demand and purporting to state the "purpose" of the demand included no reference to the 2024 EAVS Report. August 14 Letter at 1–3. And while DOJ's July 22 Letter did reference statistics reported by Massachusetts in the 2024 EAVS Report, *see* July 22 Letter at 2, neither that letter nor the Complaint alleges any evidence of anomalies or anything inconsistent with reasonable list maintenance efforts in that reported data. *See* Compl. ¶¶ 16–19.  The failure to set forth *any* "basis" for the demand is sufficient grounds for dismissal of this action.

*Second*, even if the United States had identified some proper "basis" for its demand—and it did not—it also did not and has not explained any connection between its purported "purpose" and the vast scope of its records request here.  The Complaint does not even attempt to explain why unredacted voter files are necessary to determine whether Massachusetts has "conduct[ed] a general program that makes a reasonable effort to remove the names of ineligible voters" by virtue of "death" or "a change in the residence of the registrant," 52 U.S.C. § 20507; Compl. ¶ 12. Nor could it, because such unredacted files would not assist the Attorney General to examine this question: A single snapshot of a state's voter list does not and could not provide enough information to determine if the state has made a "reasonable effort" to remove ineligible voters under Section 8 of the NVRA.  Compl. ¶ 12; 52 U.S.C. § 20507(a)(4)(A)–(B).

The NVRA and HAVA both leave the mechanisms for conducting list maintenance to the discretion of the States. *See* 52 U.S.C. § 20507(a)(4); (c)(1); § 21083(a)(2)(A); § 21085. Even if the  United States used voter file data to identify voters who had moved or died on Massachusetts's voter list at a single point in time, that still would not amount to Massachusetts failing to comply with the "reasonable effort" required by the NVRA or HAVA. *See, e.g.*, *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624–27 (6th Cir. 2025) (describing a "reasonable effort" as "a serious

12

attempt that is rational and sensible" and rejecting any "quantifiable, objective standard" in this context).[8] Instead, it is the *procedures* carried out by a state or locality that establish its compliance; the unredacted voter file does not.

Moreover, even if some portion of the voter file were necessary to "ascertain Massachusetts's compliance with the list maintenance requirements of the NVRA and HAVA," Compl. ¶ 22, the United States has not pleaded or otherwise pointed to any justification for why the full unredacted voter file is necessary to carry out this purported purpose. It is telling that, for decades, DOJ has neither sought nor required a full and unredacted voter file in its investigations regarding compliance with the NVRA. *See, e.g.*, Press Release, U.S. Dep't of Just., *United States Announces Settlement with Kentucky Ensuring Compliance with Voter Registration List Maintenance Requirements* (July 5, 2018) https://perma.cc/G2EZUUA5 (describing letters to all 44 states covered by the NVRA with requests for list maintenance information, but without demanding voter files). For this reason, too, the Complaint does not plausibly plead that DOJ has met the basis and purpose requirements of the CRA.

*Third*, the Complaint's purported NVRA-and-HAVA-compliance purposes are fatally undermined by the United States' own more recent statements to States in connection with its data requests. The United States has recently sought for a number of States to sign a now-public memorandum of understanding ("MOU") in connection with its requests for statewide voter files. *See* Ex. A, U.S. Dep't of Just., Civ. Div., Confidential Mem. of Understanding ("MOU"); *see also*

---

[8] What is more, the inclusion at any particular point in time on Massachusetts's voter registration list of some voters who may have potentially moved out of state is not unusual, since Section 8(d) of the NVRA explicitly sets out a specific set of rules and requirements for removals from the voter rolls based on changes of residence, whereby states "shall not remove" voters on these grounds unless these voters directly confirm their change of residence in writing, or unless states first provide notice and then abide by a statutory waiting period until the second general federal election after providing notice. 52 U.S.C. § 20507(d).

Ex. B., December 4 Transcript Excerpts from *United States v. Weber*, No. 25-cv-09149, at 72–73, 90 (DOJ attorney discussing MOU).  Far from indicating a purpose of ensuring compliance with the NVRA and HAVA, this MOU runs directly afoul of those statutes.[9]

As noted, the NVRA and HAVA require a state to conduct a "reasonable effort" to remove ineligible voters from the rolls.  52 U.S.C. § 20507(a)(4); § 21083(a)(4)(A).  However, the NVRA itself is structured so that potentially ineligible voters *must* necessarily stay on the rolls for two election cycles so as to limit the likelihood of a state removing eligible voters by mistake.  *Id.* § 20507(d)(1)(B). That is consistent with Congress's core goals in the NVRA of protecting and expanding the right to register to vote and participate in democracy.  *E.g.*, 52 U.S.C. § 20501.  But the MOU indicates multiple contemplated violations of those statutes' requirements. For one, the MOU seeks to place authority to identify supposed ineligible voters in the hands of the federal government, directly contrary to statute's requirement that procedures for complying with HAVA be "left to the discretion of the State."  *Id.* § 21085; MOU at 2, 5. In addition, the MOU's substantive terms seek to compel states to remove supposedly ineligible voters "within forty-five (45) days," MOU at 5, in a manner that would violate multiple protections of the NVRA, 52 U.S.C. § 20507.[10] The MOU demonstrates that DOJ's claimed purpose of ensuring compliance with NVRA and HAVA, as stated in the Complaint, is not accurate or plausible—and that its actual purpose involves defying those statutes by aggrandizing election administration powers to the DOJ.

---

[9] This Court can take judicial notice of the MOU as a government document produced by DOJ. *See Torrens v. Lockheed Martin Servs. Grp., Inc.*, 396 F.3d 468, 473 (1st Cir. 2005); *see also, e.g.*, *Town of Sanford v. United States*, 140 F.3d 20, 22 (1st Cir. 1998).

[10] *See also* Jonathan Shorman, *Trump's DOJ offers states 'confidential' deal to wipe voters flagged by feds as ineligible*, STATELINE, Dec. 18, 2025, https://stateline.org/2025/12/18/trumps-doj-offers-states-confidential-deal-to-wipe-voters-flagged-by-feds-as-ineligible/.

*Fourth*, DOJ's failure to fully and accurately provide the actual basis and purpose for its Massachusetts request is independently fatal to its Complaint. Section 303 of the CRA requires a statement of "*the* basis and *the* purpose" of a records request. By twice using the definite article, the statute requires not just *a* basis or purpose among many, but *the* complete basis and purpose underlying the request. *See Niz-Chavez v. Garland*, 593 U.S. 155, 165–166 (2021); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024) (emphasizing distinction between the definite and the indefinite article). .  Yet here, public reporting and public, judicially noticeable documents demonstrate that DOJ apparently did not disclose the main basis and purpose for its demand for Massachusetts's full and unredacted voter file, which was and is to build an unprecedented national voter file for its own use, to be shared with other agencies like DHS for unlawful purposes. *See supra* 4–7 & nn.2–4 (describing reporting in detail). The creation of such a database has never been authorized by Congress, and indeed likely violates the federal Privacy Act. *See* 5 U.S.C. § 552a (e)(7) (provision of the federal Privacy Act prohibiting the creation or maintenance of any database "describing how any individual exercises rights guaranteed by the First Amendment," which necessarily includes exercising the right to vote). This is yet another ground for dismissal.

## II.    THE UNITED STATES'S DEMAND IS INVALID BECAUSE IT DOES NOT ALLOW FOR REDACTIONS AND MODIFICATIONS TO PROTECT THE PRIVACY AND CONSTITUTIONAL RIGHTS OF VOTERS.

Even had the United States provided a valid basis and purpose sufficient to support its demand—which it did not—its request would also be deficient because it does not allow for redactions, omissions, or other modifications to protect the privacy rights of Massachusetts voters. Title III of the CRA does not prohibit such redactions to protect voter privacy and ensure compliance with federal and state law and the Constitution. Indeed, courts have found that redaction may be required to prevent the disclosure of voters' sensitive personal information that

would create an intolerable burden on the constitutional right to vote. But the United States has nevertheless sought only the full and unredacted voter file. Compl. ¶ 22. Its CRA claim is accordingly defective and may be dismissed on that ground as well.

