**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 25-cv-13816 |
| | (Hon. Leo T. Sorokin) |
| WILLIAM FRANCIS GALVIN, in his official capacity as Secretary of the Commonwealth of Massachusetts, | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS OF**
**COMMON CAUSE, JANE DOE INC., AND JUAN PABLO JARAMILLO**

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ....................................................................................................................... 2

    A.  The United States Seeks to Force the Disclosure of Voters' Sensitive Voter
        Data ................................................................................................................................. 2

    B.  The United States Seeks to Unlawfully Construct a National Voter Database
        and Use It to Disenfranchise Voters. ....................................................................... 4

LEGAL STANDARD................................................................................................................ 9

ARGUMENT ........................................................................................................................... 10

    I.  THE UNITED STATES'S DEMAND FAILS TO MEET THE STATUTORY
      REQUIREMENTS OF THE CRA................................................................................ 10

    II.  THE UNITED STATES'S DEMAND FAILS TO ACCOMODATE THE
       PRIVACY RIGHTS OF VOTERS AND ENDANGERS THEIR
       CONSTITUTIONAL RIGHTS.................................................................................... 17

CONCLUSION........................................................................................................................ 20

# TABLE OF AUTHORITIES

**Cases**

*Ala. ex rel. Gallion v. Rogers*,
  187 F. Supp. 848 (M.D. Ala. 1960) ................................................................. 2

*American Federation of State, County & Municipality Employees, AFL-CIO v. Social Security Administration*,
  No. 1:25-cv-596-ELH (D. Md. Jan. 16, 2026) ................................................ 7

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .......................................................................................... 10

*Ayers-Schaffner v. DiStefano*,
  37 F.3d 726 (1st Cir. 1994) .............................................................................. 1

*Burdick v. Takushi*,
  504 U.S. 428 (1992) .......................................................................................... 1

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System*,
  603 U.S. 799 (2024) .......................................................................................... 16

*Freeman v. Town of Hudson*,
  714 F.3d 29 (1st Cir. 2013) .............................................................................. 17

*In re Admin. Subpoena No. 25-1431-019*,
  800 F. Supp. 3d 229 (D. Mass. 2025) ............................................................. 12

*In re Coleman*,
  208 F. Supp. 199 (S.D. Miss. 1962), *aff'd sub nom.*, *Coleman v. Kennedy*,
  313 F.2d 867 (5th Cir. 1963) ........................................................................... 11

*In re Colonial Mortgage Bankers Corp.*,
  324 F.3d 12 (1st Cir. 2003) .............................................................................. 16

*Moore v. Kobach*,
  359 F. Supp. 3d 1029 (D. Kan. 2019) ............................................................. 19

*Niz-Chavez v. Garland*,
  593 U.S. 155 (2021) .......................................................................................... 15

*O'Hara v. Diageo-Guinness, USA, Inc.*,
  306 F. Supp. 3d 441 (D. Mass. 2018) ............................................................. 16

*PA Fair Elections v. Pennsylvania Department of State*,
  337 A.3d 598 (Pa. Commw. Ct. 2025) ............................................................ 6

*Public Interest Legal Found. v. Benson*,
  136 F.4th 613 (6th Cir. 2025) .......................................................................... 14

*Public Interest Legal Found., Inc. v. North Carolina State Board of Elections*,
  996 F.3d 257 (4th Cir. 2021) ........................................................................... 19

*Reno v. Condon*,
  528 U.S. 141 (2000) .......................................................................................... 20

*Schatz v. Republican State Leadership Committee,*
    669 F.3d 50 (1st Cir. 2012)...........................................................................10

*Tincher v. Noem,*
    No. 0:25-cv-04669-KMM-DTS (D. Minn. January 16, 2026)..................................9

*United States v. Comley,*
    890 F.2d 539 (1st Cir. 1989).........................................................................12

Opinion & Order, *United States v. Oregon,*
    No. 6:25-cv-01666-MTK (D. Or. Feb. 5, 2026) ..........................................passim

*United States v. Powell,*
    379 U.S. 48 (1964)........................................................................................12

*United States v. Weber,*
    --- F. Supp. 3d ----, No. 2:25-CV-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15,
    2026)..................................................................................................passim

*Watterson v. Page,*
    987 F.2d 1 (1st Cir. 1993).............................................................................17

*Yick Wo v. Hopkins,*
    118 U.S. 356 (1886) .......................................................................................1

**Statutes**

18 U.S.C. § 2721 ...............................................................................................20
18 U.S.C. § 2725 ...............................................................................................20
5 U.S.C. § 552a .............................................................................................16, 20
52 U.S.C. § 20501 ...............................................................................................2
52 U.S.C. § 20507 ...........................................................................14, 15, 18, 19
52 U.S.C. § 20701 ..........................................................................................1, 11
52 U.S.C. § 20901 ...............................................................................................2
52 U.S.C. § 21083 .........................................................................................8, 14
940 CMR, § 27.01 ..............................................................................................19
950 CMR 49.00...................................................................................................20
General Law c. 214 § 1B .....................................................................................19
General Law c. 4, § 7(26)(c)................................................................................19
General Law c. 51 § 4 .........................................................................................20
General Law c. 93H .............................................................................................19

**Other Authorities**

Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on 2020
    Grievances,*
    N.Y. TIMES, October 22, 2025, https://perma.cc/R8ZU-GGZZ ................................6
Brett Sholtis, *Pa. Election Integrity Group Met with 2 Architects of 2020 Effort to Overturn
    Election,* LANCASTERONLINE (July 21, 2024), https://lancasteronline.com/news/politics/pa-
    election-integrity-groupmet-with-2-architects-of-2020-effort-to-
    overturnelection/article_d477633c-460f-11ef-9d56-2fd754d57cab.html .................6

