# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>WILLIAM FRANCIS GALVIN, in his official capacity as Secretary of the Commonwealth of Massachusetts,<br><br>    Defendant. | Case No. 25-cv-13816<br>(Hon. Leo T. Sorokin) |

## COMMON CAUSE, JANE DOE INC., AND JUAN PABLO JARAMILLO'S BRIEF IN OPPOSITION TO THE UNITED STATES'S MOTION TO COMPEL

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................. 1

BACKGROUND .............................................................................................................................. 2

    A.    Statutory Background: The Civil Rights Act of 1960 ...................................................... 2

    B.    Factual Background:  The United States Seeks to Force Disclosure of Voters' Sensitive Voter Data for Use in Constructing an Unlawful National Database ...................................... 5

ARGUMENT .................................................................................................................................... 6

  THE UNITED STATES IS NOT ENTITLED TO SUMMARY DISPOSITION OF ITS CRA CLAIM. ........................................................................................................................................ 6

    A.    The United States's Attempt to Obtain the Records at Issue Via the Civil Litigation Process Must Proceed According to the Federal Rules of Civil Procedure ............................. 7

    B.    The Title III Cases on Which the United States Relies Do Not Exempt This Case from the Federal Rules. ................................................................................................................... 10

CONCLUSION ............................................................................................................................... 13

# **TABLE OF AUTHORITIES**

**Cases**

*Alabama v. United States*,
   304 F.2d 583 (5th Cir. 1962) .................................................................................................. 3

*Alabama v. United States*,
   371 U.S. 37 (1962) .................................................................................................................. 3

*Ayers v. Securities and Exchange Commission*,
   482 F. Supp. 747 (D. Mont. 1980).......................................................................................... 12

*Becker v. United States*,
   451 U.S. 1306 (1981) ........................................................................................................... 1, 8

*Crystal v. United States*,
   172 F.3d 1141 (9th Cir. 1999) ............................................................................................... 12

*Dinkens v. Attorney General of United States*,
   285 F.2d 430 (5th Cir. 1961) .................................................................................................. 3

*New Hampshire Fire Insurance Co. v. Scanlon*,
   362 U.S. 404 (1960) ................................................................................................................ 8

*QueerDoc, PLLC v. United States Department of Justice*,
   No. 2:25-MC-00042-JNW, 2025 WL 3013568 (W.D. Wash. Oct. 27, 2025) ...................... 12

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001) .................................................................................................................. 8

*United States v. Cartwright*,
   230 F. Supp 873 (M.D. Ala. 1964) ......................................................................................... 3

*United States v. Councilman*,
    418 F.3d 67 (1st Cir. 2005)..................................................................................................... 8

Opinion & Order, *United States v. Oregon,*
No. 6:25-cv-01666-MTK (D. Or. Feb. 5, 2026) ................................................................. 2, 7, 10

*United States v. Weber*,
   No. 2:25-CV-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) ................. 2, 7, 9

*United States v. Westinghouse Electric Corp.*,
   788 F.2d 164 (3d Cir. 1986) .................................................................................................. 11

**Statutes**

18 U.S.C. § 2721 .......................................................................................................................... 12
26 U.S.C. § 7602 ............................................................................................................................ 9
26 U.S.C. § 7604 ........................................................................................................................ 8, 9
42 U.S.C. § 1971 ............................................................................................................................ 3
44 U.S.C. § 3351 .......................................................................................................................... 12
52 U.S.C. § 10101 ................................................................................................................ 3, 4, 10
52 U.S.C. § 20703 .......................................................................................................................... 1

52 U.S.C. § 20705 .................................................................................................................. 2, 7, 9
Pub. L. No. 103-322, 108 Stat. 1796 (1994) ............................................................................... 12
Pub. L. No. 107-347, 116 Stat. 2899 (2002) ............................................................................... 12
Pub. L. No. 93-579, 88 Stat. 1896 (1974) ................................................................................... 12

