# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-13816 |
| WILLIAM FRANCIS GALVIN, in his official capacity as Secretary of the Commonwealth of Massachusetts, | |
| Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF NEW ENGLAND STATE AREA CONFERENCE OF THE NAACP AND THE MASSACHUSETTS ALLIANCE FOR RETIRED AMERICANS' MOTION TO DISMISS

**INTRODUCTION**

The United States Department of Justice ("DOJ") seeks to build a nationwide voter registration list, a scheme not authorized by Congress and contrary to federal laws assigning States the responsibility for overseeing voter registration. To build this unauthorized and unprecedented federal list, DOJ has demanded that Massachusetts—along with at least forty other States—turn over its full, unredacted voter list, even though it has no actual authority to make such a demand..

Nothing in federal law authorizes the relief that DOJ seeks. DOJ relies solely on Title III of the Civil Rights Act of 1960 ("CRA") but demands under that statute must state "the basis and the purpose" for which they are issued, and that basis and purpose must be legally valid. 52 U.S.C § 20703. DOJ's demand fails that test. DOJ claims to be investigating compliance with the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA"), but the CRA is concerned with protecting the constitutional right to vote—not with enforcing election administration rules—and DOJ's demands and actions in other States make clear that DOJ's true purpose is not assessing NVRA or HAVA enforcement in any event. Moreover, even if there were a valid demand, neither the CRA nor any other provision of federal law preempts Massachusetts's privacy protections or precludes Massachusetts from withholding sensitive voter data. *See, e.g.*, *Pub. Int. Legal Found., Inc. v. Bellows* ("*PILF*"), 92 F.4th 36, 56 (1st Cir. 2024) (concluding that "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in" voter files). And DOJ has not complied with the requirements that the federal Privacy Act imposes before the collection of the private data it seeks.

Ultimately, DOJ's demands run directly contrary to the decentralized structure of the federal electoral system. *See, e.g.*, U.S. Const. art. I, § 4, cl. 1 (giving the States principal authority over congressional elections). When enacting HAVA after the contested 2000 elections, Congress stressed that the historic American approach of administering elections at the state and local level

1

"has many benefits that must be preserved," including that "dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome." H.R. Rep. No. 107-329, pt. 1, at 31–32 (2001). DOJ's suit asserts an unprecedented federal authority over the management of federal elections, yet it cites no law that supplies such sweeping authority.

Recently, two courts in the Ninth Circuit dismissed DOJ's parallel suits in California and Oregon. *United States v. Weber*, --- F. Supp. 3d. ----, No. 2:25-cv-9149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026); *United States v. Oregon*, No. 6:25-cv-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026). Both courts dismissed DOJ's CRA claim for the reasons argued here, holding that (1) DOJ's proffered basis and purpose do not suffice under Title III of the CRA, *Weber*, 2026 WL 118807, at *8; *Oregon*, 2026 WL 318402 at *9–10, and (2) federal law does not preempt state privacy laws protecting sensitive voter data, *Weber*, 2026 WL 118807, at *13, *17; *Oregon*, 2026 WL 318402 at *12. The California court also held that DOJ's data request violates the Privacy Act, *Weber*, 2026 WL 118807, at *17–19. This Court similarly should dismiss this Complaint.

## BACKGROUND

### I.    Federal law has long made voter list maintenance a state responsibility, consistent with the constitutional principles of federalism.

The U.S. Constitution "invests the States with responsibility for the mechanics" of elections, subject to any decision by Congress to "preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997); *see also* U.S. Const. art. I, § 4, cl. 1. It is therefore States, not the federal government, that are primarily responsible for determining voter eligibility and maintaining lists of eligible voters. Congress may preempt state law, but that power extends only "so far as it is exercised, and no farther." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1,

9 (2013) (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (2013)). Where Congress has not spoken on an issue, state law controls. *See id.*

Existing federal law sits "atop *state* voter-registration systems"; it does not displace them. *Id.* at 5 (emphasis added). The NVRA charges *States*—not the federal government—with the "administration of voter registration for elections for Federal office." 52 U.S.C. § 20507(a). It makes *States* responsible for maintaining voter lists (subject to strict procedural safeguards). *Id.* § 20507(c)−(g). And it makes *States* the custodians of voter registration data. *See Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018).

HAVA, enacted "to improve voting systems and voting access" after the 2000 election, similarly involves voter registration systems, and puts the responsibility for such systems on the States. *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 394 (4th Cir. 2024). Thus, it requires *States* to create a "computerized statewide voter registration list" and "perform list maintenance," 52 U.S.C. § 21083(a)(1)(A), (a)(2)(A), and it is abundantly clear that this list is to be "defined, maintained, and administered at the State level." *Id.* § 21083(a)(1)(A).