Redaction and modification of voting records to ensure voters' privacy is commonplace before a State discloses such records to a requesting party. Title III of the CRA has not been invoked in decades, but the NVRA provides a ready analogue. The NVRA requires States to maintain "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" and to make such records available for "public inspection" upon request. 52 U.S.C. § 20507(i); *see also* Compl. ¶¶ 10–15 (discussing the NVRA). Anyone—including individual voters, groups that protect the right to vote, and government officials—has the same right to such records under the NVRA. Voting rights advocates have thus consistently relied on the NVRA to investigate infringements of the right to vote, including whether election officials have improperly denied or cancelled voter registrations. *See, e.g., Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 333 (4th Cir. 2012) (nonprofit investigating improper rejection of voter registrations submitted by students at a historically Black university). And courts have consistently held that redacting voters' sensitive personal data is necessary under the NVRA.

Because "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File," the First Circuit has concluded that such redaction of "certain personal information" can be required to "assuage the potential privacy risks implicated by the public release of the Voter File." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024); *see also Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 266–68 (4th Cir. 2021) (holding that the potential connection to ongoing criminal

investigations and the possibility of erroneously labeling a voter as a noncitizen and subjecting them to public harassment warrants maintaining confidentiality of records). Other courts have consistently recognized that the NVRA disclosure provisions do not compel the release of sensitive information that is otherwise protected by federal or state laws. *See, e.g.*, *N.C. State Bd. of Elections*, 996 F.3d at 264; *Pub. Int. Legal Found., Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1015–16 (D. Alaska 2023); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022), *clarified on denial of reconsideration*, No. 20-CV-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022); *Pub. Int. Legal Found. v. Boockvar*, 431 F. Supp. 3d 553, 561–63 (M.D. Pa. 2019).

Just like the NVRA, the CRA is also silent as to how sensitive personal information should be treated during disclosure. *Compare* 52 U.S.C. § 20703 *with* § 20507(i)(1). Courts' treatment of information requests under the NVRA is thus highly instructive in this case. *See Bellows*, 92 F.4th at 56.

Redaction of voters' personal identifying information would be required here to comply with state law privacy protections.  For example, driver's license numbers at a minimum would be protected from disclosure, and other information is likely protected as well.  *See, e.g.*, G. L. c. 93H, §§ 1, 2 (driver's license and social security numbers are protected information under state law); *see also, e.g.*, G. L. c. 214, § 1B (Massachusetts citizens "shall have a right against unreasonable, substantial or serious interference with his privacy"). Redaction would also be needed to the extent the disclosure of voters' sensitive personal information would "create[] an intolerable burden on [the constitutional right to vote] as protected by the First and Fourteenth Amendments." *Long*, 682 F.3d at 339 (quotation marks and citation omitted). For example, the Fourth Circuit in *Long*, even while granting access to a state's voter registration applications for inspection and photocopying pursuant to the NVRA's disclosure provisions, ensured the redaction

of Social Security numbers, which are "uniquely sensitive and vulnerable to abuse."[11] *Id.* In coming to this conclusion, the court emphasized that the NVRA reflected Congress's view that the right to vote was "fundamental," and that the unredacted release of voters' personal information risked deterring citizens from registering to vote in the first place, and thus created an "intolerable burden" on this fundamental right. *Id.* at 334, 339.

The public disclosure provisions of statutes like the NVRA and Title III of the CRA must be construed to avoid these intolerable burdens on state and federal privacy rights. *See Bellows*, 92 F.4th at 56; *Long*, 682 F.3d at 339. The danger of imposing those burdens on Massachusetts voters and good-government civic groups like Common Cause is present here. *See, e.g.*, Ex. A to Declaration of Suzanne Schlossberg in Supp. of Mot. for Intervention, Decl. of Common Cause Massachusetts Executive Director Geoffrey Foster ¶¶ 6, 9–13 (explaining that the requested disclosure would chill voter registration activities). Indeed, that danger is especially acute for those voters served by Jane Doe Inc., who register confidentially pursuant to special protections provided by Massachusetts law for victims of domestic violence that the United States's Complaint does not account for. Schlossberg Decl. Ex. B, Decl. of JDI Executive Director Hema Serang-Sieminski ("Serang-Sieminski Decl.") ¶ 5–16; *see* G. L. c. 51, §§ 4(d), 44 & 950 CMR 49.00 *et seq.* (providing for confidential voter registration procedures).

---

[11] The United States itself has stated—on multiple occasions—that the NVRA does not prohibit the States from redacting "uniquely sensitive information" when disclosing voting records. *See, e.g.*, Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found., Inc. v. Bellows* ("United States Amicus Brief"), No. 23-1361 (1st Cir. July 25, 2024), 2023 WL 4882397 at *27–28; Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found. v. Schmidt*, No. 23-1590 (3d Cir. Nov. 6, 2023), https://perma.cc/3BQ9-36UJ ("States may redact certain information before disclosing Section 8(i) records."); Br. for the United States as Amicus Curiae at 11, 25–26, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012) (No. 11-1809), 2011 WL 4947283, at *11, 25–26.

The limited case law considering records requests under the CRA (as opposed to the NVRA) is consistent with the more recent NVRA cases. Even in the very different context of the Jim Crow South in the early 1960s, the CRA cases expressly acknowledge that courts retain the "power and duty to issue protective orders," *Lynd*, 306 F.2d at 230, and to shield voters' private, sensitive personal information from disclosure. *See id.* at 231 ("[W]e are not discussing confidential, private papers and effects. We are, rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection"); *see also In re Coleman*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) (noting, in the context of a records request under Title III of the CRA, multiple considerations not at issue in that case but which could be "[s]ignificant," including that "[i]t is not claimed that these official records are privileged, or exempt from discovery for any sound reason of public policy," or "that an inspection of these records would be oppressive, or any unlawful invasion of any personal constitutional right").

Despite the need for privacy protections for voters' sensitive personal information, the United States nevertheless demands the full, unredacted voter file with no redactions or modifications to protect voters. That is a fatal deficiency. Even were the United States entitled to records under Title III after having provided a valid statement of the basis and the purpose therefor (which it failed to do here), sensitive personal identifying information would need to be redacted or omitted. Conditioning the right to vote on the release of voters' sensitive private information "creates an intolerable burden on that right." *Long*, 682 F.3d at 339 (citation omitted). The United States's claim seeking the full and unredacted voter file and the sensitive personal identifying information of every registered Massachusetts voter must be dismissed.

## CONCLUSION

The United States's Complaint should be dismissed.

Dated: December 22, 2025

Respectfully submitted,

/s/_____Suzanne Schlossberg_____

Ari J. Savitzky*
Theresa J. Lee*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
asavitzky@aclu.org
tlee@aclu.org
slakin@aclu.org

Megan Keenan*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street NW
Washington, DC 20005
Tel.: (202) 457-0800
mkeenan@aclu.org

*application for admission pro hac vice
forthcoming

Jessie J. Rossman (BBO # 670685)
Suzanne Schlossberg (BBO #703914)
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
Tel.: (617) 482-3170
jrossman@aclum.org
sschlossberg@aclum.org

# EXHIBIT 1



**U.S. Department of Justice**

Civil Rights Division

---

## CONFIDENTIAL MEMORANDUM OF UNDERSTANDING

### I.    PARTIES & POINTS OF CONTACT.

<u>Requester</u>
Federal Agency Name:  Civil Rights Division, U.S. Department of Justice
VRL/Data User:
Title:
Address:
Phone:

<u>VRL/Data Provider</u>
State Agency Name:
Custodian:
Title:
Address:
Phone:

The parties to this Memorandum of Understanding ("MOU" or "Agreement") are the Department of Justice, Civil Rights Division ("Justice Department" or "Department"), and the State of Colorado ("You" or "your state").

### II.    AUTHORITY.

By this Agreement, the State of Colorado ("You" or "your state") has agreed to, and will, provide an electronic copy of your state's complete statewide Voter Registration List ("VRL" or "VRL/Data") to the Civil Rights Division of the U.S. Department of Justice (at times referred to as the "Department").  The VRL/Data must include, among other fields of data, the voter registrant's full name, date of birth, residential address, his or her state driver's license number or

1

the last four digits of the registrant's social security number as required under the HAVA to register

individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A).

The authorities by which this information is requested by the Department of Justice are:

- National Voter Registration Act of 1993, 52 U.S.C. § 20501, *et seq*.

- Attorney General's authority under Section 11 of the NVRA to bring enforcement
  actions. See 52 U.S.C. § 20501(a).

- Help America Vote Act of 2002, 52 U.S.C. § 20901, *et seq*.