Carter Walker, *Efforts to Challenge Pennsylvania Voters' Mail Ballot Applications Fizzle*,
   SPOTLIGHT PA, Nov. 8, 2024, https://perma.cc/YL7J-NUV5 .................................................... 6
Carter Walker, *This Pa. Activist Is the Source of False and Flawed Election Claims Gaining
   Traction Across the Country*,
   VOTEBEAT (February 12, 2024), https://perma.cc/HQ9C-TMT7 ............................................. 6
Chester County, *Nov. 1, 2024 Election Board* overview *Hearing,*
   https://chestercopa.portal.civicclerk.com/event/852/ ................................................................. 6
Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter
   Roll*,
   N.Y. TIMES, Sept. 9, 2025,
   https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html. ............. 5
Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter
   Roll*,
   N.Y. TIMES, September 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-
   registration-data.html ................................................................................................................ 4
Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*,
   N.Y. TIMES MAGAZINE, Nov. 16, 2025,
   https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-
   attorneys.html .............................................................................................................................. 5
Jeremy Roebuck and Katie Bernard, *'I Can't Think of Anything Less American': Right-Wing
   Activists' Effort to Nullify Hundreds of Pa. Votes Met with Skepticism*,
   PHILA. INQUIRER, November 1, 2024, https://perma.cc/AMZ5-TFHQ..................................... 6
Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*,
   STATELINE, Sept. 12, 2025,
   https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security ... 5
Jonathan Shorman, *Trump's DOJ offers states 'confidential' deal to wipe voters flagged by feds
   as ineligible*,
   STATELINE, Dec. 18, 2025, https://stateline.org/2025/12/18/trumps-doj-offers-states-
   confidential-deal-to-wipe-voters-flagged-by-feds-as-ineligible/ ............................................... 8
Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship
   Data System*, NPR, June 29, 2025, https://perma.cc/J8VZ-X4N4 ............................................ 6
Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry,
   *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (January
   23, 2026), https://perma.cc/R824-QG68. ......................................................................... 3, 4, 8
Kyle Cheney,
   *Trump Administration Concedes DOGE Team May Have Misused Social Security Data*,
   POLITICO, January 20, 2026, https://www.politico.com/news/2026/01/20/trump-musk-doge-
   social-security-00737245 ............................................................................................................ 7
Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*,
   DEMOCRACY DOCKET, June 12, 2025, https://www.democracydocket.com/news-alerts/dhs-
   said-to-brief-cleta-mitchells-anti-voting-group-on-checking-citizenship-for-voters ................. 6

Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*,
    NPR, May 22, 2025, https://perma.cc/6QPB-NLZ8 .................................................................. 5
Press Release, U.S. Department of Justice,
    *Justice Department Sues Virginia for Failure to Produce Voter Rolls* (January 16, 2026),
    https://perma.cc/3L8Q-SJM5 ........................................................................................... 4
Press Release, U.S. Departmet of Justice,
    *United States Announces Settlement with Kentucky Ensuring Compliance with Voter
    Registration List Maintenance Requirements* (July 5, 2018) https://perma.cc/G2EZUUA5 .... 15
Press Release, United States Department of Justice,
    *Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls* (January
    6, 2026), https://perma.cc/YCM2-QQKM ............................................................................ 4
Press Release, United States Department of Justice,
    *Justice Department Sues Four Additional States and One Locality for Failure to Comply with
    Federal Elections Laws* (Dec. 12, 2025), https://perma.cc/8V9V-SRPJ..................................... 4
Press Release, United States Department of Justice,
    *Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025),
    https://perma.cc/RZL3-4E4B ........................................................................................... 4
Press Release, United States Department of Justice,
    *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls*
    (Sept. 16, 2025), https://perma.cc/M69P-YCVC ................................................................. 4
Press Release, United States Department of Justice,
    *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls*
    (Dec. 2, 2025), https://perma.cc/F5MD-NWHD.................................................................. 4
Press Release, United States Department of Justice,
    *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25,
    2025), https://perma.cc/7J99-WGBA ................................................................................. 4
Reid Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to 'Nationalize'
    Elections*,
    N.Y. TIMES, February 2, 2026, https://www.nytimes.com/2026/02/02/us/politics/trump-
    nationalize-elections.html ............................................................................................... 10
Sarah Lynch, *US Justice Dept Considers Handing over Voter Roll Data for Criminal Probes,
    Documents Show*,
    REUTERS, Sept. 9, 2025,
    https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-
    data-criminal-probes-documents-2025-09-09 .................................................................... 5
U.S. Dep't of Just., Civ. Rts. Div., *Federal Law Constraints on Post-Election "Audits"* (Jul. 28,
    2021), https://perma.cc/74CP-58EH ................................................................................ 2

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................................................. 10

**Reports**

H.R. Rep. No. 86-956 (1959)............................................................................................................... 2

## INTRODUCTION

The United States seeks to compel disclosure of sensitive voter information to which it is not entitled, reprising a data grab that it is currently pursuing in two dozen states. As it has elsewhere, the Administration uses civil rights laws as a pretext for its demands. This attempted perversion of laws designed to protect, rather than prevent, the franchise does not authorize the United States's actions. Neither the information requests propounded by the U.S. Department of Justice ("DOJ") on the Commonwealth of Massachusetts, nor the Complaint itself, satisfies the core statutory requirement that any federal demand for information under Title III of the Civil Rights Act of 1960 ("CRA") include a disclosure of "the basis and the purpose" for the request. 52 U.S.C. § 20703.  And even if the United States had complied with that threshold requirement, its request is also unlawful because it seeks unredacted personal information in conflict with federal and state privacy protections and procedures.  Two district courts have already concluded that a materially identical CRA claim by the United States was legally deficient, dismissing cases in California and Oregon without leave to replead.  *See United States v. Weber*, --- F. Supp. 3d ----, No. 2:25-CV-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026); *see also* Opinion & Order, *United States v. Oregon*, No. 6:25-cv-01666-MTK (D. Or. Feb. 5, 2026), Dkt. No. 73 ("*Oregon* Op.").  This Court should do the same.