**Other Authorities**

Eric H. Holder, Jr.,
  *MLK50 Symposium: Where Do We Go from Here? Keynote Address*, 49 U. Mem. L. Rev. 33, 38 (2018). ...................................................................................................................... 4
Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry,
  *Tracker of Justice Department Requests for Voter Information*, Brennan Center for Justice (January 23, 2026) ................................................................................................................. 5
Press Release, U.S. Deparment of Justice,
  *Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls* (January 6, 2026) ....................................................................................................................... 5
Press Release, U.S. Deparment of Justice,
  *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (December 12, 2025) ........................................................... 5
Press Release, U.S. Department of Justice,
  *Justice Department Sues Four States for Failure to Produce Voter Rolls* (December 18, 2025) 5
Press Release, U.S. Department of Justice,
  *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (December 2, 2025), ..................................................................................................... 6
Press Release, U.S. Department of Justice,
  *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (September 25, 2025), ................................................................................................................ 6
Press Release, U.S. Department of Justice,
  *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (September 16, 2025) .................................................................................................... 6
Press Release, U.S. Department of Justice,
  *Justice Department Sues Virginia for Failure to Produce Voter Rolls* (January 16, 2026) ......... 5
Steven F. Lawson,
  *Black Ballots: Voting Rights in the South, 1944-1969* (1976) ..................................................... 4

**Rules**

Federal Rules of Civil Procedure, Rule 1 .................................................................................. 1, 7
Federal Rules of Civil Procedure, Rule 81 ................................................................................ 1, 7

## INTRODUCTION

The United States not only seeks to force the disclosure of sensitive personal voter data to which it is not entitled, but endeavors to do so via a complete bypass of the Federal Rules of Civil Procedure, asking this Court to summarily dispose of this case at the outset via an improper motion to compel. That gambit must be rejected.

The United States's single cause of action is based on Title III of the Civil Rights Act of 1960 ("CRA"), 52 U.S.C. § 20701 *et seq.*, a disclosure scheme that has not been the subject of federal litigation since the early 1960s. Title III mandates that any request for disclosure by the U.S. Attorney General for covered voting-related records include a statement "in writing" setting forth "the basis and the purpose" for the request. *Id.* at § 20703. Here, the United States has failed to meet that threshold requirement as a matter of law. But even if the United States had pleaded compliance with Title III's requirements, the next step in this case would be discovery pursuant to the Federal Rules into whether, among other things, the United States had *in fact* properly disclosed "the basis and the purpose" of its request as mandated by the statute it invokes.

The United States's contrary position is that the rules do not apply, and that this is a "summary" proceeding which can be resolved in one fell swoop via a motion to compel. Memo. of Law in Supp. of U.S. Mot. to Compel ("U.S. Br."), Dkt. No. 7 at 6, 10. The United States's position contravenes the CRA's text, the plain terms of the Federal Rules, and decades of binding precedent which requires the normal application of the Federal Rules of Civil Procedure in cases like this one. *See, e.g.*, *Becker v. United States*, 451 U.S. 1306, 1307–08 (1981); *United States v. Powell*, 379 U.S. 48, 57–58 (1964); *see also* Fed. R. Civ. P. 1, 81. Rather than statutory text and Supreme Court authority, the United States relies on a misreading of Fifth Circuit cases from the Jim Crow era, a radically different context in which federal courts were required to help protect the franchise, not enable attacks on it. As another district court in a case involving a materially

1

identical CRA claim recently held in rejecting the United States' motion to compel arguments out of hand, "Title III cannot transform an election records request by the federal government from an ordinary civil action into an action comparable to an order to show cause." *United States v. Weber*, No. 2:25-CV-09149-DOC-ADS, 2026 WL 118807, at *8 (C.D. Cal. Jan. 15, 2026); *accord* Opinion & Order, *United States v. Oregon*, No. 6:25-cv-01666-MTK (D. Or. Feb. 5, 2026), Dkt. No. 73 ("*Oregon* Op.").

The United States may not end-run the procedural and substantive protections imposed by the CRA and the Federal Rules to summarily obtain the ultimate relief it seeks in this civil action. The motion to compel should be denied.