Neither the NVRA nor HAVA tasks the federal government with compiling a federal voter registration list. Instead, Congress has "left it up to the States to maintain accurate lists of those eligible to vote in federal elections," *Husted*, 584 U.S. at 761, subject only to the specific requirements of the NVRA and HAVA, which purposefully operate through the States themselves.

## II.    The Department of Justice has embarked on an unprecedented campaign to amass personal voter registration data held by the States.

In the spring of 2025, DOJ launched an unprecedented campaign to demand broad access to state voter files, which include sensitive and personal information about each registered voter, such as dates of birth, driver's license numbers, and social security numbers. DOJ has reportedly

sent demands to at least 44 states, with plans to make similar demands on all 50.[1] It seeks to use the data to create a national voter database that will be used to substantiate President Trump's unfounded accusations that millions of non-citizens have voted illegally in recent elections.[2] In recent public statements, Assistant Attorney General Harmeet Dhillon has made clear that DOJ also intends to use the data it is demanding from the States to attempt to compel the removal of *hundreds of thousands* of voters from the rolls.[3] The Attorney General herself took the quite astonishing step of sending a letter to the Minnesota Governor implying that the extraordinary federal immigration operations currently happening in Minneapolis would be suspended if (among other things) Minnesota turned over the same type of private voter data that DOJ seeks here.[4] And the Administration is only escalating its efforts in this area. In just the last week, DOJ has seized ballots and other voting records from state election centers, and President Trump has called for the federal government to "take over" and "nationalize" voting.[5]

---

[1] Kaylie Martinz-Ochao, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Jan. 9, 2025), https://perma.cc/JQ39-Q2A9; Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sep. 9, 2025), https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html.

[2] Barrett & Corasaniti, *supra* note 1.

[3] *See* AAG Harmeet Dhillon (@AAGHarmeetDhillon), X (Dec. 18, 2025, at 9:24 AM ET), https://x.com/AAGDhillon/status/2001659823335616795 (stating in video discussing these lawsuits: "You're going to see hundreds of thousands of people in some States being removed from the voter rolls.").

[4] Nick Corasaniti, *Why is the Trump Administration Demanding Minnesota's Voter Rolls?*, N.Y. Times (Jan. 26, 2026), https://www.nytimes.com/2026/01/26/us/politics/minnesota-trump-voter-rolls.html. Minnesota is similarly currently involved in litigation in which it has declined to turn over its voters' private data in response to a similar demand from DOJ. *See United States v. Simon*, No. 0:25-cv-03761-KMM-EMB (D. Minn. Sep. 25, 2025).

[5] *See* Reid J. Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, N.Y. Times (Feb. 2, 2026), https://www.nytimes.com/2026/02/02/us/politics/trump-nationalize-elections.html.

Many of the States subject to these demands have reported that DOJ has sought not simply read-only access, but "materials that define or explain how" the voter information is coded into the registration database, "potentially because additional information about database coding would assist in transferring data . . . into other federal databases." Br. of Amici Curiae Md. et al. in Supp. of Mot. to Dismiss at 6, *United States v. Bd. of Elections of N.Y.*, No. 1:25-CV-1338 (N.D.N.Y. Jan. 6, 2026), ECF No. 79-1. The vast majority of States have appropriately rejected DOJ's demand, declining to turn over sensitive personal information that is typically protected by privacy laws.[6] Massachusetts law, for example, protects against the disclosure of personally identifiable information contained in voter registration records. Mass. Gen. Laws c. 66A § 2(k); Mass. Gen. Laws c. 51 § 42g 1/2(f); 950 Mass. Code Regs. § 33.

As part of its broader pressure campaign, on July 22, 2025, DOJ sent a letter to Secretary Galvin asking that the Secretary provide DOJ with "[a] current electronic copy of Massachusetts's computerized statewide voter registration list" within fourteen days. Ex. 1 to Decl. of Eric Neff ("Neff Decl.") at 2, ECF No. 6-3. DOJ was explicit that the statewide voter registration list should "include *all fields*." *Id.* (emphasis added). On August 7, Secretary Galvin replied that he was "preparing a response" to DOJ's request but needed additional time. Neff Decl., Ex. 2 at 2, ECF No. 7-2. On August 14, DOJ reiterated its request for Massachusetts's statewide voter registration list including "the registrant's full name, date of birth, residential address, [and] driver's license number or the last four digits of the registrant's social security number." Neff Decl., Ex. 3 at 2, ECF No. 7-3. The State has not shared with DOJ the statewide voter registration list. *See* Compl. ¶ 27, ECF No. 1.

---

[6] *See* Martinez-Ochoa, O'Connor & Berry, *supra* note 1.