- Attorney General's authority to enforce the Help America Vote Act under 53 U.S.C. §
  21111.

- Attorney General authority to request records pursuant to Title III of the Civil Rights
  Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq*.

- The Privacy Act of 1974, 5 U.S.C. § 552a, as amended.

## III.    PURPOSE.

A VRL is a Voter Registration List pursuant to the NVRA and HAVA, commonly referred

to as "voter roll," compiled by a state – often from information submitted by counties – containing

a list of all the state's *eligible* voters.  Regardless of the basis for ineligibility, ineligible voters do

not appear on a state's VRL when proper list maintenance is performed by states.  The Justice

Department is requesting your state's VRL to test, analyze, and assess states' VRLs for proper list

maintenance and compliance with federal law.  In the event the Justice Department's analysis of a

VRL results in list maintenance issues, insufficiency, inadequacy, anomalies, or concerns, the

Justice Department will notify your state's point of contact   of the issues to assist your state with

curing.

The purpose of this MOU is to establish the parties' understanding as to the security protections for data transfer and data access by the Department of Justice of the electronic copy of the statewide voter registration list, including all fields requested by the Department of Justice.

## IV.    TIMING OF AGREEMENT – TIME IS OF ESSENCE.

Although the Justice Department is under no such obligation as a matter of law, because this Agreement is proposed, made, and to be entered into at your state's request as part of your state's transmission of its VRL to the Justice Department, this Agreement is to be fully executed within seven (7) days of the Justice Department presenting this Agreement to you.  Both parties agree that no part of this Agreement or execution is intended to, or will, cause delay of the transmission of your state's VRL to the Justice Department for analysis.

## V.    TIMING OF VRL/DATA TRANSFER.

You agree to transfer an electronic copy of your state's complete statewide VRL/Data to the Civil Rights Division of the U.S. Department of Justice as described in Section III of this Agreement no later than five (5) business days from the execution of this Agreement, which is counted from the last day of the last signatory.

## VI.    METHOD OF VRL/DATA ACCESS OR TRANSFER.

The VRL will be submitted by your state via the Department of Justice's secure file-sharing system, i.e., Justice Enterprise File Sharing (JEFS").  A separate application to use JEFS must be completed and submitted by your state through the Civil Rights Help Desk.  JEFS implements strict access controls to ensure that each user can only access their own files.  All files and folders are tied to a specific user, and each user has defined permissions that govern how they may interact with those files (e.g., read, write, or read-only).

Whenever a user attempts to access a file or folder, JEFS validates the request against the assigned permissions to confirm that the user is explicitly authorized. This process guarantees that users can only access files and folders only where they have permission. Users are also limited to the authorized type of interaction with each file or folder. Within the Department of Justice, access to JEFS is restricted to specific roles: Litigation Support, IT staff, and Civil Rights Division staff.

## VII.    LOCATION OF DATA AND CUSTODIAL RESPONSIBILITY.

The parties mutually agree that the Civil Rights Division (also "Department") will be designated as "Custodian" of the file(s) and will be responsible for the observance of all conditions for use and for establishment and maintenance of security agreements as specified in this agreement to prevent unauthorized use. The information that the Department is collecting will be maintained consistent with the Privacy Act of 1974, 5 U.S.C. § 552a. The full list of routine uses for this collection of information can be found in the Systems of Record Notice ("SORN") titled, JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (August 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017). It should be noted that the statutes cited for routine use include NVRA, HAVA, and the Civil Rights Act of 1960, and the Justice Department is making our request pursuant to those statutes. The records in the system of records are kept under the authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

VRL/Data storage is similar to the restricted access provided on JEFS and complies with the SORN: Information in computer form is safeguarded and protected in accordance with applicable Department security regulations for systems of records. Only a limited number of staff members who are assigned a specific identification code will be able to use the computer to access

the stored information.  However, a section may decide to allow its employees access to the system in order to perform their official duties.

All systems storing the VRL data will comply with all security requirements applicable to Justice Department systems, including but not limited to all Executive Branch system security requirements (e.g., requirements imposed by the Office of Management and Budget [OMB] and National Institute of Standards and Technology [NIST]), Department of Justice IT Security Standards, and Department of Justice Order 2640.2F.

## VIII.    NVRA/HAVA COMPLIANT VOTER REGISTRATION LIST.

After analysis and assessment of your state's VRL, the Justice Department will securely notify you or your state of any voter list maintenance issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, the Justice Department found when testing, assessing, and analyzing your state's VRL for NVRA and HAVA compliance, i.e., that your state's VRL only includes eligible voters.

You agree therefore that within forty-five (45) days of receiving that notice from the Justice Department of any issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, your state will clean its VRL/Data by removing ineligible voters and resubmit the updated VRL/Data to the Civil Rights Division of the Justice Department to verify proper list maintenance has occurred by your state pursuant to the NVRA and HAVA.

## IX.    CONFIDENTIALITY & DEPARTMENT SAFEGUARDS.

Any member of the Justice Department in possession of a VRL/Data will employ reasonable administrative, technical, and physical safeguards designed to protect the security and confidentiality of such data.  Compliance with these safeguards will include secure user authentication protocols deploying either: (i) Two-Factor Authentication ("2FA"), which requires users to go through two layers of security before access is granted to the system; or (ii) the

assignment of unique user identifications to each person with computer access plus unique complex passwords, which are not vendor supplied default passwords.

The Department will activate audit logging for the records, files, and data containing the state's VRL/Data in order to identify abnormal use, as well as to track access control, on computers, servers and/or Devices containing the VRL/Data.

For all devices storing records, files, and data containing the VRL/Data: there is (i) up-to-date versions of system security agent software that includes endpoint protection and malware protection and reasonably up-to-date patches and virus definitions, or a version of such software that can still be supported with up-to-date patches and virus definitions, and is set to receive the most current security updates on a regular basis; and (ii) up-to-date operating system security patches designed to maintain the integrity of the personal information.

For all devices storing records, files, and data containing the VRL/Data: there is (i) controlled and locked physical access for the Device; and (ii) the prohibition of the connection of the Device to public or insecure home networks.

There will be no copying of records, files, or data containing the VRL/Data to unencrypted USB drives, CDs, or external storage.  In addition, the use of devices outside of moving the records, files, or data to the final stored device location shall be limited.

Any notes, lists, memoranda, indices, compilations prepared or based on an examination of VRL/Data or any other form of information (including electronic forms), that quote from, paraphrase, copy, or disclose the VRL/Data with such specificity that the VRL/Data can be identified, or by reasonable logical extension can be identified will not be shared by the Department. Any summary results, however, may be shared by the Department.

In addition to the Department's enforcement efforts, the Justice Department may use the information you provide for certain routine, or pre-litigation or litigation purposes including:

present VRL/Data to a court, magistrate, or administrative tribunal; a contractor with the Department of Justice who needs access to the VRL/Data information in order to perform duties related to the Department's list maintenance verification procedures. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. § 552a(m).

## X.    LOSS OR BREACH OF DATA.

If a receiving party discovers any loss of VRL/Data, or a breach of security, including any actual or suspected unauthorized access, relating to VRL/Data, the receiving party shall, at its own expense immediately provide written notice to the producing party of such breach; investigate and make reasonable and timely efforts to remediate the effects of the breach, and provide the producing party with assurances reasonably satisfactory to the producing party that such breach shall not recur; and provide sufficient information about the breach that the producing party can reasonably ascertain the size and scope of the breach. The receiving party agrees to cooperate with the producing party or law enforcement in investigating any such security incident. In any event, the receiving party shall promptly take all necessary and appropriate corrective action to terminate unauthorized access.

## XI.    DESTRUCTION OF DATA.

The Department will destroy all VRL/Data associated with actual records as soon as the purposes of the list maintenance project have been accomplished and the time required for records retention pursuant to applicable law has passed. When the project is complete and such retention requirements by law expires, the Justice Department will:

1. Destroy all hard copies containing confidential data (e.g., shredding);

2. Archive and store electronic data containing confidential information offline in a secure location; and

3.   All other data will be erased or maintained in a secured area.

**XII.    OTHER PROVISIONS.**

A.  Conflicts. This MOU constitutes the full MOU on this subject between the Department and your state. Any inconsistency or conflict between or among the provisions of this MOU, will be resolved in the following order of precedence: (1) this MOU and (2) other documents incorporated by reference in this MOU (e.g., transaction charges).