The right to vote "'is of the most fundamental significance under our constitutional structure.'" *Ayers-Schaffner v. DiStefano*, 37 F.3d 726, 727 (1st Cir. 1994) (quoting *Burdick v. Takushi,* 504 U.S. 428, 432 (1992)). It is "preservative of all rights" because it serves as a check against tyrannical rule, keeping elected officials bound and beholden to the people. *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

Congress has repeatedly legislated to protect the franchise, including through Title III of the CRA, 52 U.S.C. § 20701 *et seq*., as well as the National Voter Registration Act ("NVRA"), 52

U.S.C. § 20501 *et seq.*, and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901 *et seq.* The purpose of these statutes is to ensure that all eligible Americans—especially racial minorities and voters with disabilities—have the opportunity to participate in free, fair, and secure elections. As DOJ itself has explained, the election records provision invoked here—Title III of the CRA—was designed to "secure a more effective protection of the right to vote." U.S. DOJ, Civ. Rts. Div., *Federal Law Constraints on Post-Election "Audits"* (Jul. 28, 2021), https://perma.cc/74CP-58EH (citing *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960) and H.R. Rep. No. 86-956 (1959)).

The United States's demand for Massachusetts's unredacted voter file—which contains sensitive personal information such as full birth dates, driver's license numbers, and partial Social Security numbers from every voter in the state—undermines these statutes' core objectives by *decreasing* access to the franchise and is contrary to law. Public disclosure of carefully redacted state voting records can help ensure transparency and the accuracy of the voter rolls, but this demand for unredacted voter records will deter voter participation and undermine the right to vote. Especially so here, where the United States's actual reason for the data demand, which it never disclosed in its request but which has been widely reported, is to create an unauthorized and unlawful national voter database, and to use this illicit tool to illegally target and challenge voters.

Because the Complaint fails to establish the United States's entitlement to the voter file, let alone an unredacted, non-public version, the Court should dismiss this action.

## BACKGROUND

### A. The United States Seeks to Force the Disclosure of Voters' Sensitive Voter Data

Beginning in May 2025, the United States, through the DOJ began sending letters to election officials in at least forty states, making escalating demands for the production of statewide

voter registration databases, with plans to gather data from all fifty states.[1]

On July 22, 2025, DOJ sent a letter to the Secretary for the Commonwealth of Massachusetts, William F. Galvin ("Secretary Galvin") demanding an electronic copy of Massachusetts's entire statewide voter registration list. Compl. ¶¶ 18–19; Letter of Michael Gates to the Hon. William Galvin dated July 22, 2025, Dkt. No. 7-1 ("July 22 Letter"). DOJ specifically requested that the electronic voter file be produced with "all fields" included. *Id.* The July 22 Letter did not claim any particular statutory basis for the request. *Id.* It propounded questions regarding Massachusetts's voter registration and list maintenance procedures and requested that Massachusetts provide information about purported "registered voters identified as ineligible to vote" due to being non-citizens or to a felony conviction. *Id.* at 2. DOJ asked for a response within 14 days. *Id.* Secretary Galvin's office informed DOJ that 60 days would be required for a response. Compl. ¶ 20; Letter of Michelle Tassinari dated August 7, 2025, Dkt. No. 7-2.

DOJ then sent another letter, demanding an earlier response and reiterating its demand for the full electronic voter file. Compl. ¶¶ 21–24. DOJ again stated that the production "must contain *all fields*, including the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number." Letter of Harmeet K. Dhillon to the Hon. William Galvin dated Aug. 14, 2025, Dkt. No. 7-3 ("Aug. 14 Letter"). DOJ's August 14 letter for the first time cited Title III of the CRA as authority for its request. Aug. 14 Letter at 1–3. It stated that "[t]he purpose of this request is to ascertain Massachusetts's compliance with the list maintenance requirements of the NVRA and HAVA," but

---

[1] *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated Jan. 23, 2026), https://perma.cc/R824-QG68.

did not elaborate further or reference any compliance deficiencies with respect to those statutes' voter list maintenance requirements. Compl. ¶ 22; Aug. 14 Letter at 1–3.

When Massachusetts did not comply, the United States filed this lawsuit—one of at least twenty-five nearly identical actions DOJ has initiated against states and election officials across the country—seeking to compel the production of sensitive Massachusetts voter data.[2]

**B. The United States Seeks to Unlawfully Construct a National Voter Database and Use It to Disenfranchise Voters.**

According to extensive public reporting, corroborated by government documents, DOJ's requests for private, sensitive voter data from Massachusetts and other states appear to be in connection with novel efforts to construct a national voter database, and to otherwise use untested forms of database analysis to scrutinize state voter rolls and challenge voters' eligibility.

According to public reporting, DOJ officials "have been clear that they are interested in a central, federal database of voter information." *E.g.*, Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html. And they have viewed state voter rolls as a key component in that effort. Within months of the new Administration's taking office, DOJ officials asked staffers from the new "Department of Governmental Efficiency" ("DOGE") to identify supposed noncitizens in state voter rolls by matching voter data with data from the Social Security Administration.[3] DOJ officials have since claimed that "we've checked 47.5 million voter records" and found "several thousand non-citizens

---

[2] *See, e.g.*, Martinez-Ochoa, O'Connor, & Berry, *Tracker of Justice Department Requests for Voter Information*, *supra* n.1 (indicating all states where lawsuits have been filed).

[3] *E.g.*, Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NPR, May 22, 2025, https://perma.cc/6QPB-NLZ8.

who are enrolled to vote in Federal elections," although public reporting indicates these efforts are incorrectly flagging U.S. citizens as ineligible to vote.[4]

DOJ has been coordinating in these novel efforts with the federal Department of Homeland Security ("DHS"), according to reported statements from both agencies. *Id.*[5] One article extensively quoted a recently-departed lawyer from DOJ's Civil Rights Division, describing DOJ's aims in this case and others like it with respect to the collection and aggregation of voter data:

> We were tasked with obtaining states' voter rolls, by suing them if necessary. Leadership said they had a DOGE person who could go through all the data and compare it to the Department of Homeland Security data and Social Security data. . . . I had never before told an opposing party, Hey, I want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division.

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAG., Nov. 16, 2025, https://perma.cc/L39A-S5VZ.