## BACKGROUND[1]

### A. Statutory Background: The Civil Rights Act of 1960

Amidst the turmoil of the Jim Crow era, Congress enacted the Civil Rights Act of 1960, including the public records provisions in Title III, to facilitate investigations of civil rights violations preventing eligible citizens from voting due to discrimination. H.R. Rep. No. 86-956 at 7 (1959) (indicating the purpose of Title III "is to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race").

Title III requires states to retain and preserve "all records and papers which come into [an election official's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting." 52 U.S.C. § 20701. These records "shall, upon demand in writing by the Attorney General or his representative . . . be made available for inspection, reproduction, and copying at the principal office of [the] custodian." *Id*. § 20703. This written demand must "contain a statement of the basis and the purpose therefor." *Id.* Title III provides the federal courts in the

---

[1] Additional background is provided in Intervenors' brief in support of their Motion to Dismiss, which is incorporated here by reference.

district where such a demand is made with "jurisdiction by appropriate process to compel the production of such record or paper." *Id.* § 20705.

Title III, as part of the 1960 Civil Rights Act, provided a mechanism by which "preliminary investigations of registration practices [could] be made in order to determine whether or not such practices conform[ed] to constitutional principles," including the prevention of racial discrimination and the protection of the right to vote. *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961). Consistent with that statutory purpose, the federal government used Title III to investigate jurisdictions that had effectively denied Black Americans the right to register to vote. *See, e.g.*, *Alabama v. United States*, 304 F.2d 583, 585–86 (5th Cir. 1962), *aff'd sub nom. Alabama v. United States*, 371 U.S. 37 (1962) (finding an Alabama county's registration practices were racially discriminatory, leading to less than 10% of Black citizens being registered to vote while nearly 100% of white citizens were registered, despite the county's population being 83% Black); *see also United States v. Cartwright*, 230 F. Supp 873, 875 (M.D. Ala. 1964) (reviewing data from an investigation pursuant to Title III which revealed that voting registrars engaged in racially discriminatory practices resulting in 89% of white citizens being registered to vote but only 7.5% of Black citizens being registered). Used as it was intended—i.e., as a mechanism to expand and protect the franchise— Title III proved crucial for uncovering evidence of unlawfully low Black voter registration and allowed the federal government to bring early "'pattern or practice'" voter discrimination cases against such jurisdictions. *See Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962) (citing 42 U.S.C. § 1971 (since transferred to 52 U.S.C. § 10101)).

In the early 1960s, those jurisdictions were mainly the Fifth Circuit states of Alabama, Florida, Georgia, Louisiana, Mississippi, and Texas, where election officials notoriously refused

to register Black voters, and civil rights enforcement efforts confronted strong resistance from local officials and local courts.[2]  In defending against Title III suits, these states claimed that the Attorney General needed to further elaborate on the basis for the demand, or even to prove discrimination, before he was entitled to inspect a county's election records, even where massive racial disparities with respect to registration and voting were clear and where the Attorney General had already identified both the basis and the purpose for inspecting the jurisdictions' registration records.  *See Lynd*, 306 F.2d at 228.  Reflecting Title III's unmistakable aim to expand the franchise, the Fifth Circuit in cases like *Lynd* held that Title III required counties to produce documents that were sought for that purpose when a proper statement of basis and purpose were given.  *See id.* (Title III's "purpose is to enable the Attorney General to determine whether [52 U.S.C. § 10101] suits or similar actions should be instituted.  And it is to enable him to obtain evidence for use in such cases if and when filed.").

The need for this use of Title III was short lived.  Only a few years later, Congress passed the Civil Rights Act of 1964, which outlawed racial segregation altogether.  Then, in 1965, Congress passed the Voting Rights Act, the "crown jewel of the civil rights movement,"[3] which established new voter protections, eliminated literacy tests, and led to the enfranchisement of millions of Black citizens.  Because Congress enacted more effective voting rights laws—most notably the Voting Rights Act—federal court assessment of Title III has largely been silent since 1965.