In September 2025, DOJ began filing lawsuits against the scores of States that refused to turn over highly sensitive personal voter information. Initially, DOJ brought actions against States alleging that DOJ was entitled to the voter information it sought under three statutes: the NVRA, HAVA, and the CRA.[7] But in early December, as DOJ continued to file new actions, DOJ notably ceased asserting claims under the NVRA and HAVA, relying instead upon the CRA alone—a tacit acknowledgement of the weakness of its earlier NVRA and HAVA claims.[8] Since that point, DOJ has sued another 10 States and the District of Columbia; it has now brought 25 such suits.[9]

## III.     The Department of Justice sues Secretary Galvin to obtain Massachusetts's voter registration list.

DOJ filed this suit on December 11, 2025, seeking to compel Secretary Galvin to provide Massachusetts's full, unredacted statewide voter registration list. *See generally* Compl. DOJ brings only a single count: that in refusing to comply with DOJ's requests, Secretary Galvin violated Title III of the CRA. Title III is a Civil Rights-era law that permits DOJ to review certain voting records to investigate "question[s] concerning infringement or denial of . . . constitutional voting rights." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962). Congress enacted the law under the Fifteenth Amendment to preserve "the right of all qualified citizens to vote without discrimination on

---

[7] Press Release, *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls*, U.S. Dep't of Just. (Sep. 16, 2025), https://perma.cc/9HZQ-CFCG; Press Release, *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls*, U.S. Dep't of Just. (Sep. 25, 2025), https://perma.cc/J2Z3-C4NY.

[8] Press Release, *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls*, U.S. Dep't of Just. (Dec. 2, 2025), https://perma.cc/SCJ6-7GW4.

[9] *See* Press Release, *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws*, U.S. Dep't of Just. (Dec. 12, 2025), https://perma.cc/Y8VL-QBDP; Press Release, *Justice Department Sues Four States for Failure to Produce Voter Rolls*, U.S. Dep't of Just. (Dec. 18, 2025), https://perma.cc/7WMZ-FSQR; Press Release, *Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls*, U.S. Dep't of Just. (Jan. 6, 2026), https://perma.cc/PCE6-DHYA; Press Release, *Justice Department Sues Virginia for Failure to Produce Voter Rolls*, U.S. Dep't of Just. (Jan. 16, 2026), https://perma.cc/FQ4R-2KX6.

account of race," and specifically to facilitate "investigation[s] authorized under the Civil Rights Act of 1957." H.R. Rep. No. 86-956, at 7 (1959).

DOJ admits, however, that it is not seeking to enforce the civil rights laws or investigate the unconstitutional denial of the right to vote. Rather, DOJ's stated purpose in making the request to the Secretary was "to ascertain Massachusetts's compliance with the list maintenance requirements of the NVRA and HAVA." Compl. ¶ 22 (citation omitted). These are laws with their *own* procedures and enforcement mechanisms, which DOJ has not invoked in its Complaint here.

## LEGAL STANDARD

A complaint must be dismissed where it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). At the motion-to-dismiss stage, the Court "must accept as true all of the allegations contained in a complaint" but need not accept the complaint's "legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusions, do not suffice." *Id.* Mere "labels and conclusions" are insufficient. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Dismissal is required when a complaint "fails to include 'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'" *Better Way Ford, LLC v. Ford Motor Co.*, 142 F.4th 67, 78 (1st Cir. 2025) (quoting *Pitta v. Medeiros*, 90 F.4th 11, 17 (1st Cir. 2024)).

## ARGUMENT

The Complaint should be dismissed because DOJ's demand did not include a valid statement of "the basis and the purpose" for the demand, as Title III of the CRA requires; because federal law does not require Massachusetts to produce sensitive, confidential voter information; and because DOJ has not complied with the federal restrictions on compiling the sensitive data it seeks. Thus, DOJ's Complaint fails to sustain an actionable legal theory.

## I.      DOJ did not state an adequate, truthful basis and purpose for the demand as Title III requires.

A demand for records under Title III must state "the basis and the purpose therefor." 52 U.S.C. § 20703. DOJ has previously understood this dual requirement, and, in *Lynd*, provided an explicit statement of *both* the "basis" *and* the "purpose" of its demand, as required by Title III:

> This demand is *based upon* information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction. The *purpose* of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred.

306 F.2d at 229 n.6 (emphasis added) (internal quotation marks omitted). Other Title III cases from that period likewise discuss—consistent with Title III's express requirements—an explicit statement of both the "basis" and "purpose" for DOJ's demand. *See Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962); *In re Coleman*, 208 F. Supp. 199, 199−200 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963). Here, however, DOJ's demand fails to adequately allege *either* the basis or the purpose of its request, for at least four reasons.