B.  Severability. Nothing in this MOU is intended to conflict with current law or regulation or the directives of Department, or the your state. If a term of this MOU is inconsistent with such authority, then that term shall be invalid but, to the extent allowable, the remaining terms and conditions of this MOU shall remain in full force and effect.

C.  Assignment. Your state may not assign this MOU, nor may it assign any of its rights or obligations under this MOU.  To the extent allowable by law, this MOU shall inure to the benefit of, and be binding upon, any successors to the Justice Department and your state without restriction.

D.  Waiver. No waiver by either party of any breach of any provision of this MOU shall constitute a waiver of any other breach. Failure of either party to enforce at any time, or from time to time, any provision of this MOU shall not be construed to be a waiver thereof.

E.  Compliance with Other Laws. Nothing in this MOU is intended or should be construed to limit or affect the duties, responsibilities, and rights of the User Agency under the National Voter Registration Act, 52 U.S.C. § 20501 *et seq*., as amended; the Help America Vote Act, 52 U.S.C. § 20901 *et seq*., as amended; the Voting Rights Act, 52 U.S.C. § *10301 et seq.*, as amended; and the Civil Rights Act, 52 U.S.C. § 10101 et seq., as amended.

F.  Confidentiality of MOU.  To the extent allowed by applicable law, this MOU, its contents, and the drafts and communications leading up to the execution of this MOU are deemed

8

by the parties as "confidential." Any disclosures therefore could be made, if at all, pursuant to applicable laws or court orders requiring such disclosures.

**SIGNATURES**

VRL/Data Provider
State Agency Name:
Signature: _____ Date of Execution:_____

Authorized Signatory Name Printed:_____

Title: _____

Requester
Federal Agency Name:  Civil Rights Division, U.S. Department of Justice

Signature: _____ Date of Execution:_____

Authorized Signatory Name Printed:_____

Title: _____

# EXHIBIT 2

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 2:25-cv-09149-DOC-ADSx |
| | ) | |
| Plaintiff, | ) | CIVIL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| SHIRLEY WEBER, ET AL, | ) | Thursday, December 4, 2025 |
| | ) | ( 7:38 a.m. to  9:09 a.m.) |
| Defendants. | ) | (12:01 p.m. to 12:58 p.m.) |
| | | ( 2:00 p.m. to  2:31 p.m.) |
| | | ( 2:31 p.m. to  2:33 p.m.) |


HEARING RE:

MOTION TO DISMISS [DKT.NO.67];

PLAINTIFF'S REQUEST FOR ORDER TO PRODUCE RECORDS
(52 USC 20701)
[DKT.NOS.87,88,89]


BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE



APPEARANCES:          SEE PAGE 2


Court Reporter:        Recorded; CourtSmart


Courtroom Deputy:      Karlen Dubon


Transcribed by:        Exceptional Reporting Services, Inc.
                       P.O. Box 8365
                       Corpus Christi, TX 78468
                       361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

<u>**APPEARANCES**</u>:


For Plaintiff:              ERIC V. NEFF, ESQ.
                           U.S. Department of Justice
                           150 M St. NE, Suite 8-139
                           Washington, DC 20002
                           202-532-3628


For Intervenors:           GRAYCE S.P. ZELPHIN, ESQ.
                           American Civil Liberties
                           Union of Northern California
                           39 Drumm Street
                           San Francisco, CA 94111
                           530-515-8978


                           CHRISTOPHER D. DODGE, ESQ.
                           Elias Law Group
                           250 Massachusetts Ave. NW
                           Suite 400
                           Washington, DC 20001
                           202-987-4928


For Robert Page:           SUZANNE E. SHOAI, ESQ.
                           Orange County Counsel
                           P.O. Box 1379
                           Santa Ana, CA 92702
                           714-834-3300


For Defendants:            MALCOLM A. BRUDIGAM, ESQ.
                           Office of the Attorney General
                           1300 I Street
                           Suite 125
                           Sacramento, CA 95814
                           916-210-7873


                           ROBERT W. SETRAKIAN, ESQ.
                           California Department of Justice
                           300 S. Spring Street
                           Suite 1702
                           Los Angeles, CA 90013
                           213-269-6668

3

1  **Los Angeles, California; Thursday, December 4, 2025; 7:38 a.m.**

2                          **(Call to Order)**

3          **THE COURT:**  -- Shirley Weber.

4      **(Pause)**

5          **THE COURT:**  And, counsel, as you're seated, let me

6  take one more matter.  Just remain seated for a moment.

7      **(Pause)**

8          **THE COURT:**  All right.  Thank you then.  I think that

9  resolves the rest of the morning calendar.  So first of all,

10  good morning.

11          **MR. NEFF:**  Good morning, Your Honor.

12          **THE COURT:**  This is the matter of United States v.

13  Shirley Weber.  It's case number 25-09149.  And, counsel, you

14  can just remain seated.  You can pretend it's state court if

15  you want to, but make your appearances.

16          **MR. NEFF:**  Eric Neff on behalf of the United States.

17  Good morning, Your Honor.

18          **THE COURT:**  Thank you.

19          **MR. BRUDIGAM:**  Deputy Attorney General Malcolm

20  Brudigam on behalf of defendants Secretary of State Shirley

21  Weber and the State of California.

22          **THE COURT:**  Okay, thank you very much.

23          **MR. SETRAKIAN:**  Deputy Attorney General Will

24  Setrakian on behalf of defendants State of California and

25  California Secretary of State Shirley Weber.

4

1          **THE COURT:**  Thank you very much.  I appreciate it.

2          **MR. DODGE:**  Chris Dodge on behalf of Intervenors

3    NAACP and Siren.

4          **MS. ZELPHIN:**  Grace Zelphin on behalf of Intervenors

5    League of Women Voters of California.

6          **THE COURT:**  Is anybody here representing what I call

7    the County case?

8          **MS. SHOAI:**  Good morning, Your Honor.

9          **THE COURT:**  Come on up.  What we're doing here may be

10   of interest to you.  So we want your appearance.

11         **MS. SHOAI:**  Thank you, Your Honor.  Deputy County

12   Counsel --

13         **THE COURT:**  No, no, wait, wait till we get a good

14   recording of you.

15         **MS. SHOAI:**  Good morning, Your Honor.  Deputy County

16   Counsel Suzanne Schoai on behalf of --

17         **THE COURT:**  I see.  Why don't you have a seat?  Do

18   you have any other colleague with you today?

19         **MS. SHOAI:**  No, Your Honor.

20         **THE COURT:**  All right.  So first, I'd like to address

21   plaintiff's motion for order to produce records pursuant to 52

22   U.S.C. 20701 that was filed on Monday, set for hearing

23   today.  I appreciate the speed, but not at the expense of due

24   process.  And although I've encouraged us to move forward as

25   quickly as possible concerning the substantive issues, this is

1    not the due process because there needs to be at least 28 days'

2    notice before a date for hearing under CD California Rule 6-1.

3            The plaintiff is seeking to reach the ultimate

4    question in this case regarding the production of records and

5    thousands of voters' lives will be impacted by this case.  And

6    the Court will not be setting the matter on any legal -- I

7    don't want to say gamesmanship, but therefore, the motion for

8    order to produce records pursuant to 52 U.S.C. 20701 is

9    denied.

10           Now, you can once again follow the process and

11   procedure in terms of due process.  We'll have time

12   potentially, but this doesn't supply the due process needed.

13           Second, I'd like to hear arguments if there are any

14   on two motions regarding amicus briefs.  First, there was a

15   motion for leave to file an amicus brief brought by 16 states.

16   Those states are Arizona, Colorado, Delaware, Hawaii, Illinois,

17   Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico,

18   New York, Oregon, Rhode Island, Vermont, and Washington.

19           The second request was to file an amicus brief and it

20   was filed by the former secretaries of state and the proposed

21   amicus briefs are allegedly from a bipartisan group of state

22   secretaries for the states of Colorado, Connecticut, Minnesota,

23   Nebraska, Oregon, Pennsylvania, and Washington.

24           Does any party have a statement to make regarding

25   these amici briefs and any wisdom on your part that if I allow

6

1    these amici briefs, whether I should then extend for some

2    period of time the opportunity for additional briefs from

3    interested parties, because these are the parties that have

4    directly contacted the Court, but there may be other parties

5    that piecemeal choose to come in, and then I'm deciding that on

6    an almost ex-parte basis, case by case as they come to me,

7    unless you're flying out here for every single hearing for

8    every requested amici brief.