DOJ's efforts to obtain massive amounts of private voter data are being undertaken in coordination with self-proclaimed "election integrity" advocates inside and outside government who have previously sought to mass-challenge voters and overturn elections. For example, Heather Honey, who is currently serving as DHS's "deputy assistant secretary for election integrity," has been involved in efforts to overturn the 2020 election, to compel states to engage in

---

[4] December 5, 2025 Post by @AAGDhillon
https://x.com/AAGDhillon/status/1997003629442519114; *see* Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR, Dec. 10, 2025, https://perma.cc/6P7X-NZXL.

[5] *See also, e.g.*, Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security; Sarah Lynch, *US Justice Dept Considers Handing Over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025, https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09.

aggressive purges of registered voters, and to abuse voter data to make flawed mass challenges to disenfranchise thousands. *See, e.g.*, *PA Fair Elections v. Pa. Dep't of State*, 337 A.3d 598, 600 n.1 (Pa. Commw. Ct. 2025) (dismissing as meritless complaint brought by "PA Fair Elections," a group affiliated with now-Deputy Assistant Secretary Honey, challenging Pennsylvania's voter roll maintenance practices pursuant to HAVA).[6]

A recent federal court filing by DOJ further confirms that United States officials have been working with outside "election integrity" advocates to misuse voters' sensitive personal data. As detailed in the filing, which was made on behalf of the U.S. Social Security Administration (SSA):

> [I]n March 2025, a political advocacy group contacted two members of SSA's DOGE Team with a request to analyze state voter rolls that the advocacy group had acquired. The advocacy group's stated aim was to find evidence of voter fraud and to overturn election results in certain States. In connection with these communications, one of the DOGE team members signed a "Voter Data Agreement," in his capacity as an SSA employee, with the advocacy group. He sent the executed agreement to the advocacy group on March 24, 2025.

Notice of Corrections to the Record at 5, *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v.*

---

[6] Deputy Assistant Secretary Honey's involvement in attempts to overthrow the 2020 election are well documented. *E.g.*, Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*, N.Y. TIMES, Oct. 22, 2025, https://perma.cc/R8ZU-GGZZ ; Doug Bock Clark, *She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*, PROPUBLICA, Aug. 26, 2025, https://perma.cc/CE7A-6RY6; Carter Walker, *This Pa. Activist Is the Source of False and Flawed Election Claims Gaining Traction Across the Country*, VOTEBEAT (Feb. 12, 2024), https://perma.cc/HQ9C-TMT7 . Her organization's role in failed attempts to illegally purge and mass-challenge thousands of Pennsylvania voters in 2024is also a matter of public record. *E.g.*, Carter Walker, *Efforts to Challenge Pennsylvania Voters' Mail Ballot Applications Fizzle*, SPOTLIGHT PA, Nov. 8, 2024, https://perma.cc/YL7J-NUV5 ; Jeremy Roebuck and Katie Bernard, *'I Can't Think of Anything Less American': Right-Wing Activists' Effort to Nullify Hundreds of Pa. Votes Met with Skepticism*, PHILA. INQUIRER, Nov. 1, 2024, https://perma.cc/AMZ5-TFHQ ; *see also* Chester County, *Nov. 1, 2024 Election Board Hearing* at 50:30-51:34; 58:00-58:47; 1:54:58-1:55:19, https://chestercopa.portal.civicclerk.com/event/852/media.

*Soc. Sec. Admin.*, No. 1:25-cv-596-ELH, Dkt. No. 197 (D. Md. Jan. 16, 2026).[7]  The filings, which

do not specify the terms of the "Voter Data Agreement" or the activities these DOGE actors or

others undertook pursuant to it, also indicate that, around the same period, DOGE actors shared

unknown amounts of Social Security data on an unapproved third-party server, in a "manner [that]

is outside SSA's security protocols."  Notice of Corrections to the Record, *supra*, at 6

Additional government documents indicate how the United States ultimately plans to use

voters' sensitive personal data: to assert control over voting eligibility in the states, to order the

disenfranchisement of voters, and potentially to contest the results of state-run elections.

In particular, the United States has recently begun asking states to execute a memorandum

of understanding ("MOU") in connection with its requests for states' voter data. *See* Declaration

of Ari Savitzky in Supp. of Intervenors' Mot. to Dismiss ("Savitzky Declaration"), Ex. A, U.S.

Dep't of Just., Civ. Div., Confidential Mem. of Understanding ("U.S. MOU") (unsigned version

sent to Colorado); Savitzky Declaration, Ex. B, MOU (executed version between Texas and DOJ);

*see also* Savitzky Declaration, Ex. C., December 4 Transcript Excerpts from *United States v.*

*Weber*, No. 25-cv-09149, at 72–73, 90 (DOJ attorney discussing MOU).[8]  The terms of the MOU

purport to vest the United States with substantial new authority to identify supposedly ineligible

voters on state voter rolls and to compel states to remove these voters from the rolls, depriving

them of the franchise.  U.S. MOU at 2, 5.  Contrary to the provisions of the NVRA and HAVA,

which give states the responsibility of conducting a "reasonable effort" to maintain voter lists and

---

[7] *See also* Kyle Cheney, *Trump Administration Concedes DOGE Team May Have Misused Social Security Data*, POLITICO, Jan. 20, 2026, https://www.politico.com/news/2026/01/20/trump-musk-doge-social-security-00737245.

[8] In addition to the Colorado and Texas versions of the MOU attached as Exhibits A and B to the Savitzky Declaration, the copies provided to many other states are aggregated and posted in Martinez-Ochoa, O'Connor, & Berry, *Tracker of Justice Department Requests for Voter Information*, *supra* n.1.

remove actually ineligible voters from the rolls, *see* 52 U.S.C. §§ 20507(a)(4), 21083(a)(4)(A), and which leave the particular procedures developed to maintain electronic voter files "to the discretion of the State," 52 U.S.C. § 21085, the MOU puts DOJ in the driver's seat. It makes DOJ a "Custodian" of the state's voter file, and provides that DOJ will analyze the file and identify "any voter list maintenance issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, the Justice Department found when testing, assessing, and analyzing your state's [voter list] for NVRA and HAVA compliance." U.S. MOU at 4-5. Under the MOU's terms, once federal officials identify supposed "ineligible voters," states would be required to "remov[e]" these voters "within forty-five (45) days" and then resubmit their voter lists for additional analysis, U.S. MOU at 5. These removals are required under the terms of the MOU despite the procedural protections afforded the NVRA, including the statute's firm bar on systematic removals of certain voters within 90 days of an election, 52 U.S.C. § 20507.[9]

Thus, the government's own documents and extensive public reporting indicate that the United States's aim in seeking sensitive voter data on millions of Americans is to turn states' own voter rolls into a tool for unlawfully and improperly mass-challenging voters and interfering with the democratic process in the states.