---

[2] *See generally, e.g.*, Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944-1969* (1976).

[3] Eric H. Holder, Jr., *MLK50 Symposium: Where Do We Go from Here? Keynote Address*, 49 U. Mem. L. Rev. 33, 38 (2018).

**B. Factual Background: The United States Seeks to Force Disclosure of Voters' Sensitive Voter Data for Use in Constructing an Unlawful National Database**

Beginning in May 2025, Plaintiff the United States, through its Department of Justice ("DOJ"), began sending letters to election officials in at least forty states, making escalating demands for the production of statewide voter registration databases, with plans to gather data from all fifty states. *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated Jan. 23, 2026), https://perma.cc/R824-QG68. Massachusetts was one such state. *See* Compl. ¶¶ 18-24.

DOJ has sought Massachusetts's complete and unredacted electronic voter file, including "all fields, including the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number." U.S. Br., Ex. 3, Letter of Harmeet K. Dhillon to the Hon. William Galvin dated Aug. 14, 2025, Dkt. No. 7-3 ("Aug. 14 Letter"). DOJ ultimately invoked Title III of the CRA in making this request, stating that "[t]he purpose of this request is to ascertain Massachusetts's compliance with the list maintenance requirements of the NVRA and HAVA." Compl. ¶ 22; Aug. 14 Letter at 1–3. DOJ's demand letter did not state the "basis" for its request. Aug. 14 Letter at 1–3.

When Massachusetts did not provide the requested information, the United States filed this lawsuit—one of at least twenty-five nearly identical lawsuits that DOJ has initiated against states and election officials across the country—seeking to compel the production of this sensitive Massachusetts voter data.[4]

---

[4] *See* Press Release, U.S. Dep't of Just., *Justice Department Sues Virginia for Failure to Produce Voter Rolls* (Jan. 16, 2026), https://perma.cc/3L8Q-SJM5; Press Release, U.S. Dep't of Just., *Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls* (Jan. 6, 2026), https://perma.cc/YCM2-QQKM; Press Release, U.S. Dep't of Just., *Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025), https://perma.cc/RZL3-4E4B; Press Release, U.S. Dep't of Just., *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025),

DOJ has not identified any deficiencies or anomalies in Massachusetts's maintenance of its voter file. Rather, according to extensive public reporting, DOJ's requests for private, sensitive voter data from Massachusetts and other states appear to be in connection with a purpose that is different from the one set forth in the DOJ's demand letter, namely, the construction of an unauthorized national voter database that can be used to mass-challenge voters' eligibility and contest election results in certain states.[5]

## ARGUMENT

**I.    THE UNITED STATES IS NOT ENTITLED TO SUMMARY DISPOSITION OF ITS CRA CLAIM.**

Should the United States's Complaint survive the Rule 12 stage, then the case should proceed to discovery in the normal course under the Federal Rules of Civil Procedure. The United States's motion to compel the sensitive voter information it seeks in this litigation, thereby resolving the case with no discovery, motion practice, or trial, is contrary to law and must be denied. The text of the CRA, binding case law, and the terms of the Federal Rules all require that result. And the cases on which the United States relies are inapposite on this question, especially when properly understood in the context of the time in which they were decided.

---

https://perma.cc/8V9V-SRPJ; Press Release, U.S. Dep't of Just., *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025), https://perma.cc/F5MD-NWHD; Press Release, U.S. Dep't of Just., *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025), https://perma.cc/7J99-WGBA; Press Release, U.S. Dep't of Just., *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025), https://perma.cc/M69P-YCVC.

[5] The extensive record of public reporting and government documents and admissions relating to this ulterior purpose are described at length in Intervenors' Motion to Dismiss at pages 4-9 and notes 3-11.

### A. The United States's Attempt to Obtain the Records at Issue Via the Civil Litigation Process Must Proceed According to the Federal Rules of Civil Procedure

The question of what procedure the CRA requires is governed by the text of the statute, as well as binding case law and the applicable Federal Rules. All point in the same direction.