*First*, DOJ's stated purpose for issuing the demand to Secretary Galvin—"to ascertain Massachusetts's compliance with the list maintenance requirements of the NVRA and HAVA," Compl. ¶ 22—is not sufficient under Title III. *See CFPB v. Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d 683, 689−90 (D.C. Cir. 2017) (rejecting "perfunctory" statement of purpose in issuing civil investigative demand, reasoning agencies "are . . . not afforded unfettered authority to cast about for potential wrongdoing" (internal quotation marks and citation omitted)); *see also Weber*, 2026 WL 118807, at *9–10 (finding that "DOJ has not complied with Title III of the CRA and has provided an inadequate statement of basis and purpose" and holding that "[t]he requirement that the Attorney General state their basis and purpose is not merely perfunctory—it is a critical safeguard that ensures the request is legitimately related to the purpose of the statute").

Title III permits DOJ to review voting records for "question[s] concerning infringement or denial of . . . constitutional voting rights." *Lynd*, 306 F.2d at 228. Its "purpose is to enable the Attorney General to determine whether" a suit to enforce the CRA is appropriate, *id.*, not to ascertain compliance with distinct laws serving separate purposes with their own enforcement mechanisms and—in the NVRA's case—disclosure provisions. *See also Weber*, 2026 WL 118807, at *8–9 (concluding the "purpose of Title III is to detect voting-related racial discrimination" and that "Title III was not passed as a tool for NVRA compliance"); *Oregon*, 2026 WL 318402 at *10 (holding that "investigat[ing] list maintenance procedures" bore no relation to "the purposes for which Title III was enacted"). The NVRA and HAVA are concerned with things like "failures to purge voters who have moved away or died," which, as one early court applying Title III noted, "do[] not bear any particular importance" to the Title III inquiry. *Bruce*, 298 F.2d at 863 n.2.

In interpreting the "purpose" requirement, the Court should "account for both 'the specific context in which . . . language is used' and 'the broader context of the statute as a whole.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) (alteration in original) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)); *see also Home Depot U.S.A., Inc. v. Jackson*, 587 U.S. 435, 441 (2019) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context, and with a view to their place in the overall statutory scheme." (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989))). And Congress enacted Title III to buttress protections of the constitutional right to vote in the Civil Rights Act of 1957. *See* H.R. Rep. No. 86-956, at 3 (finding "some progress" since the 1957 Act, but a "need for additional legislation to implement the enforcement of civil rights"); *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960) ("The legislative history leaves no doubt but that

[Title III] is designed to secure a more effective protection of the right to vote."), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961) (per curiam).

In the Civil Rights Act of 1957, Congress tasked DOJ with protecting the "right of all qualified citizens to vote without discrimination on account of race." H.R. Rep. No. 86-956, at 7. Despite this charge, DOJ's efforts were stymied by "the refusal of some state and local authority to permit" inspection of certain voter records, *id.*, not to mention the intentional destruction of others, *Gallion*, 187 F. Supp. at 856 n.4 ("State action such as taken by the Alabama legislature authorizing registrars to destroy their records is an excellent example."). DOJ had "no existing power in civil proceedings to require the production of [voter registration] records during any investigation" concerning "complaints of a denial to vote because of race." H.R. Rep. No. 86-956, at 7. Congress found that, without granting DOJ a "suitable provision for access to voting records during the course of an investigation," its ability to protect the right to vote was "rendered relatively ineffective." *Id.* Congress thus enacted Title III of the Civil Rights Act of 1960 to assist DOJ in those investigations. Title III had nothing to do with investigating the administrative voter registration list requirements enacted in the NVRA and HAVA decades later.

The Court should reject DOJ's efforts to justify its demands with a purpose disconnected from the statutory scheme. *See In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 236–39 (D. Mass. 2025) (rejecting subpoena seeking private health information where DOJ made "overbroad requests for documents and information seemingly unrelated to investigating fraud" but rather for "interfering with the Commonwealth's right to protect gender-affirming care"). Prior enforcement of Title III confirms that it is meant to be used only for investigating the denial of voting rights. Shortly after the law's enactment, courts upheld DOJ demand letters that stated they were "based upon information in the possession of the Attorney General tending to show that

discrimination on the basis of race and color have been made with respect to registration and voting within your jurisdiction." *In re Coleman*, 208 F. Supp. at 199−200; *see also Lynd*, 306 F.2d at 229 n.6 (same). DOJ has yet to cite a single instance in which a court upheld a demand for records made under Title III to assess state compliance with the NVRA or HAVA.[10] Instead, two federal courts have *dismissed* such demands as inconsistent with Title III's purpose of protecting voter rights. *Weber*, 2026 WL 118807, at *8−10; *Oregon*, 2026 WL 318402 at *10.

In fact, DOJ's stated purpose is not just divorced from Title III's scope—it is antithetical to it. DOJ has publicly acknowledged that it wants to use the records it is demanding to attempt to compel States to purge voter rolls. *Supra* note 3. Far from protecting constitutional voting rights, DOJ seeks to undermine them.