9             So I was thinking if I was going to allow these, that

10   I should throw this open for 7 days or 14 days for the amici

11   briefs to come in during the period of argument and try to sort

12   through whatever the Court's opinion would be and give you that

13   courtesy and simply extend it.  But I'm looking for your wisdom

14   on that because you can anticipate if I'm getting these amici

15   requests now, I promise you, as soon as you leave the

16   courtroom, there's going to be another request.  And I don't

17   want to do that ex parte without your wisdom on both parties'

18   parts.

19            So let's start with the first group.  This motion for

20   leave to file an amici brief by 16 states, and one of my

21   concerns was whether this would become a bipartisan effort, for

22   instance, of Democrats and Republicans using the Court in a

23   sense, in a political sense, not necessarily a substantive

24   sense.  But I noticed there are what I consider some swing

25   states, New Mexico certainly was during the last election,

1   those records to make sure we are doing our duty as the federal

2   government to make sure that these federal elections remain

3   free and fair.

4        And counsel simply has to rely on both

5   misrepresentations of the law and our position, stating our --

6   for example, that our whole case relies on Lynd.  No.  This

7   action relies on the Civil Rights Act of 1960 and its very

8   clear text, which is the one thing they don't want to talk

9   about because it's very clear.

10        Privacy concerns are first not a proper concern for

11  this motion to dismiss but even if they were, they're

12  unfounded.  Privacy -- the United States is going to comply

13  with all federal laws.  That includes the Federal Privacy Act.

14  The DOJ Civil Rights Division itself has a stated policy

15  available on a website as to how we will comply with the

16  Federal Privacy Act and have before.

17        **THE COURT:**  Explain that to me.

18        **MR. NEFF:**  Yes, sure.

19        So we publish a series of regulations.  They're

20  called the SORNs that show how we tend to the data and make

21  sure everything is properly protected under, not just Federal

22  Privacy Act, but other obvious concerns when you're dealing

23  with large databases.

24        **THE COURT:**  Is that part of my record?

25        **MR. NEFF:**  Yes.

72

```
1          THE COURT:  And what would I look at that?  What
2    exhibit?
3          MR. NEFF:  At our -- in our response to our motion to
4    dismiss and the supporting data for that, the attachments for
5    that.
6          However, I would state, that to any extent,
7    especially the state privacy-type acts would contradict the
8    Civil Rights Act, that the Civil Rights Act would rule.
9          The United States does this on a regular basis.  We
10   have multiple states that don't even see this as a dispute,
11   that simply just -- in fact, on their own do this on a regular
12   basis, share the information with the federal government so
13   that we can run crosschecks to make sure that people are
14   properly on voter rolls.
15         THE COURT:  What states are those that have shared
16   either their DMV registrations or the social security numbers
17   of voters?
18         MR. NEFF:  Offhand, right now, off of memory I
19   believe the states are Kansas, Indiana -- there are four.
20         THE COURT:  That's okay.
21         MR. NEFF:  I'll also state the biggest one is -- so
22   we also have an MOU that we produce at the state request.  Some
23   states request it, some don't.  Some say, yes, you're entitled
24   to this data, here you go.  And we have a whole data-sharing
25   setup ready.  It's essentially the Box program, plus some
```

1    federal proprietary encryption technology to make sure that

2    this is as secure as it needs to be.  And we -- so Texas just

3    told us today they're going to enter in the MOU and share us

4    the data in the next few days.  We believe many more states are

5    going to follow just in the next few days but so we have four

6    states that have already sent us the data.  No questions asked.

7    Probably another dozen or so states in the next week or so that

8    are just going to sign the MOU and share with us.  This really

9    shouldn't be controversial.  It's clearly stated as part of our

10   duty under HAVA and the Civil Rights Act is clear that this is

11   the mechanism in which we do it.

12           **THE COURT:**  Do you think that those states with

13   attorney generals complying with your request would be

14   interested in filing an amicus just as other states who may be

15   opposed to your request are filing amicus?  In other words,

16   what I want to do is make certain if we have states coming late

17   to the table but in compliance that we're looking at the

18   reasoning by all of the atty generals in the respective states.

19           And what I was worried about before, frankly, is if I

20   had red and blue states lining up when I started to look at the

21   amicus, I was particularly interested in the states bringing

22   that to me.

23           Now, I don't know how you define what I call -- well

24   those states that have voted for different -- in different

25   elections in different ways.  Arizona, New Mexico, Michigan,

74

1    Minnesota, seem to be what I call those states that

2    traditionally doesn't go Democrat or Republican.

3            And then I looked down at the state secretaries for

4    the states and if you notice, there are three states out of

5    there on the amicus.  Connecticut is in for the first time.

6    They are not part of the amicus for the 16 states that we

7    initially named but these are the state secretaries for the

8    states of and Connecticut is an addition, Nebraska is an

9    addition, Pennsylvania -- which has certainly been a swing

10   state.

11           So I was a little worried and that's why I sought

12   your wisdom about whether you all were going to stipulate to me

13   accepting this because I didn't know the weight if I was just

14   dealing with a party disagreement.  And I'm not saying that

15   these swing states necessarily carry greater or less weight but

16   I want to be alert that if this is a partisan effort.  And

17   certainly the country is divided so ...

18           **MR. NEFF:**  I would be --

19           **THE COURT:**  ... so I've got a stipulation that I'm

20   accepting all of these amicus briefs.  I just want to pay you

21   the courtesy if other states are coming onboard, like Texas, et

22   cetera, that we give them a chance for those attorney generals

23   to get this to us but by the same token, I'm going to be

24   writing over the next couple weeks.

25           Is two weeks enough time for you?

1          **MR. NEFF:**  We can inform the states that --

2          **THE COURT:**  Okay.

3          **MR. NEFF:**  -- a judge has invited them to file amicus

4    but --

5          **THE COURT:**  Will you do so?  In other words, for both

6    parties.  Get it out to all the states that you can and I'll

7    docket this, et cetera.  And there may even be disagreements

8    between different courts examining this matter and different

9    circuits.

10          **MR. NEFF:**  I think the bigger picture is that the

11    states that are complying are likely not going to see this as

12    something that they need to delve issue.

13          **THE COURT:**  But I just want to pay you the courtesy

14    in terms of due process.  Okay.

15          **MR. NEFF:**  Yes.  And I would say that's because this

16    really shouldn't be a political issue.  One side can make it a

17    political issue if they want to just simply in a single

18    position declare it that but it doesn't change the fact that

19    the Civil Rights Act of 1960, the text is quite clear and that

20    no one is in favor of faulty voter rolls.

21          **THE COURT:**  We've also had for both parties we've had

22    a series of state rights issues in the federal court for years.

23    And different states have taken a perspective on what the

24    states' rights issues are.  Some are much more state-right

25    oriented, others aren't.  That's why I was interested in the

1    division.  But since you've all stipulated, I'm accepting this

2    amicus at the present time.  I just want to make sure you've

3    got the courtesy on both sides of any other parties coming

4    onboard so if we need an extra week we can take it, okay?

5             Okay.  Won't you continue.  I'm sorry.

6             **MR. NEFF:**  Thank you, Your Honor.

7             The -- would emphasize that this data is necessary

8    for the United States to conduct its HAVA operation -- its HAVA

9    enforcement compliance and that is why that data is

10   specifically cited in the statute.  It simply couldn't be

11   clearer that it needs to be the last four digits of a social

12   security number or the driver's license; otherwise, we are not

13   able to make a verified finding as to the various voter roll

14   registrations that might have problems.  In fact, we sometimes

15   even have to follow up after that data is run.  It's rare but

16   there's a reason that was put in the statute because it's

17   something like we can verify it from what I've talked to our

18   database analysts something like 99.999 percent of the time.

19   That's enough for us to be able to know if it's an actual

20   person that lives in that location and is who the voter

21   registration role says it is.

22       **(Pause)**

23             Again, with the caveat that we do not need to ever --

24   that we do not need to get to this.  This is essentially an OSC

25   where we only need to state our purpose and then we are

1    entitled to the records.  Also under a prompt order, according

2    to caselaw, a prompt order that this is essentially an OSC

3    hearing.