Recent events have highlighted those impermissible aims and laid bare the lack of connection between the United States's voter data requests and the statutory provisions which they originally purported to rely on. In September 2025, DOJ sued the state of Minnesota to try to obtain sensitive voter data. On January 24, 2026, U. S. Attorney General Pamela Bondi wrote a letter to Minnesota Governor Tim Walz, purporting to discuss DHS's "Operation Metro Surge"

---

[9] *See also* Jonathan Shorman, *Trump's DOJ Offers States 'Confidential' Deal to Wipe Voters Flagged by Feds*, STATELINE, Dec. 18, 2025, https://stateline.org/2025/12/18/trumps-doj-offers-states-confidential-deal-to-wipe-voters-flagged-by-feds-as-ineligible/.

activities in the Twin Cities amidst ongoing violence against the city's residents.[10] The letter sets out three actions that Minnesota should take to "restore the rule of law, support ICE officers, and bring an end to the chaos in Minnesota." One of the actions is to "allow the Civil Rights Division of the Department of Justice to access voter rolls to confirm that Minnesota's voter registration practices comply with federal law as authorized by the Civil Rights Act of 1960."[11] And just days ago, President Trump announced his desire to "nationalize" elections in certain states. "The Republicans should say, 'We want to take over,'" he said. "We should take over the voting, the voting in at least many — 15 places. The Republicans ought to nationalize the voting." Reid Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, N.Y. TIMES, Feb. 2, 2026, https://www.nytimes.com/2026/02/02/us/politics/trump-nationalize-elections.html.

## LEGAL STANDARD

A court must dismiss a complaint if, accepting all well-pleaded factual allegations as true, it does not "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must state a "plausible claim for relief" and contain more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678–79.

In analyzing a motion to dismiss, the court must "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements," and then "take the complaint's well-pled (*i.e.,* non-conclusory, non-speculative) facts

---

[10] Savitzky Declaration, Ex. D, Letter of U.S. Attorney General Pamela Bondi to Minnesota Governor Tim Walz dated Jan. 24, 2026 ("Bondi Letter"); *see also* Order, *Tincher v. Noem*, No. 0:25-cv-04669-KMM-DTS (D. Minn. Jan. 16, 2026), Dkt. No. 85 (granting injunction against certain DHS practices towards the civilian population of Minneapolis-St. Paul).

[11] Bondi Letter at 2, 3.

as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012). Courts can also "consider (a) implications from documents attached to or fairly incorporated into the complaint, (b) facts susceptible to judicial notice, and (c) concessions in plaintiff's response to the motion to dismiss." *Id.* at 55–56 (1st Cir. 2012) (cleaned up).

## ARGUMENT

The single-count Complaint does not plausibly articulate a claim for relief because the United States's demand for Massachusetts's full and unredacted electronic voter file exceeds its statutory authority under the CRA.  Against the backdrop of the Jim Crow era, Congress enacted the CRA to facilitate federal investigations of civil rights violations preventing eligible citizens from voting due to discrimination. H.R. Rep. No. 86-956 at 7 (1959). The Attorney General's authority under the statute is important but not unlimited.  When the Attorney General invokes Title III to demand voting-related documents, she must provide, in writing, "a statement of the basis and the purpose" for her request.  52 U.S.C. § 20703.

Here, the United States fails to state a claim under the CRA for at least two reasons.  *First*, DOJ failed to set forth a statutorily sufficient statement of "the basis and the purpose" of its demand for Massachusetts's unredacted state voter file. Compl. ¶¶ 1–4, 18–23.  *Second*, even if the United States had followed this threshold requirement, this request for the complete, unredacted list is unlawful because it fails to protect the privacy rights and endangers the constitutional rights of Massachusetts voters.

## I.      THE UNITED STATES'S DEMAND FAILS TO MEET THE STATUTORY REQUIREMENTS OF THE CRA.

Title III of the CRA requires that officers of elections "retain and preserve, for a period of twenty-two months from the date of any" federal election, certain "records and papers which come

into [their] possession" relating to "act[s] requisite to voting," such as voter registration. 52 U.S.C. § 20701. Section 303 of the statute requires that "[a]ny record or paper" so retained and preserved "shall, upon demand in writing by the Attorney General … be made available for inspection, reproduction, and copying." *Id.* § 20703.[12]  This "demand in writing" "*shall* contain a statement of *the basis and the purpose* therefor." *Id.* (emphasis added).

Consistent with the statutory text, courts have consistently treated "the basis" and "the purpose" as two related, but distinct, concepts. *See Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).  The "basis" is the statement of *why* the Attorney General believes there may be a violation of federal civil rights law in the first place, whereas the "purpose" explains *how* the requested records would help the Attorney General determine if there is, in fact, a violation. *See United States v. Weber*, --- F. Supp. 3d ----, No. 2:25-CV-09149-DOC-ADS, 2026 WL 118807, at *9 & nn.17-18 (C.D. Cal. Jan. 15, 2026); *Cf. Lynd* 306 F.2d at 229 n.6.