The text itself makes this clear. Title III provides that the Attorney General may make a "demand in writing" for certain voting-related records or papers, which "shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. It then provides that "[t]he United States district court for the district in which a demand is made pursuant to section 20703 of this title … shall have jurisdiction *by appropriate process* to compel the production of such record or paper." *Id.* § 20705 (emphasis added). In other words: If there is a dispute over a Title III demand, the Attorney General may go to a federal court to seek relief. The statute contains no special procedures. It does not state that courts must rule summarily or that they are stripped of their ordinary functions. It does not say that the ordinary rules for invoking and deploying judicial power have been circumvented. *Weber*, 2026 WL 118807, at *8 ("Nothing in the text of Title III requires a special statutory proceeding or any abbreviated procedures."); *accord Oregon* Op. at 14-15. To the contrary, Title III provides for judicial enforcement of records requests under the statute "by appropriate process," 52 U.S.C. § 20705. And the appropriate process is set forth in the Federal Rules of Civil Procedure, which "govern the procedure in *all* civil actions and proceedings in the United States district courts," Fed. R. Civ. P. 1 (emphasis added), with only a narrow set of express exceptions of which the CRA is not one, Fed. R. Civ. P. 81. *See also* Fed. R. Civ. P. 81(a)(5) (expressly providing that "[t]hese rules apply to proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute").

The drafters of the Federal Rules clearly knew how to carve out certain types of proceedings from the otherwise unequivocal mandate that the Rules apply to *all* civil actions and proceedings, yet they did not do so for Title III. *See, e.g.*, *United States v. Councilman*, 418 F.3d 67, 75 (1st Cir. 2005) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001)). The Federal Rules—including the protections and processes they supply for testing the sufficiency of pleadings and for taking discovery—apply in this civil action.

Binding precedent is in accord. The Supreme Court has repeatedly reaffirmed that "the Federal Rules apply to proceedings to compel the giving of testimony or production of documents in accordance with a subpoena issued by an officer or agency of the United States under any statute of the United States except as otherwise provided by statute or by rules of the district court or by order of the court in the proceedings." *Becker v. United States*, 451 U.S. 1306, 1307–1308 (1981) (Rehnquist, C.J.) (internal citation and quotation marks omitted); *see also, e.g.*, *United States v. Powell*, 379 U.S. 48, 57–58 (1964) (holding that IRS Commissioner bears the burden to establish statutory requirements before enforcement of a tax subpoena); *N.H. Fire Ins. Co. v. Scanlon*, 362 U.S. 404, 407–08 (1960).

*Powell* controls here. That case involved an attempt to enforce a statute providing the United States with the power to request certain books and records relating to taxes and to compel their production "by appropriate process." 379 U.S. at 52, 57–58 & nn.10, 18 (citing 26 U.S.C. § 7604(a)). The Supreme Court squarely held that the tax records statute being enforced did *not* authorize any special or summary proceeding that might supplant the Federal Rules. *Id.* Critically, the IRS statute at issue in *Powell* is virtually identical to Title III. The relevant provision of the

8

IRS statute reads: "[T]he United States district court for the district in which such person resides or is found *shall have jurisdiction by appropriate process to compel* such attendance, testimony, or production of books, papers, records, or other data." 26 U.S.C. § 7604(a) (emphasis added). Title III reads: "The United States district court for the district in which a demand is made … or in which a record or paper so demanded is located, *shall have jurisdiction by appropriate process to compel* the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). The holding in *Powell*—that a statute which is materially identical to Title III did not authorize any special proceedings that deviate from the Federal Rules—is on point and binding here. *See* 379 U.S. at 57–58 & n.18; *accord Weber*, 2026 WL 118807, at *8 n.15 (explaining *Powell*'s holding "that courts should apply standard civil procedures in ensuring [statutory] prerequisites are satisfied under a similarly worded statute").[6]