*Second*, DOJ's request to Massachusetts entirely failed to articulate "the basis" for the request. Not only does it fail to assert that Massachusetts has denied the right to vote or otherwise infringed on anyone's voting rights, it even fails to assert the basis for its claimed purpose: investigating Massachusetts's list maintenance practices for compliance with the NVRA and HAVA. DOJ's July 22, 2025 letter demanding Massachusetts's voter registration list with all fields did *not* articulate *any* specific concerns with Massachusetts's list maintenance efforts, much less provide a factual basis to conclude that its efforts might not be "reasonable," which is all that the

---

[10] While some of the 1960s-era cases that interpreted Title III included language indicating broad deference to the Attorney General's statement of a "basis and . . . purpose" for requesting records, *see Lynd*, 306 F.2d at 226 (quoting 42 U.S.C. § 1974b, recodified at 52 U.S.C. § 20703), those cases involved circumstances where Title III was unquestionably being used for its intended purpose: investigations into the potential denial of voting rights on account of race. Those prior cases are thus fundamentally different from the circumstances here, where DOJ has not even tried to assert that it seeks to investigate any possible denial of the constitutional right to vote. Nor has it offered any justifiable basis to support the need for records to evaluate compliance with the two *other* statutes it has invoked.

NVRA and HAVA require. 52 U.S.C. § 20507(a)(4); *id.* § 21083(a)(4); *see also id.* § 21085 (committing "specific choices on the methods of complying with" HAVA "to the discretion of the State"); Mem. in Support of Mot. to Compel, Ex. 1, ECF No. 7-1.[11]

The lack of a stated basis is fatal—Congress required DOJ to state "the basis *and* the purpose" of its request, 52 U.S.C. § 20703 (emphasis added), and the Court must give meaning to both requirements. *See, e.g.*, *Herman v. Hector I. Nieves Transp. Inc.*, 244 F.3d 32, 36 (1st Cir. 2001) ("A primary canon of statutory construction is that a statute should be construed so as not to render any of its phrases superfluous."). So even if Title III could be used to investigate matters unrelated to denial of the right to vote, it requires that some concrete *basis* for such an investigation be contained in the *demand itself*, not as a post-hoc rationale advanced in litigation. *See* 52 U.S.C. § 20703 ("*This demand* shall contain a statement of the basis and the purpose therefor." (emphasis added)). DOJ's failure to include any "basis" in its demand to Massachusetts independently warrants dismissal. *Oregon*, 2026 WL 318402 at *9 (dismissing because Title III demand letter "contain[ed] no statement of a factual basis."); *see also Weber*, 2026 WL 118807, at *9 (finding that DOJ did not "establish[] the basis for its request" because DOJ failed to explain why it believed California had violated the NVRA or why the voter registration list was necessary for DOJ's investigation).

*Third*, context shows that "the basis and the purpose" that DOJ included in its demands to Massachusetts were not the true basis and purpose for its request. *See Weber*, 2026 WL 118807, at *10–12 (holding that the court is "not obliged to accept a contrived statement and purpose").

---

[11] DOJ's own website acknowledges that States "have discretion under the NVRA and HAVA" to design voter registration list-maintenance programs, and that "States currently undertake a variety of approaches" to this process. *The National Voter Registration Act of 1993 (NVRA)*, U.S. Dep't of Justice, https://perma.cc/4Q33-DH8X (updated Nov. 1, 2024) (last accessed Feb. 5, 2026).

Neither DOJ's letter on July 22, 2025, demanding Massachusetts's voter registration list nor its subsequent Complaint identified any deficiencies with Massachusetts's list maintenance procedures. *See generally* Mem. in Support of Mot. to Compel, Ex. 1; Compl. Nor did they identify any evidence of anomalies, provide any reason to suspect—or even express any concern—that Massachusetts's list maintenance efforts were not "reasonable." The lack of any stated basis for DOJ's investigation of Massachusetts is further highlighted by DOJ's carbon copy demands to over 40 States and lawsuits against more than 20 based on nearly identical boilerplate claims and allegations. *See supra* Background § II. This nationwide effort to collect state voter registration lists undermines any notion that DOJ has a "basis" for investigating Massachusetts specifically.[12]

In addition, Massachusetts's full and unredacted statewide voter file is simply not helpful or necessary to determine whether Massachusetts "conduct[ed] a general program that makes a reasonable effort to remove the names of ineligible voters" by virtue of "death" or "a change in the residence of the registrant," 52 U.S.C. § 20507(a)(4); Compl. ¶ 12; *see also* 52 U.S.C. § 21083(a)(4). The unredacted voter file cannot tell DOJ anything about the list maintenance procedures that Massachusetts undertook within its discretion under the NVRA and HAVA. *Oregon,* 2026 WL 318402 at *10 n.4 ("[N]either Plaintiff's Title III demand nor any of its pleadings before this Court provide any reasonable explanation for why the Sensitive Voter Data