4            The facts of California itself are particularly

5    worrisome.  Maybe the most worrisome state in the union.

6            The state is required to provide various data to the

7    Election Assistance Commission which is a nonpartisan

8    commission.  The state -- the agency created by HAVA in order

9    to try and keep this as neutral as possible and California

10   doesn't provide the complete data.  Their data doesn't have Los

11   Angeles County in it.  It's one-fourth the state's population.

12   That on its own should cause concern countrywide that they've

13   not submitted that data.  It would be irresponsible of the

14   United States to not come in at this point and say we need to

15   see your data to ensure fair and free elections.

16           All of the harms that opposing counsel have pointed

17   to are based on speculation, logical leaps and there is no

18   concrete evidence they can point to.

19           That being said, with the overarching point that this

20   is before the Court right now as essentially an order for an

21   order to show cause, dressed up as a complaint, and that you

22   have a dismissal that is essentially fighting that order to

23   show cause, dressed up as a motion to dismiss, I believe the

24   Court should act within what would be its lawful authority to

25   issue a prompt order that California needs to turn those

 1    records over to us that we are entitled to.

 2         **THE COURT:**  How do you deal with the state provisions

 3    concerning the DMV?  In other words, the state is arguing to

 4    the Court that that has a -- for want of a better word -- a

 5    special category that is not subject to the Voting Rights Act

 6    of 1960 or HAVA, and that they have a privacy interest in a

 7    sense as well.  What does the Court do with that?

 8         **MR. NEFF:**  Any state privacy interest would be

 9    trumped by federal law.  It would be trumped by both the

10    Federal Privacy Act, which we're complying with.  It would be

11    trumped by HAVA, which is a -- I repeat -- a federal minimum

12    standards law for state compliance that specifically mentions

13    driver's license number or last four digits of social.

14         The state is required to produce and provide this

15    data under the statute.  If they have some issue with the

16    driver's license; hypothetically, if a state just said we have

17    some real concerns about our driver's license, they comply with

18    the statute if they provide the last four of the social

19    security number.

20         Does the Court have other questions or concerns?

21         **THE COURT:**  Just one moment.  Let me look at a note

22    that I made.

23         **(Pause)**

24         The state represents that they have offered -- and I

25    think both in the Orange County case with the registrar -- and

1    it's represented today in the statewide case -- the names and

2    addresses.  Has that offer in fact been made?

3              **MR. NEFF:**  Has that offer --

4              **THE COURT:**  Yes.  To you.

5              **MR. NEFF:**  Oh --

6              **THE COURT:**  Not to you but to the government, the

7    DOJ.

8              **MR. NEFF:**  California has taken the unique in the

9    nation position that they are -- that they -- we are permitted

10   to come and inspect it in their offices, that data; which, (a),

11   is not sufficient; (b), we argue is not an appropriate way of

12   providing it in today's day and age where it's actually more

13   secure to share this data electronically through our shared

14   file-sharing --

15             **THE COURT:**  Kind of slow-walking you.  Kind of slow

16   walking.

17             **MR. NEFF:**  I think --

18             **THE COURT:**  For want of a better term.

19             **MR. NEFF:**  That is the United States' interpretation

20   of it but --

21             **THE COURT:**  How about the voter participation and the

22   registration methods?  Have those been offered to you?  In

23   other words, that's been argued to me but behind the scenes I

24   don't have that record right now.  Has that been offered to

25   you?

1          **MR. NEFF:**  It is in the back-and-forth is in the

2   letters attached as exhibits in the filings, Your Honor;

3   however, the United States' position is that the responses have

4   been woefully inadequate.

5          **THE COURT:**  Okay.  So we've never gotten down to

6   really how that information would be exchanged.  It's flowing

7   back and forth in terms of representations but as a practical

8   matter there's a big difference between a representation and

9   conveying the information to you.

10          **MR. NEFF:**  Well actually in our letters we did lay

11   out to opposing counsel our file-sharing program, how it works,

12   that it is secure and we invite them to -- assuming they have a

13   change of heart, to use it.

14          **THE COURT:**  About the registration status and the

15   contact information, has that been offered to you?

16          **MR. NEFF:**  That, I'm not sure about.  I'm not sure

17   what the scope of their offer is.

18          **THE COURT:**  Okay.

19          **MR. NEFF:**  I just know that it does not include the -

20   - for sure, does not include the driver's license number or the

21   last four of the social as required by the HAVA statute.  And

22   in other states as well, that has always been the crux of the

23   dispute.

24          **THE COURT:**  In their opening arguments they'd argued

25   that in the Benson case out of the Sixth Circuit, Bellows out

1   of the First and Long case out of the Fourth, that there's an

2   inconsistent and uniformed position taken by the government.

3   How do you respond to that?

4           MR. NEFF:  That the -- there is no inconsistency in

5   position.

6           THE COURT:  Explain that to me.

7           MR. NEFF:  What there is is difference in posture of

8   those cases.  It is a true statement to say that the United

9   States, as an agency, has yet to go to states to enforce the

10  minimum standards of the HAVA statute.  One can argue whether

11  that was a wise or unwise decision but here we are 23 years

12  later and the federal government has yet to do it.  It is

13  still, for certain, good law.  The United States believes it is

14  a law that should be enforced and complied with.  Therefore,

15  because of that history where this hasn't been done before, all

16  of those cases relate to private parties trying to in some way

17  get in.

18          The DOJ's position is that private parties do not

19  have a right of action under HAVA and therefore they should not

20  be allowed to go to states and say, I would like your driver's

21  license or social security number.  However, there are states

22  around the country, including ones that are fighting us, that

23  interestingly, have been willing to turn over that data to a

24  private organization without the same protections as the United

25  States.  That's been cited in our briefing, the ERIC

1    Organization.

2            So what I would say is all those cases are

3    inapplicable.  It often requires selectively quoting them to

4    make it sound like in some way the United States government is

5    not entitled to it.  No, the United States government is

6    uniquely mentioned in both the CRA and HAVA.  And therefore

7    just because this is the first time the United States is coming

8    in and doing it, doesn't mean that it's not clearly what the

9    statute states.

10           **THE COURT:**  For both parties, you mentioned that

11   California is one of the main outliers, for want of a better

12   word, from the DOJ and the executive branch's position.  Is it

13   the position of the executive branch that there need not be any

14   stated purpose that there's an absolute right to obtain this

15   information per statute?

16           **MR. NEFF:**  Statute requires we state a purpose.  A

17   purpose.

18           **THE COURT:**  And what is the purpose here?

19           **MR. NEFF:**  The purpose is for, as stated in our

20   letters to them, for voter roll maintenance enforcement and

21   compliance.

22           **THE COURT:**  And we stated in Orange County with a

23   limited county case involving Page.  There, there were -- and I

24   keep 13 or 17 but 17, I believe, allegations.  The most

25   notorious became the dog that voted twice.

1          Is that, out of 1.2 million voters, what's the basis,

2  for instance, of that kind of request because of course we're

3  always going to have error, including people who legitimately

4  die.  So what's the threshold that this stated purpose has?

5  How should I interpret that?

6          **MR. NEFF:**  Under the CRA there is no threshold.

7          **THE COURT:**  Okay.  Now, do you need to -- and thank

8  you.  Do you need to make any calls?  You're all by yourself,

9  you're doing -- there's nobody to consult with but do you need

10  to make any calls?  Are you satisfied with your argument?

11          **MR. NEFF:**  I appreciate the offer, Your Honor, but

12  no, we're satisfied.

13          **THE COURT:**  Okay.  There'll be a second round.

14          **MR. NEFF:**  Yes.

15          **THE COURT:**  So counsel, however you'd like to proceed

16  then.  One of you has another obligation, I don't care which

17  order.  You can take the intervenors first or the parties.

18      **(Pause)**

19          **MR. BRUDIGAM:**  So there was a lot going on there,

20  Your Honor, and so I'm going to try to be thorough in making

21  sure I cover all of those points.

22          So I think the first thing I want to talk about is

23  this notion that the complaint is just an order to show cause.

24  And essentially what the federal government wants to do is take

25  the Court and sideline them in this dispute and say that the

84

1   Court has no room for any judicial review here.  And that's

2   just not supported by the text of the statute.