The basis-and-purpose requirement under the CRA is a "critical safeguard that ensures the request is legitimately related to the purpose of the statute." *Weber*, 2026 WL 118807, at *9.  It prevents the statute from being used for a "fishing expedition" to obtain records for reasons that are speculative, unrelated to the CRA's aims, or otherwise impermissible or contrary to law.  *Id.*  It requires a specific statement as to the reason for requesting the information and how that information will aid in the investigatory analysis.  *Id.*  That is consistent with the application of other federal statutes allowing federal agencies to obtain records in service of investigations, which

---

[12] Intervenors assume for purposes of this Motion that the statewide electronic voter file may constitute a "record" or "paper" "relating to any application, registration, payment of poll tax, or other act requisite to voting" that has "come into [the Secretary's] possession.  52 U.S.C. § 20701. However, no court has ever addressed the question.

are enforceable if, among other things, the underlying investigation has a proper purpose and there is an actual nexus between that purpose and the specific information sought. *See United States v. Comley*, 890 F.2d 539, 541 (1st Cir. 1989) (citing *United States v. Powell*, 379 U.S. 48, 57–58 (1964). *Compare Comley*, 890 F.2d at 542 (upholding subpoena upon showing based on government affidavits specifying proper purpose and detailing evidentiary basis for requested information) *with In re Admin. Subpoena No. 25-1431-019,* 800 F. Supp. 3d 229, 237 (D. Mass. 2025) (quashing administrative subpoena against hospital where asserted basis and purpose was an internal DOJ memo directing officials "to undertake appropriate investigations").[13]

Here, the United States's demand fails to meet the CRA's basis-and-purpose requirement for at least three distinct reasons, any one of which warrants dismissal of the case.

*First*, the United States simply has not stated a "basis" for its demand. The "basis" for a CRA request is a statement of *why* the United States believes there may be some relevant violation of law. *See Lynd*, 306 F.2d at 229 n.6 (demand was "based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction.") ; *accord Weber*, 2026 WL 118807 at *9 ("The basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law."); *Oregon* Op. at 17 ("The Court understands 'basis' to mean a factual basis for investigating a violation of a federal statute."). Neither the Complaint nor the August 14 Letter that first invoked

---

[13] *See also, e.g.*, *Coro, Inc. v. F.T.C.*, 338 F.2d 149, 153 (1st Cir. 1964) ("[S]ubpoenas are not issued on bare suspicion. They are not licenses for extended fishing expeditions in waters of unknown productivity in the vague hope of 'catching the odd one.'" (quoting *Bowman Dairy Co. v. United States*, 341 U.S. 214, 221 (1951)).

the CRA state any "basis" for why the United States believes Massachusetts's list maintenance procedures might violate the NVRA or HAVA.

Nor could some "basis" otherwise be extrapolated from the pleadings. The Complaint alleges that DOJ is investigating Massachusetts's compliance with the NVRA and HAVA based on a review of the Election Administration and Voting Survey 2024 Comprehensive Report from the U.S. Election Assistance Commission ("2024 EAVS Report"), which includes States' "reported data on their efforts to keep voter registration lists current and accurate, known as list maintenance." Compl. ¶¶ 16–19. But the August 14 Letter making DOJ's formal CRA demand and purporting to state the "purpose" of the demand included no reference to the 2024 EAVS Report. August 14 Letter at 1–3. And while DOJ's July 22 Letter did reference statistics reported by Massachusetts in the 2024 EAVS Report, *see* July 22 Letter at 2, neither that letter nor the Complaint alleges any evidence of anomalies or anything inconsistent with reasonable list maintenance efforts in that reported data. *See* Compl. ¶¶ 16–19. The United States cannot use the July 22 Letter in a "patchwork and post hoc effort to stitch together a legally sufficient 'statement of the basis'" for its request. *Oregon* Op. at 17.

*Second*, even if the United States had identified some proper "basis" for its demand, it has not explained any connection between its purported "purpose" and the records requested here. The United States alleges that the "purpose" of its request seeking "an electronic copy of Massachusetts's complete and current [voter registration list]" was "to ascertain Massachusetts's compliance with the list maintenance requirements of the NVRA and HAVA." Compl. ¶ 22; August 14 Letter at 2. But neither the August 14 Letter nor the Complaint attempt to articulate *how* unredacted voter files are necessary or even relevant to that end. They do not explain how this information will enable the United States to determine whether Massachusetts is doing what the

statute actually says it must do, namely, "conduct a general program that makes a reasonable effort to remove the names of ineligible voters" by virtue of "death" or "a change in the residence of the registrant," 52 U.S.C. § 20507(a)(4); Compl. ¶ 12. Nor could they, because the unredacted voter file would not assist the Attorney General in examining this question: A single snapshot of a state's voter list does not and could not provide enough information to determine if the state has made a "reasonable effort" to remove ineligible voters under Section 8 of the NVRA.  Compl. ¶ 12; 52 U.S.C. § 20507(a)(4)(A)–(B).

The NVRA and HAVA both leave the mechanisms for conducting list maintenance to the discretion of the States. *See* 52 U.S.C. §§ 20507(a)(4); (c)(1); *Id.* § 21083(a)(2)(A); *Id.* § 21085. Even if the United States used voter file data to identify voters who had moved or died on Massachusetts's voter list at a single point in time, that still would not amount to Massachusetts failing to comply with the "reasonable effort" required by the NVRA or HAVA. *See, e.g.*, *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624–27 (6th Cir. 2025) (describing a "reasonable effort" as "a serious attempt that is rational and sensible" and rejecting any "quantifiable, objective standard" in this context).[14]  It is the procedures carried out by a state or locality—not the unredacted voter file— that establish its compliance with the statute.

Moreover, even if some portion of the voter file were necessary to "ascertain Massachusetts's compliance with the list maintenance requirements of the NVRA and HAVA," Compl. ¶ 22, the United States has provided no justification for why the full unredacted voter file

---

[14] Indeed, the inclusion on Massachusetts's voter registration list at any particular point in time of some voters who may have moved out of state is to be expected. Section 8(d) of the NVRA explicitly sets out a specific set of rules and requirements for removals from the voter rolls based on changes of residence, whereby states "shall not remove" voters on these grounds unless these voters directly confirm their change of residence in writing, or unless states first provide notice and then abide by a multi-year statutory waiting period. 52 U.S.C. § 20507(d).

is necessary to carry out this purported purpose. *See Oregon* Op. at 20 n.4.  It is telling that, for decades, DOJ has neither sought nor required a full and unredacted voter file in its investigations regarding compliance with the NVRA. *See, e.g.*, Press Release, U.S. Dep't of Just., *United States Announces Settlement with Kentucky Ensuring Compliance with Voter Registration List Maintenance Requirements* (July 5, 2018) https://perma.cc/G2EZUUA5 (describing letters to all 44 states covered by the NVRA with requests for list maintenance information, but without demanding voter files). The Complaint thus does not plausibly plead that DOJ has met the purpose requirement of the CRA, either.