The safeguards and procedures built into the Federal Rules of Civil Procedure, which require appropriate discovery into all the relevant facts, followed by the proper presentation of summary judgment motions on the record or trial, are especially important here. The United States seeks to obtain voters' sensitive personal data, but has failed to properly set forth "the basis and the purpose" for its request as required to establish any potential entitlement to such data, 52 U.S.C. § 20703, all while failing to disclose its actual purpose, which is the unlawful construction of a tool to disenfranchise voters. *See supra* n.5. The United States can move for summary judgment or for an expedited schedule if it wishes to do so. But it cannot end-run the Federal Rules and the

---

[6] The United States may argue that the IRS statute involves "subpoena power" and is therefore distinguishable, but the word "subpoena" does not appear in the relevant IRS statute which is virtually identical to Title III in its terms, phrasing, and structure. *See* 26 U.S.C. §§ 7602, 7604 (not containing that term). Indeed, if anything, the IRS statute provides *more* summary procedures than Title III. *Compare* 26 U.S.C. § 7604(b) (providing for power to bring contempt proceedings against persons who fail to appear or produce data in response to a request), *with* 52 U.S.C. § 20705 (containing no such provision).

CRA's requirements. Because the motion to compel would improperly circumvent the Federal Rules and impermissibly award the United States all of the relief it seeks in this lawsuit before it has proven entitlement to judgment on its claim, the motion should be denied.

**B. The Cases on Which the United States Relies Do Not Exempt This Case from the Federal Rules.**

The United States's contrary assertion that Title III creates some sort of special summary proceeding rests entirely on a set of Fifth Circuit cases from the early 1960's, chief among them *Kennedy v. Lynd*. U.S. Br. at 4–6, 8, 10–11 & n.1. Those non-binding cases, all of which predate *Becker* and *Powell*, are inapposite on this point, both because they arose in a completely different context, and because they did not involve the disclosure of sensitive personally identifying information and substantial data privacy risks. It would be error to adopt the United States's proposal to bypass the Federal Rules based on out-of-context snippets from those cases. *See Oregon* Op. at 15 ("The Supreme Court's holding in *Powell* squarely rejects Plaintiff's contention and reliance on *Lynd*.").

Decisions like *Lynd* must be understood in context, as a pragmatic response to the situation that prevailed in the Jim Crow South in the early 1960s. Title III's purpose was to protect the right to vote by facilitating discrimination suits against recalcitrant Jim Crow counties that refused to process the voter registrations of Black voters and that stymied every effort to enforce federal law, sometimes with help from friendly judges. *Lynd*, 306 F.2d at 228 (Title III's "purpose is to enable the Attorney General to determine whether [52 U.S.C. § 10101 pattern-or-practice] suits or similar actions should be instituted. And it is to enable him to obtain such evidence for use in such cases if and when filed."). The Fifth Circuit painted a clear picture of the situation: By the time *Lynd* was decided, the county registrar defendants in that case had already spent 18 months filing "a series of motions, motions to dismiss, opposing substitution motions for more definite statement

10

and briefs and repeated extended oral arguments thereon," all "with no clear-cut ruling, no indication that this interminable proceeding would ever come to an end, and certainly never an order for production." *Id.* at 227. This was all despite the fact that "the factual foundation for" the basis and purpose of the Attorney General's Title III requests was utterly self-evident— massive racial disparities with respect to registration and voting in the counties at issue were clear and the Jim Crow regimes were using every possible means to block Black Americans from registering to vote. *See id.*

It was within this context that the Fifth Circuit emphasized the need for a summary resolution of the Title III requests being deployed against the Jim Crow registrars. Following 18 months of litigation, plenary "judicial review or ascertainment" of further facts was not warranted to further the aims of Title III; to the contrary, at that point the statutory goal of protecting the franchise could only be met with summary resolution. *See Lynd*, 306 F.2d at 226–228. The 1960s Fifth Circuit cases analyzing the CRA cannot be divorced from this historically specific context and should not be taken to stand for the general availability of summary proceedings whenever the CRA is invoked.