---

[12] In parallel cases, DOJ has referred to a complaint against the State of Georgia requesting a copy of the State's voter registration list, including social security numbers, and a subsequent consent decree between the State and DOJ granting access to that voter registration list, as well as a memorandum of understanding with Texas granting DOJ access to the State's voter registration list. *See, e.g.*, Notice of Supp. Auth., *United States v. Oregon*, 6:25-cv-01666-MTK (Jan. 26, 2026), ECF No. 67. In both cases, the DOJ asserted that its demand was for the purpose of assessing compliance with voter registration laws and list maintenance provisions of the NVRA. However, those cases were not litigated, and the adequacy of the stated basis and purpose of DOJ's demands were therefore not probed by a federal court. Nor did those settlements involve DOJ using CRA demands to gain access to voter registration data for the purpose of demanding the removal of voters from the rolls or as political leverage. *See supra* notes 3−4.

in particular serves those purposes."). If DOJ were to obtain the unredacted voter file, the data would be outdated almost immediately,[13] and even if DOJ were able to use the data to identify voters who have moved or died since that single snapshot in time, it would not mean that Massachusetts did not make a "reasonable" list maintenance effort under the NVRA or HAVA.[14]

Finally, DOJ's claim is further undermined by the ample evidence of its true aims. Namely, DOJ seeks to use the information it is demanding from States across the country to build a national voter file and purge "hundreds of thousands" of individuals from the rolls.[15] DOJ has made little effort to conceal this objective: Assistant Attorney General Dhillon has expressly stated that this vast federally coordinated removal initiative is the Department's goal in seeking state voter data.[16] These efforts occur against a broader backdrop of federal hostility toward state-run election administration—President Trump has publicly "thanked" FBI officials for seizing state election records in recent days, urged Republican-allies in Congress to "nationalize voting," and lamented that he did not deploy the National Guard to seize voting machinery following the 2020 election.[17] Taken together, these actions reflect a coordinated effort to take control over election infrastructure in violation of the Constitution and the very federal laws that DOJ claims to be "enforcing"— HAVA and the NVRA. This only reinforces that the basis and purpose DOJ advances in its filings are pretextual, compelling dismissal of its claim. *Oregon*, 2026 WL 318402 at *11 (expressing

---

[13] *See* Kris Maher & Eliza Collins, *The Fight Over the Justice Department's Push for State Voter Data*, Wall Street J. (Dec. 24, 2025), https://www.wsj.com/politics/elections/the-fight-over-the-justice-departments-push-for-state-voter-data-111103f8.
[14] As noted above, the DOJ's own website acknowledges that States need only make a "reasonable" effort to identify and remove ineligible persons from the voter rolls. *The National Voter Registration Act of 1993 (NVRA)*, *supra* note 12.
[15] *See supra* note 3.
[16] *Id.*
[17] *See supra* note 5.

"serious doubt as to the true purposes for which Plaintiff is seeking voter registration lists in this and other cases").

## II.    Title III does not require producing sensitive voter information.

Even if DOJ met Title III's requirements, nothing in that provision or any other federal law requires Massachusetts to provide sensitive voter data in the form of an unredacted voter file. Massachusetts law limits the disclosure of personally identifiable information in voter registration records. *See* Mass. Gen. Laws c. 66A § 2(f); Mass. Gen. Laws c. 51 § 42g 1/2(f); 950 Mass. Code Regs. § 33. Thus, even if DOJ were entitled to some of the information contained in Massachusetts's statewide registration list, Massachusetts would be entitled to redact that information to remove uniquely sensitive information.

The First Circuit has held that the NVRA does not prohibit the redaction of sensitive personal data contained in state voter registration lists. *PILF*, 92 F.4th at 56 ("[N]othing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File."). So has the Tenth Circuit. *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1083 n.14 (10th Cir. 2025) ("To the extent the State wishes to redact appropriate personal information before providing the voter data, the NVRA does not prohibit that limitation."). These are no outliers—many other courts have reached the same conclusion. *See Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012) (affirming district court order to redact social security numbers before disclosure under NVRA); *Pub. Int. Legal Found. v. N.C. State Bd. of Elections*, 996 F.3d 257, 268 (4th Cir. 2021) (recognizing that the NVRA permits redactions to "protect sensitive information"); *see also Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022) (holding the NVRA permits "proper redaction of highly sensitive information"); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1344 (N.D. Ga. 2016) (holding the NVRA "does not require the disclosure of sensitive information

that implicates special privacy concerns," including telephone numbers, partial social security numbers, partial email addresses, and birth dates); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 739 (S.D. Miss. 2014) (holding the NVRA "does not require the disclosure of unredacted voter registration documents, including voter registrant birthdates"); *Project Vote/Voting For Am., Inc. v. Long*, 752 F. Supp. 2d 697, 711 (E.D. Va. 2010) (holding the NVRA permits redacting social security numbers). And the California court considering a parallel lawsuit likewise held that "states are entitled to redact sensitive voter information, like social security numbers and birthdates, under the NVRA"—and noted DOJ conceded this in amicus briefs as recently as 2023. *Weber*, 2026 WL 118807, at *12–13 (citation omitted); *see also Oregon*, 2026 WL 318402 at *6 (holding that the federal government "does not enjoy any intrinsic authority to compel disclosure" of unredacted voter files under the NVRA).