3           There's nothing in the Civil Rights Act that creates

4   a special statutory procedure.  The words "order to show cause"

5   are not in the statute at all and I'll just read you the text

6   right here.

7           It says that:

8           "The appropriate district court shall have

9           jurisdiction by appropriate process to compel the

10          production of such record or paper."

11          That's what it says, "By appropriate process."  And

12  so that's up to the Court to decide what the appropriate

13  process is here.

14          And I'd also just point Your Honor to the fact that

15  the Federal Rules of Civil Procedure contemplate what rules

16  apply when you have a government investigative demand.  I mean

17  Federal Rule of Civil Procedure 81(a)(5) specifically says:

18          "The Federal Rules of Civil Procedure apply to

19          proceedings governing demands for records by the U.S.

20          government."

21          And so this idea that some other procedure applies,

22  it's not supported by the text, it's not supported by the

23  Federal Rules of Civil Procedure.  The only thing that supports

24  this purported procedure are these early 1960s' cases and like

25  we've said, the federal government, they pin their hopes on

85

1    this one <u>Kennedy v. Lynd</u>, Fifth Circuit case from 1962.  That's

2    the one they're referring to which says that the Court

3    shouldn't have any role here.

4           But that case is obviously nonbinding on Your Honor

5    and it's really been overruled.  I would point you to the

6    <u>United States v. Powell</u> case.

7           **THE COURT:**  I'm sorry, what -- just a moment.

8           **MR. BRUDIGAM:**  Sure.

9           **THE COURT:**  All right.  Please continue.  I've got my

10   note.

11          **MR. BRUDIGAM:**  So the Supreme Court in United States

12   v. Powell found that the Federal Rules of Civil Procedure, they

13   apply to a proceeding like this.  And in that case it involved

14   an IRS document request statute which used the very same

15   language that we have here which is that the Court shall, by

16   appropriate process, compel relief under that statute.  So even

17   if Your Honor found Kennedy v. Lynd persuasive, it's obviously

18   unbinding, that's been overruled.  So just to be clear, the

19   Federal Rules of Civil Procedure govern this action.

20          **THE COURT:**  Well, you've cited on both parties'

21   parts, different enactments by council, statutory provisions.

22   I think we can all agree that we want qualified voters to vote

23   without any chilling effect.

24          **MR. BRUDIGAM:**  I agree.

25          **THE COURT:**  Is there -- well I think we can all

86

1    stipulate to that.

2         **MR. BRUDIGAM:**  We can.

3         **THE COURT:**  And I'll use the word "qualified voters".

4         Is there a chilling effect in the request by the

5    government and if so, what is that chilling effect?  How would

6    there allegedly be persons who may believe that the government

7    has no business in the sense of getting more information.

8         **MR. BRUDIGAM:**  Sure I mean I think --

9         **THE COURT:**  And behind this the concern of this court

10   eventually, besides the statutory following the law, is going

11   to be the impact of what we write and do.  And this case will

12   probably be the first case that comes out that other circuits

13   look at.  So with that noble goal in mind of having voter

14   participation, is there a chilling effect or not?

15        **MR. BRUDIGAM:**  I think there's absolutely a chilling

16   effect here because --

17        **THE COURT:**  And I need you to define that for me.

18        **MR. BRUDIGAM:**  Sure.

19        **THE COURT:**  And it may not be relevant to the opinion

20   but behind all of this, we need voters who are qualified to be

21   able to vote.

22        **MR. BRUDIGAM:**  Right.

23        **THE COURT:**  Now the ease of that could be differences

24   between different administrations and whether you have

25   different methodologies.  And I know there's a huge controversy

87

1    about mail-in ballots and voter registration and drive-in, et

2    cetera, but when we're finally done with this, we want

3    qualified voters to vote.  And if there's a chilling effect, or

4    this privacy right that we've somewhat skipped over, I want to

5    hear how you define that.

6         MR. BRUDIGAM:  Sure.  Your Honor, I think this action

7    should make the stomach of every American turn, knowing that

8    this executive branch is going in, state by state, collecting

9    and vacuuming up everybody's voter registration information.

10   It is on a scale that we have never seen before.  Okay.

11        And what this is going to do --

12        THE COURT:  It is their disparity argument.  In other

13   words, remember when I started this conversation early on, and

14   I discussed the amicus briefs, I was particularly interested if

15   I was getting just red and blue states.  That's why I was

16   looking to see if there were these swing states.

17        MR. BRUDIGAM:  I mean I point Your Honor to --

18        THE COURT:  Or is this a argument also that a

19   particular group of states are being examined versus other

20   states?  Because here, the government has represented while

21   California from their perception might be an outlier, they've

22   also made inquiries of the let's say more, from their

23   standpoint, compliant states like Kansas and -- I forget which

24   one -- just a moment -- Indiana, and that Texas was coming

25   onboard.

1          **MR. BRUDIGAM:**  Yeah.  Well, what I would say is I

2    mean those aren't states that are complying, they're

3    voluntarily giving that information to the federal government.

4          **THE COURT:**  But regardless, the government has made

5    an inquiry so if there's an argument that the government is

6    reaching out and being selective, if the state is voluntarily

7    complying that doesn't seem to me to be singling out

8    progressive states.  And if you think that, then I need to hear

9    that and hear your reasoning behind that.

10          **MR. BRUDIGAM:**  I'm not saying they're singling out

11    states.

12          **THE COURT:**  Okay.  Then we can pass that.

13          **MR. BRUDIGAM:**  They're going after every state and

14    California is by no means --

15          **THE COURT:**  So I'm not going to have a disparity

16    argument.

17          **MR. BRUDIGAM:**  Right, right.  I just mean in terms of

18    the position the secretary has taken, I mean the reason they

19    had to sue 14 different states is because nobody wants to turn

20    this data over.  The representations that Counsel just gave

21    today, that's the first that I've heard of any state turning

22    over that information.  So we are by no means an outlier in

23    taking this position.

24          **THE COURT:**  Wait just a moment.  For the government

25    or DOJ, how do we validate Kansas and Indiana?  What validation

89

1   do I have about that?

2           **MR. NEFF:**  I was actually looking that up right now,

3   Your Honor, because --

4           **THE COURT:**  Well go ahead and look it up.  You've got

5   lots of time.

6           **MR. NEFF:**  And I --

7           **THE COURT:**  By the way, I'm not holding you to it.  I

8   know it's in good faith but I'd like to hear what states that

9   we have validation for turning this document over.  And there

10  may be numerous states.

11          **MR. NEFF:**  It's a good-faith representation here.  I

12  am kind of a point --

13          **THE COURT:**  Okay.  Well now take away the good faith.

14  I accept that.  Okay, I'm asking for proof now.

15          **MR. NEFF:**  Okay.  Wyoming, Kansas, Indiana and

16  Arkansas all complied voluntarily.

17          **THE COURT:**  Okay.  Just a moment.

18          **MR. NEFF:**  Texas --

19          **THE COURT:**  Kansas, Indiana, Wyoming and Arkansas ...

20          **MR. NEFF:**  ... have already complied ...

21          **THE COURT:**  ... voluntarily.

22          **MR. NEFF:**  ... voluntarily.

23          **THE COURT:**  Okay.  Texas?

24          **MR. NEFF:**  Texas, Virginia, Utah, Tennessee, South

25  Dakota --

1          **THE COURT:** Just a moment.

2          **MR. NEFF:** Oh it's gonna go long, yeah. South

3    Carolina, Nebraska, Montana, Mississippi, Missouri and Alabama,

4    all fall into the list of they have expressed with us a

5    willingness to comply based on the represented MOU that we have

6    sent them. And so we expect full --

7          **THE COURT:** Now apparently Nebraska can't make up its

8    mind because of the proposed amici briefed to the Court, they

9    have the former state secretaries of state for Colorado,

10   Connecticut, Minnesota and guess what? Nebraska.

11         **MR. NEFF:** Well those are former. And furthermore,

12   just because some states are representing certain things in

13   court, there are still discussions going on now that this MOU

14   we have is fully blessed. There are the -- I don't think it's

15   safe at this point to go beyond those states but --

16         **THE COURT:** Then that's fine.

17         **MR. NEFF:** -- that's a fair representation of the

18   state of discussions as of today.

19         **THE COURT:** And Counsel, back to you.

20         **MR. BRUDIGAM:** Sure. And yeah, so all I heard there

21   was we've heard a willingness. It doesn't sound like those

22   states have actually turned over any data, just to be clear.