       *Third*, even if the United States had plausibly set forth a facially sufficient statement of the basis and the purpose for its request, the CRA claim should also be dismissed because DOJ's stated reason for requesting millions of Massachusetts voters' personal data is pretextual.

       The CRA requires a statement of "*the* basis and *the* purpose" of a records request.  52 U.S.C. § 20703 (emphasis added). By twice using the definite article, the statute requires not just *a* basis or *a* purpose, but *the* complete basis and purpose underlying the request.  *See Niz-Chavez v. Garland*, 593 U.S. 155, 165–166 (2021); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024).  The United States has not disclosed the actual purpose for its requests here, and this Court "is not obliged to accept a contrived statement and purpose" in place of an accurate one.  *Weber*, 2026 WL 118807, at *10.

       Public reporting and public, judicially noticeable documents confirm that the United States's actual purpose is not to ensure compliance with the NVRA and HAVA, but to compile an unprecedented national voter file using error-prone, DOGE-inspired forms of data-aggregation and then to use this tool to identify and mass-challenge ostensibly ineligible voters. *See supra* 4-10 & nn.3-11. Considering the same robust set of reporting and documents, the *Weber* court concluded,

"[i]t appears that the DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database." 2026 WL 118807, at *10; *accord Oregon* Op. at 21.

The creation of a national voter database—much less one designed for targeting and mass-challenging voters—has never been authorized by Congress, and would violate (among other provisions of federal law) the federal Privacy Act's prohibition on the creation or maintenance of any database "describing how any individual exercises rights guaranteed by the First Amendment," which necessarily includes exercising the right to vote. *See* 5 U.S.C. § 552a(e)(7).

This concern is particularly acute in light of the MOU that the United States has recently asked states to sign in connection with its requests for statewide voter files. *See supra* 8-9 & nn.8-9. Far from indicating a purpose of ensuring compliance with the NVRA and HAVA, the MOU runs directly afoul of those statutes.[15] It purports to authorize the federal government to identify supposed ineligible voters, directly contrary to the requirement that procedures for complying with HAVA be "left to the discretion of the State." 52 U.S.C. § 21085; U.S. MOU at 2, 5. In addition, the MOU's substantive terms would allow DOJ to compel states to remove supposedly ineligible voters "within forty-five (45) days," U.S. MOU at 5, in a manner that would violate multiple protections of the NVRA, including the requirement to provide voters with notice prior to their removal from the rolls, and the bar against systematic voter removals close to an election. 52

---

[15] At the motion to dismiss stage, this Court may "consider not only the complaint but also matters fairly incorporated within it and matters susceptible to judicial notice." *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 15 (1st Cir. 2003). The MOU is susceptible to judicial notice as a government document whose accuracy cannot be questioned. *See, e.g., O'Hara v. Diageo-Guinness, USA, Inc.*, 306 F. Supp. 3d 441, 450 (D. Mass. 2018) (documents properly subject to judicial notice include "'documents the authenticity of which [is] not disputed by the parties,' and 'official public records.'" (quoting *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993) and *Freeman v. Town of Hudson*, 714 F.3d 29, 36–37 (1st Cir. 2013)).

U.S.C. § 20507.  The MOU confirms that DOJ's stated purpose of ensuring compliance with the NVRA and HAVA is not accurate or plausible, and that its actual purpose for seeking to ingest the sensitive personal information of millions of Massachusetts voters involves defying those statutes in order to unlawfully centralize control over state voter rolls in the hands of the federal executive. Other federal actions, including the Attorney General's attempt to link the disclosure of voter roll data to violent immigration enforcement activities in Minnesota, create even more "serious doubt as to the true purposes for which [the United States] is seeking voter registration lists in this and other cases, and what it intends to do with that data." *Oregon* Op. at 22.

The United States's failure to disclose what it is doing and will do with voters' sensitive personal information is independently fatal to the CRA claim.  "Congress passed the NVRA, Civil Rights Act, and HAVA to protect voting rights. If the DOJ wants to instead use these statutes for more than their stated purpose, circumventing the authority granted to them by Congress, it cannot do so under the guise of a pretextual investigative purpose." *Weber*, 2026 WL 118807, at *12; *accord Oregon* Op. at 20-23 & n.5.

## II.    THE UNITED STATES'S DEMAND FAILS TO ACCOMODATE THE PRIVACY RIGHTS OF VOTERS AND ENDANGERS THEIR CONSTITUTIONAL RIGHTS.

Even if the United States had provided a valid basis and purpose—which it did not—its request for unredacted documents is legally flawed because it fails to comport with the federal and state law privacy rights of Massachusetts voters.  Courts have found that federal and state law and the Constitution may require redaction of voters' records to protect privacy.  *E.g.*, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334, 339 (4th Cir. 2012).  But the United States has sought only the full and unredacted voter file.  *See* Compl. ¶ 22. Because providing the data as demanded would be unlawful, the CRA claim must be dismissed.

Redaction and modification of voting records to ensure voters' privacy is commonplace

before a state discloses such records to a requesting party. Title III of the CRA has not been invoked in decades, but the NVRA provides a ready analogue. The NVRA requires states to maintain "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" and to make such records available to anyone for "public inspection" upon request. 52 U.S.C. § 20507(i)(1); *see also* Compl. ¶¶ 10–15 (discussing NVRA). Voting rights advocates have consistently relied on the NVRA to investigate infringements of the right to vote, including whether election officials have improperly denied or cancelled voter registrations. *See, e.g., Long*, 682 F.3d at 333. And critically, courts have consistently held that redacting voters' sensitive personal data is compatible with the NVRA. *Id.* at 339.