Here, the context of this records request could not be more different. The United States has invoked the CRA for novel purposes far removed from Congress's aims in 1960, to make sweeping demands for extensive voter data including sensitive, non-public personal identifying information with no showing or claim of legal deficiencies or violations of rights. Even more alarming, there is extensive reporting that the purported basis and purpose of DOJ's request are likely pretextual, and that the data at issue is in fact being sought for unlawful ends that are directly contrary to Title III's purpose to expand the franchise.[7] Such improper purposes can never justify judicial

---

[7] *See supra* n.5.

11

enforcement of a government records request, summarily or otherwise. *See, e.g.*, *United States v. Westinghouse Elec. Corp.*, 788 F.2d 164, 166–67 (3d Cir. 1986) ("[I]f a subpoena is issued for an improper purpose [], its enforcement constitutes an abuse of the court's process."); *QueerDoc, PLLC v. U.S. Dep't of Just.*, No. 2:25-MC-00042-JNW, 2025 WL 3013568, at *5 (W.D. Wash. Oct. 27, 2025) (finding that where litigant makes "adequate showing of bad faith or improper purpose, courts may examine whether the agency is 'pursuing the authorized purposes in good faith.'" (quoting *Crystal v. United States*, 172 F.3d 1141, 1144–45 (9th Cir. 1999))); *Ayers v. SEC*, 482 F. Supp. 747, 751 (D. Mont. 1980) (where a subpoena "was issued 'for an improper purpose … or for any other purpose reflecting on the good faith of the particular investigation,' it shall not be enforced by the courts." (quoting *Powell*, 379 U.S. at 58)).

The 1960s Fifth Circuit cases do not support proceeding summarily here for another reason as well: They were decided before sensitive personal identifying information such as Social Security Numbers or driver's license numbers was widely collected as part of a person's voter registration record, and before any federal laws had been passed to protect and constrain access to personal information.[8] The premise of those cases was that they involved public records; as the court explained in *Lynd*: "we are not discussing confidential, private papers and effects. We are, rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection." 306 F.2d at 231; *see also In re Coleman*, 208 F. Supp. 199, 201 (S.D. Miss. 1962), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963) (acknowledging in the context of Title III of the CRA that while "[t]he right of free examination of official records is the rule,"

---

[8] *E.g.*, Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896 (1974); Driver's Privacy Protection Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994), codified at 18 U.S.C. § 2721 *et seq.*; E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 (2002); Federal Information Security Modernization Act of 2014, Pub. L. No. 113-283, 128 Stat. 3073 (2014), codified at 44 U.S.C. §§ 3351 *et seq.* (2014).

there could be "exception[s]" where "the purpose is speculative, or from idle curiosity"). Indeed, the court in *Lynd* even acknowledged that courts in Title III cases might "issue protective orders" even where the statute's requirements were satisfied. 206 F.2d at 230. Those courts plainly did not intend their decisions to lay down a rule of law that would justify the summary disposition of a request like the one here, involving the disclosure of highly sensitive, protected personal information. Such considerations, totally absent in the 1960s Fifth Circuit cases, further emphasize why the protections and procedures of the Federal Rules must apply here.

## CONCLUSION

For these reasons, the United States's motion to compel should be denied.

Dated: February 6, 2026                                   Respectfully submitted,

                                                          /s/ Ari Savitzky

Jessie J. Rossman (BBO # 670685)            Ari J. Savitzky*
Suzanne Schlossberg (BBO #703914)           Theresa J. Lee*
AMERICAN CIVIL LIBERTIES UNION              Sophia Lin Lakin*
 FOUNDATION OF MASSACHUSETTS, INC.          AMERICAN CIVIL LIBERTIES UNION FOUNDATION
One Center Plaza, Suite 850                 125 Broad Street, 18th Floor
Boston, MA 02108                            New York, NY 10004
Tel.: (617) 482-3170                        Tel.: (212) 549-2500
jrossman@aclum.org                          asavitzky@aclu.org
sschlossberg@aclum.org                      tlee@aclu.org
                                            slakin@aclu.org

                                            * *admitted pro hac vice*

13

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 6, 2026 a true and correct copy of the foregoing document was served via the Court's ECF system on all counsel of record.

<u>/s/ Ari Savitzky</u>