Nothing in the text of Title III prohibits the redaction of private information that courts have repeatedly held may be redacted under the NVRA. Title III says nothing about the issue, but as *Lynd*—the central case DOJ relies on—recognizes, Congress seems to have contemplated the production of public records, not private data. That court concluded that Title III is intended to reach only "public records which ought ordinarily to be open to legitimate reasonable inspection," not "confidential, private papers and effects." *Lynd*, 306 F.2d at 231. In contrast, the information DOJ demands here is safeguarded under both federal and state privacy laws. *See, e.g.*, 5 U.S.C. § 552a; 18 U.S.C. § 2721; Mass. Gen. Laws c. 66A § 2(f); Mass. Gen. Laws c. 51 § 42g 1/2(f); 950 Mass. Code Regs. § 33. Driver's license numbers and partial social security numbers were not required to be provided on registration forms until 2002, *see* 52 U.S.C. § 21083(a)(5)(A)(i), so the Congress that enacted Title III could not have possibly intended it to require disclosure of such information (or concluded that doing so was necessary to conduct the investigations that Title III

was enacted to support). *See Watt v. W. Nuclear, Inc.*, 462 U.S. 36, 47 (1983) (interpreting statute to avoid result that "Congress could not have expected").

The conclusion that Title III does not entitle DOJ to the sensitive data it seeks is reinforced by the choices Congress made when it enacted the NVRA and HAVA. If Congress had thought that it was necessary or desirable for DOJ to have access to a database containing highly sensitive information about every voter in a State to ensure that the State was complying with its list maintenance obligations under those statutes, it would have done so in the NVRA and HAVA themselves. But Congress did not do so. In fact, Congress created a different mechanism to ascertain States' compliance with list maintenance obligations: the NVRA inspection provision, located at 52 U.S.C. § 20507(i). Congress "envisioned" this inspection to allow for "critical scrutiny and public audits of voter data"—but nonetheless permitted the redaction of sensitive voter data. *Voter Reference Found.*, 160 F.4th at 1082 & 1083 n.14. Congress specified that records subject to inspection under that provision must include the "names and addresses" of certain voters, 52 U.S.C. § 20507(i)(2), but it stopped short of requiring States to go beyond that and disclose sensitive voter information. As for HAVA, it contains no disclosure provision at all and instead confirms that voter registration lists must be "maintained" and "administered at the State level"— not by the federal government. *Id.* § 21083(a)(1)(A). In short, it makes no sense to say that Congress intended Title III to preempt state privacy laws protecting highly sensitive information so that the federal government could assess compliance with voter list maintenance under the NVRA and HAVA—statutes passed decades later that reflect a congressional judgment not to preempt such laws. Thus, just as with the NVRA, nothing in Title III prohibits the "redaction of uniquely or highly sensitive personal information in the Voter File." *PILF*, 92 F.4th at 56; *accord Voter Reference Found.*, 160 F.4th at 1083 n.14.

DOJ can point to no statute that authorizes it to create an unprecedented, national voter registration database, let alone one that could be compared with other federal databases in aid of a nationwide voter purge. Certainly, the CRA cannot be read to do so, given that the CRA's purpose is to assist investigation of the "infringement or denial of . . . constitutional voting rights." *Lynd*, 306 F.2d at 228 (emphasis added). Consequently, Secretary Galvin properly refused to share an unredacted copy of Massachusetts's statewide voter registration list with DOJ.

## III.    DOJ has failed to comply with the Privacy Act, which independently requires dismissal.

Congress enacted the Privacy Act, codified 5 U.S.C. § 552a, et seq., in response to the government's "ever-expanding stockpile of information about private individuals that was readily susceptible to both misuse and the perpetuation of inaccuracies." *Londrigan v. FBI*, 670 F.2d 1164, 1169 (D.C. Cir. 1981). The Act "offers substantial protections regarding governmental use and retention of identifiable personal information." *League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. 25-cv-3501, 2025 WL 3198970, at *1 (D.D.C. Nov. 17, 2025). It does so in part by "adopt[ing] procedural safeguards when the records maintained by a federal agency, i.e., a 'system of records,' are changed or used in a new way." *Id.* at *2 (quoting 5 U.S.C. § 552a(a)(5), (e)). In its rush to sweep up the sensitive information of every registered voter in Massachusetts, DOJ overlooked the Privacy Act's basic procedural requirements. As a result, the Privacy Act independently prohibits DOJ from obtaining Massachusetts's statewide voter registration list.