23         So I want to talk a little bit about --

24         **THE COURT:** No, I think he said that four states have

25   actually. Kansas --

1          **MR. BRUDIGAM:**  Four states have actually turned over

2     but the broader list --

3          **THE COURT:**  -- Indiana, Wyoming and Arkansas.

4          **MR. BRUDIGAM:**  Right.

5          **THE COURT:**  The others were a purported willingness.

6          **MR. BRUDIGAM:**  Right.

7          So Your Honor, the federal government is really

8     leaning hard into the text of these statutes and they say that

9     we don't want to talk about the text but that's just absolutely

10    not true.  And I want to just start with the Civil Rights Act

11    of 1960.

12         There is a very clear statutory limitation in that

13    provision and it's in Section 20703.  And it says that the

14    attorney general's demand shall contain a statement of the

15    basis and the purpose therefore.  DOJ has not satisfied this

16    requirement and so their demand is invalid plainly under the

17    statutory text.

18         **THE COURT:**  So the plain representation by the

19    government is too broad; and that is, they want to stop voter

20    fraud.

21         **MR. BRUDIGAM:**  Well, so they've mentioned a couple of

22    things.  It keeps changing so I want to unpack this a little

23    bit.

24         So they said that the purpose is free and fair

25    elections, clean voter rolls.  Then he said up here that it's

1    for enforcing HAVA.  So these are multiple different bases.

2    And also it's different than the -- or than the purpose that

3    was originally articulated in the letters to the secretary.

4            The original request said that it was -- they were

5    seeking it for NVRA voter list -- list maintenance compliance.

6    So the reason and rationale keeps shifting and changing.  And

7    that's a problem, not just because it's suspicious, it's a

8    problem because, again, the text says, "The demand shall

9    contain a statement of the basis and the purpose therefore.

10    The text use of the article."  'The,' twice, in front of the

11    basis and the purpose indicates that there is only one basis

12    and one purpose.

13            And the federal government has explicitly rejected

14    this plain text reading.  They said it up here that they just

15    need to give you any old basis and then the demand is good.

16            **THE COURT:**  That's my question also to both of you;

17    and that is, does the executive branch need to state a purpose?

18    Your argument is that they do.

19            **MR. BRUDIGAM:**  They do.

20            **THE COURT:**  Counsel for DOJ puts that in broad terms.

21            **MR. BRUDIGAM:**  Right.  Well but again, it's not just

22    a purpose, it's -- or not just the purpose, it's also the

23    basis.

24            **THE COURT:**  Okay.

25            **MR. BRUDIGAM:**  And they have not alleged any basis

1  anywhere in their action.

2       Now, I also want to talk about -- and just -- you

3  know this -- I'm sorry.  I want to talk a little bit more about

4  HAVA, which is the law that apparently now that's the main

5  method of enforcement we're now learning today, that that's

6  what they want to enforce and they specifically reference the

7  requirement under HAVA that states collect social security

8  numbers and driver's license numbers.  Well let's look to the

9  text of HAVA.  What does it say?

10          "The state shall determine whether the information

11          provided by an individual is sufficient to meet the

12          requirements of this subparagraph in accordance with

13          state law."

14       And that is -- when it says "this subparagraph," it's

15  referring directly to the requirement that states collect that

16  information when processing voter registration applications.

17  So there is nothing for the federal government to enforce here.

18  This is solely the state's domain.

19       And as I said in my original motion, another

20  provision of HAVA explicitly delegates discretion of

21  implementation of HAVA to the states.  So again, we're not

22  afraid of the text in this case, we think it strongly supports

23  our position.  And so I also want to talk about what this data

24  could be used for.

25       So we've heard a lot of different reasons.  I just

1    explained why it's not relevant for HAVA.  I want to also talk

2    about why it's not relevant for List Maintenance under the

3    NVRA.

4            So the legal standard under the NVRA requires states

5    to conduct a general program that makes a reasonable effort.

6    So the Sixth Circuit held this year in that Benson case that

7    this just means a serious attempt, a rational, sensible

8    approach.  It need not be perfect or optimal.  And so under

9    this standard, getting line-by-line voter information of their

10   social security numbers and driver's license numbers, that's

11   entirely unrelated to whether a general program exists or

12   whether the state is making a reasonable effort.  And so,

13   again, at every turn, the supposed reason why they need this

14   information, it just doesn't add up.

15           And then finally, I want to talk about they claimed,

16   as they did in their brief, that California has, quote, "the

17   most worrisome voter registration data in the nation."  That's

18   just absolutely wrong, okay?  That's an assertion in a brief

19   without any support.

20           And they also incorrectly say that in submitting data

21   to the Election Administration Commission in response to the

22   EACs survey, this is an election administration survey, they

23   said the LA County didn't submit any data.  That's not true.

24   That's simply not true.  You can go to the survey and look at

25   the data that LA submitted and you can look at our explanation

1    to DOJ in our letters in advance (inaudible) litigation

2    explaining the questions they had about that survey.  So to the

3    extent that they want to rely on EACs as some after-the-fact

4    rationalization for this demand, it just doesn't make sense.

5    It doesn't add up.

6              So those are the main --

7              **THE COURT:**  Were there inconsistent or consistent

8    offers if you're aware of the Page case, as well as this case.

9    In other words, when this started in Orange County, originally

10   counsel was here, there's a representation about the registrar

11   there making the same or similar representations about what

12   they were willing to share with DOJ but I've never compared the

13   two.  And I don't know what the state's position is because

14   DOJ's argument might be, we're getting inconsistent data.  In

15   other words, even when we're sharing, with the different

16   entities promising that they'll share some amount of this data,

17   the different counties are supplying this in different ways.

18             **MR. BRUDIGAM:**  Sure.  So I won't speak too much about

19   that case but I would say that case is different and there

20   isn't a problem of inconsistent data sharing because in the

21   state case, they're saying, give us the whole list.  We want

22   every voter.

23             In Orange County, they said, we want a list of just

24   the individuals that have been removed from your list because

25   of non-citizenship, people who renounced or for whatever

1    reason.

2            **THE COURT:**  So this is much broader from your

3    perspective in terms of protection, privacy, HAVA.

4            **MR. BRUDIGAM:**  Yeah.  It's not an issue of can they

5    be reconciled.

6            So I do want to just back up again and just zoom out

7    on the big picture here in this case.

8            You know, as we talked about -- my colleague talked

9    about, in his motion, that the states really have the primary

10   role in administering elections and the voter registration

11   process.  The Constitution makes that quite clear in the

12   elections clause.  And it makes sense to prioritize the state

13   in this process because they're the ones that are closer to the

14   voters, more accountable to the voters.  And so this is an

15   arrangement that it depends on the principle of subsidiarity

16   where a decision should be made at the local level.  And here,

17   we don't -- there's no place for the federal government to come

18   in and start demanding these records under that constitutional

19   framework.

20           And not only are the states the default entity

21   running elections but it's only Congress that can make or alter

22   those rules.  Here, we have the executive branch in court

23   trying to get this information.  The Constitution says nothing

24   about the executive branch having any role in federal

25   elections.

97

1          And I would just say that this is not a unique

2   position by this administration.  The president has been

3   meddling in state election law since he came into office.  And

4   I would point Your Honor to a case in the District of

5   Massachusetts, California v. Trump, where the executive was

6   doing something sort of similar where they were going in under

7   the guise of federal law and trying the change the way states

8   administer and conduct elections and that was pursuant to an

9   executive order the president issued.  And so here, we're

10  having another situation where the federal government is coming

11  in under the guise of inapplicable federal laws and trying to

12  interfere with the state's role in elections.  And so I'd just

13  say against that backdrop, it's important to keep that in mind;

14  but even if, you know, considering all that, if you'd just go

15  back to the text of these statutes, the federal government is

16  not entitled to this information under those laws.

17          And so at this point I want to turn it over to my

18  colleague, Will Setrakian, to just provide some rebuttal on the

19  federal privacy laws issue.

20          **THE COURT:**  Thank you.  And once again, would you

21  state your name because we're on CourtSmart.

22          **MR. SETRAKIAN:**  Good afternoon, Your Honor.  Will

23  Setrakian for defendants, The State of California and

24  California Secretary of State Shirley Weber.  Just four quick

25  points on the federal privacy statute.