Because "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File," redaction of "certain personal information" can be required to "assuage the potential privacy risks implicated by the public release of the Voter File." *See Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024). Like the First Circuit, other courts have repeatedly recognized that the NVRA does not compel the release of sensitive information that is otherwise protected by federal or state law. *See, e.g.*, *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 266–68 (4th Cir. 2021) (certain records could be kept from disclosure consistent with the NVRA).[16]

Just like the NVRA, the CRA is silent as to how sensitive personal information should be treated during disclosure. *Compare* 52 U.S.C. § 20703 *with* § 20507(i)(1). So, as with the NVRA,

---

[16] The United States has conceded that the NVRA does not prohibit states from redacting "uniquely sensitive information" when disclosing voting records. *See, e.g.*, Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found., Inc. v. Bellows* ("United States Amicus Brief"), No. 23-1361 (1st Cir. July 25, 2024), 2023 WL 4882397 at *27–28 (quoting *Long*, 682 F.3d at 339).

the disclosure provisions of Title III of the CRA must also be construed to avoid intolerable burdens on critical privacy rights and violations of statute. *See Long*, 682 F.3d at 339; *see also Bellows*, 92 F.4th at 56; *N.C. State Bd. of Elections*, 996 F.3d at 264.

The United States's demand fails this standard. State law recognizes significant privacy interests in and protections for sensitive information like drivers' license and Social Security numbers. *See, e.g.,* G.L. c. 214 § 1B (Massachusetts citizens "shall have a right against unreasonable, substantial or serious interference with his privacy"); G. L. c. 93H (driver's license and Social Security numbers are personal information subject to protection); 940 CMR 27.01 (regulations implementing c. 93 H, including prohibiting "use of such information that could result in substantial harm or inconvenience to any resident of the commonwealth"); G. L. c. 4, § 7(26)(c) (exempting from public disclosure "materials or data relating to a specifically named individual, the disclosure of which may constitute an unwarranted invasion of personal privacy."). The U.S. Constitution also protects voters' informational privacy. *See Moore v. Kobach*, 359 F. Supp. 3d 1029, 1049 (D. Kan. 2019) (voters stated privacy claim based on officials sharing personal information with other states without adequate protections). And federal statutory law requires, at a minimum, substantial redaction of sensitive information like Social Security and driver's license information, as well as additional procedural steps such as a "privacy impact statement" and hard limits on interagency data sharing *Weber*, 2026 WL 118807, at *17–19.[17]

---

[17] In particular, the Privacy Act requires the publication of notice in the Federal Register before the collection of data, 5 U.S.C. § 552a(e)(4), which the United States does not allege it did here, *Weber*, 2026 WL 118807, at *18. The E-Government Act requires publication of a "privacy impact assessment" "prior to 'initiating a new collection of information'" that includes individualized contact information for "'10 or more persons.'" *Id.* at *19. The United States does not allege it did that here. Finally, the Driver's Privacy Protection Act "prevents the disclosure of 'personal information' that is obtained by" a state Motor Vehicles Department "in connection with a 'motor vehicle record.'" *Id.* (quoting 18 U.S.C. §§ 2721(a), 2725(1), (3), & (4); *Reno v. Condon*, 528 U.S. 141, 143 (2000)). Massachusetts receives voter information from its Registry of Motor Vehicles.

Disclosure of voters' sensitive personal information, such as partial Social Security numbers, which are "uniquely sensitive and vulnerable to abuse," would also "create[] an intolerable burden on [the constitutional right to vote] as protected by the First and Fourteenth Amendments." *Long*, 682 F.3d at 334, 339 (cleaned up). The danger of imposing those burdens on Massachusetts voters and good-government civic groups like Common Cause is present here. *See, e.g.*, Decl. of Geoffrey Foster, Dkt. No. 15-1 at ¶¶ 6, 9–13 (Common Cause Massachusetts director explaining that disclosure would chill voter registration activities).  And it is especially acute for those voters served by Jane Doe Inc., who register confidentially pursuant to special protections provided by Massachusetts law for survivors of domestic violence.  Decl. of Hema Serang-Sieminski, Dkt. No. 15-2 at ¶¶ 5–16; *see* G. L. c. 51, §§ 4 (d), 44; 950 CMR 49.00 *et seq.*

Title III "was meant to provide the DOJ access to 'public records which ought ordinarily to be open to legitimate reasonable inspection.'"  *Weber*, 2026 WL 118807, at *9 (quoting *Lynd*, 306 F.2d at 231). It was never meant to be used to trammel voters' rights, by giving the federal executive unrestricted access to their "confidential, private papers and effects" to facilitate disenfranchisement. *Weber*, 2026 WL 118807, at *9 (quoting *Lynd*, 306 F.2d at 231). Because the CRA was enacted decades before HAVA first mandated collection of driver's license and partial Social Security numbers for voter registration in 2002, Congress "could not have conceived for this highly sensitive information to be at the DOJ's disposal" via a Title III request.  *Id.*

Title III does not entitle the United States to obtain millions of voters' sensitive personal information, with no modifications or redactions, in violation of federal and state privacy protections.  The United States's demand for the complete, unredacted voter file is contrary to law, and the relief it seeks in this action cannot be granted.  The Complaint should be dismissed.

## CONCLUSION

For these reasons, the United States's Complaint should be dismissed.

Dated: February 6, 2026

Respectfully submitted,

/s/_____Ari J. Savitzky_____

Jessie J. Rossman (BBO # 670685)
Suzanne Schlossberg (BBO #703914)
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
Tel.: (617) 482-3170
jrossman@aclum.org
sschlossberg@aclum.org

Ari J. Savitzky*
Theresa J. Lee*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
asavitzky@aclu.org
tlee@aclu.org
slakin@aclu.org

*admitted pro hac vice*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 6, 2026 a true and correct copy of the foregoing document was served via the Court's ECF system on all counsel of record.


<u>/s/ Ari Savitzky            </u>