The Privacy Act imposes certain obligations on any agency that "maintains" a "system of records." *See* 5 U.S.C. § 552a(e). Both of those terms are given specific definitions by the statute. A "system of records" is defined as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." *Id.* § 552a(a)(5); *see also id.* §

552a(a)(4) (defining "record" to include "any item, collection, or grouping of information about an individual that is maintained by an agency . . . that contains his name, or the identifying number . . . or other identifying particular assigned to the individual") (emphasis added). Massachusetts's statewide voter registration list, which contains the names and other unique identifying information of all registered voters in Massachusetts, plainly qualifies as a "system of records" under the Privacy Act. *Cf.* Compl. at 22. The term "maintain" is defined to include "maintain, collect, use, or disseminate." 5 U.S.C. § 552a(a)(3). Accordingly, if DOJ were to "collect," "use," or "maintain" Massachusetts's statewide voter registration list, the obligations imposed by subsection (e) of the Privacy Act are triggered. *See id.* § 552a(e)(4); *see also Weber*, 2026 WL 118807, at *17 (holding that "[t]he Privacy Act applies to the voter records request by the DOJ"). And that is the relief DOJ seeks here: an order from this Court to collect Massachusetts's statewide voter list. Compl. at 8.

As DOJ attempts to amass state voter registration data onto its own servers, the Privacy Act imposes specific obligations. Most relevant here, "when an agency 'establish[es] or revis[es]' any 'system of records,' it must 'publish in the Federal Register . . . a notice of the existence and character of the system of records,' *i.e.*, a System of Records Notice (SORN)." *League of Women Voters*, 2025 WL 3198970, at *2 (alterations in original) (quoting 5 U.S.C. § 552a(e)(4)). A SORN must include, among other things, the name and location of the system, the categories of individuals on whom records are maintained in the system, the categories of records maintained in the system, and all "routine use[s]" to which the system can be put as well as the "categories of users and the purpose of such use." *Id.*

To allow DOJ to collate sensitive information about every registered voter in Massachusetts (and the country) would nullify the Privacy Act's "procedural safeguards," which "Congress enacted to . . . permit an individual to determine what records pertaining to him are

collected, maintained, used, or disseminated by federal agencies" and to "ensure adequate safeguards are provided to prevent misuse of such information." *Id.* (citation modified); *see also Webe*r, 2026 WL 118807, at *18. If DOJ wishes to take such a radical step and compile a federal database of the registered voters in the United States, the Privacy Act requires (at a minimum) that DOJ adhere to strict notice-and-comment requirements, by first providing "adequate advance notice" to two congressional committees and the Office of Management and Budget to evaluate the effects on privacy and other rights and then publishing a SORN in the Federal Register that accurately discloses the system of records it intends to create and the uses to which it will put that information with the opportunity for written data, views, and arguments from interested persons. 5 U.S.C. § 552a(e)(4); *see also id.* § 552a(r); *id.* § 552a(e)(11) (requiring a 30-day notice period "of any new use or intended use of the information in the system," to "provide an opportunity for interested persons to submit written data, views, or arguments to the agency"). In short, because DOJ identifies no SORN that covers the system of records it intends to maintain, the Privacy Act prohibits DOJ from collecting Massachusetts's statewide voter registration list.[18]

## CONCLUSION

For the reasons stated above, Intervenor-Defendants respectfully request that the Court dismiss the complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

---

[18] There is no impediment to the Court dismissing the complaint based on DOJ's failure to comply with the Privacy Act. Even if the Court construes failure to comply with the Privacy Act as an affirmative defense, "a properly raised affirmative defense can be adjudicated on a motion to dismiss so long as (i) the facts establishing the defense are definitively ascertainable from the complaint and the other allowable sources of information, and (ii) those facts suffice to establish the affirmative defense with certitude" *Rodi v. S. New England Sch. Of L.*, 389 F.3d 5, 12 (1st Cir. 2004). Here, the complaint explicitly references compliance with the Privacy Act, *see* Compl. ¶ 24, and for the reasons stated above, DOJ's collection and maintenance of Massachusetts's voter registration list do not comply with the Privacy Act.

Dated: February 6, 2026

Respectfully submitted,

*s/ David R. Fox*
David R. Fox (BBO #692372)
Kevin R. Kowalewski*
Tori Shaw*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Suite 400
Washington, D.C. 20001
T: (202) 968-4490
F: (202) 968-4498
dfox@elias.law
kkowalewski@elias.law
tshaw@elias.law

*Counsel for Intervenor-Defendants the New England State Area Conference of the NAACP and the Massachusetts Alliance for Retired Americans*

*Admitted Pro Hac Vice

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served this 6th day of February, 2026, with a copy of this document via the Court's CM/ECF system.

*/s/ David R. Fox*
David R. Fox (BBO #692372)