IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

                    Plaintiff,

          v.

WILLIAM FRANCIS GALVIN, IN HIS
OFFICIAL CAPACITY AS SECRETARY OF
THE COMMONWEALTH OF
MASSACHUSETTS,

                    Defendant.

CIVIL ACTION
NO. 1:25-cv-13816-LTS

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
AND IN OPPOSITION TO MOTION TO COMPEL**

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

Anne Sterman, BBO No. 650426
Phoebe Fischer-Groban, BBO No. 687068
*Assistant Attorneys General*
Vanessa A. Arslanian, BBO No. 688099
*State Trial Counsel*
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2524
anne.sterman@mass.gov
phoebe.fischer-groban@mass.gov
vanessa.arslanian@mass.gov

Dated: February 6, 2026

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

BACKGROUND ........................................................................................................1

I.    Congress Enacted the Civil Rights Acts of 1957 and 1960 in an Effort to Remedy Race-Based Discrimination in Voting. .................................................... 1

II.    The National Voter Registration Act and Help America Vote Act ........................ 3

III.    Massachusetts's Voter Registration List and List Maintenance Activities ............ 4

    A.    Voter Registration in Massachusetts and Massachusetts's Voter List ........................................................................................................ 4

    B.    VRIS: Massachusetts's Statewide Database of Registered Voters ............. 5

    C.    Voter List Maintenance ............................................................................ 6

IV.    The United States's Demand for a Complete Voter Registration List .................... 8

ARGUMENT ..........................................................................................................10

I.    The United States Has Failed to State a Claim Under the Civil Rights Act of 1960. .............................................................................................................. 10

    A.    The United States Has Not Stated a Plausible Purpose for its Demand. ................................................................................................ 10

        1.    Assessing a State's Compliance With List Maintenance Is Not a Proper Purpose Under the Civil Rights Act of 1960 .......... 10

        2.    Even If Assessing Compliance with NVRA and HAVA Could Justify a Demand Under the 1960 Civil Rights Act, the United States's Demand Here Is Utterly Implausible. ............. 12

    B.    The United States Has Failed to State any Basis for its Demand. ............ 14

    C.    Even With a Valid Basis and Purpose, the CRA Would Not Entitle the United States to Massachusetts's Statewide Voter Registration List. ........................................................................................................ 15

    D.    Privacy Concerns and State and Federal Law Mandate the Redaction of Personal Information. ......................................................... 16

        1.    Other Federal Statutes Prohibit Disclosure of Information Covered by the United States's Demand. ..................................... 17

2.      Assessing Compliance with NVRA and HAVA Does Not
        Require that State Privacy Laws Be Ignored. ............................... 18

II.    The Motion to Compel Must Be Denied Because the Complaint Fails to
       State a Claim for Records under Title III of the Civil Rights Act. ....................... 19

CONCLUSION..................................................................................................................20

CERTIFICATE OF SERVICE ........................................................................................22

## INTRODUCTION

In a clear misuse of a civil rights law that provides for good faith investigations into voting discrimination on the basis of race, the United States wrongly claims not only that it is entitled to an unredacted copy of Massachusetts's electronic voter list, but that this Court is powerless to test the sufficiency of that demand. The United States's complaint fails to meet the basic statutory requirements for a demand for election records under Title III of the Civil Rights Act of 1960. The United States offers nothing at all as the investigatory basis for seeking these records; provides a purpose that is facially implausible; and seeks records well beyond the scope of what it is entitled to demand under the Act. This Court, like the U.S. District Courts for the Central District of California and the District of Oregon, should reject the United States's attempt to abuse the Civil Rights Act of 1960 to force the Commonwealth to supply the federal government with massive amounts of private information regarding Massachusetts citizens. The Court should dismiss the Complaint, ECF No. 1, with prejudice, and deny the Motion to Compel, ECF No. 6.

## BACKGROUND

**I.     Congress Enacted the Civil Rights Acts of 1957 and 1960 in an Effort to Remedy Race-Based Discrimination in Voting.**

In its first post-Reconstruction effort to "cope with the problem" of "racial discrimination in voting," *South Carolina v. Katzenbach*, 383 U.S. 301, 308, 313 (1966), Congress enacted the Civil Rights Act of 1957. Pub. L. 85-315, 71 Stat. 634 (1957), now codified at 52 U.S.C. §§ 10101 *et seq.* (the "1957 Act"). The 1957 Act requires that all qualified citizens "shall be entitled and allowed to vote . . . without distinction of race, color, or previous condition of servitude," and provides that "[no] person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the

1

purpose of interfering with the right of such other person to vote," *id.* 52 U.S.C. § 10101(a)(1), (b). The 1957 Act also authorizes the U.S. Attorney General to initiate a civil action to enjoin imminent or ongoing race-based deprivations of voting rights—a so-called "Section 1971 suit," after the U.S. Code section where the provision originally appeared. *Id.* § 10101(c) (originally codified at 42 U.S.C § 1971(c)).

In 1959, President Eisenhower expressed concern that "[a] serious obstacle has developed which minimizes the effect of [the 1957 Act]." H. Doc. No. 75, at 2 (86th Cong., 1st Sess.) (Feb. 5, 1959). He observed that "[a]ccess to registration records is essential to determine whether the denial of the franchise was in furtherance of a pattern of racial discrimination," but that "State or local authorities, in some instances, have refused to permit the inspection of their election records in the course of investigations." *Id.* Accordingly, President Eisenhower filed proposed legislation to require local election officials to preserve federal election records and to authorize the Attorney General to demand those records. 86th Cong. Rec. Vol. 105, Pt. 2, at S1919-20 (Feb. 5, 1959). In considering this proposal, the House Committee on the Judiciary explained that its "purpose" was "to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race." H. Rep. No. 86-956, at 7 (Aug. 20, 1959) (hereinafter "House Report"). The Committee further explained that "[t]his is the same purpose contained in the Civil Rights Act of 1957, which authorizes the Attorney General to institute civil proceedings for preventive relief from the discriminatory denial of the right to vote," and observed that the legislation was necessary because without "a suitable provision for access to voting records during the course of an investigation and prior to the institution of a suit, the authority of the Attorney General is rendered relatively ineffective." *Id.*

Congress ultimately enacted the record-retention and record-demand provisions as Title III of the Civil Rights Act of 1960, Pub. L. 86-449, § 301, 74 Stat. 86, 88 (1960), codified at 52

U.S.C. §§ 20701 *et seq.*, together with provisions "permitt[ing] the joinder of States as parties defendant . . . and authoriz[ing] courts to register voters in areas of systematic discrimination." *Katzenbach*, 383 U.S. at 313. The Supreme Court described the 1960 Act as a set of "perfecting amendments" to the 1957 Act. *Id.* Title III's record-retention provision requires election officers to retain, for 22 months after any federal election, "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election[.]" 52 U.S.C. § 20701.

Title III's record-demand provision tracked President Eisenhower's proposal that "[a]ny record or paper" required to be retained "shall, upon demand in writing by the Attorney General . . . be made available for inspection, reproduction, and copying." 52 U.S.C. § 20703. But the enacted language added a new requirement that the "demand shall contain a statement of the basis and the purpose therefor." *Id.*[1] The Act confers jurisdiction on specified district courts to compel production of the records "by appropriate process." *Id.* § 20705.

Several years later, it had become clear that "facilitating case-by-case litigation against voting discrimination," as the 1957 and 1960 Acts did, was an incomplete and relatively ineffective approach, and Congress therefore adopted the "sterner and more elaborate measures" of the Voting Rights Act of 1965. *Katzenbach*, 383 U.S. at 309, 313–14. The Voting Rights Act's superior enforcement mechanisms to "banish the blight of racial discrimination in voting," *id.* at 308, relegated the 1957 and 1960 Acts to largely historical interest in recent years.

## II. The National Voter Registration Act and Help America Vote Act

Decades later, Congress enacted the two laws upon which the United States purports to

---

[1] The House Judiciary Committee Report specifically notes that the "[d]emand, however, must contain a statement of the basis and the purpose therefor." House Report at 6.

rely to justify its demand for records: the National Voter Registration Act of 1993 (NVRA), and the Help American Vote Act of 2002 (HAVA). The NVRA requires states to "conduct a general program" of voter list maintenance that makes a "reasonable effort" to remove deceased voters or voters who have moved from the rolls. 52 U.S.C. § 20507(a)(4). And HAVA, like the NVRA, leaves "[t]he specific choices on the methods of complying with" list maintenance requirements "to the discretion of the State." 52 U.S.C. § 21085.[2] Additionally, HAVA required each state to implement a "single, uniform, official, centralized, interactive computerized statewide voter registration list." 42 U.S.C. § 15483(a)(1)(A).

## III.    Massachusetts's Voter Registration List and List Maintenance Activities

### A.    Voter Registration in Massachusetts and Massachusetts's Voter List

The Massachusetts voter registration form collects a range of confidential and sensitive personally-identifiable information, and requires each registrant to confirm their United States citizenship, Massachusetts residence, and age.[3] Mass. Gen. Laws ch. 51, §§ 42, 44, 47A. To establish their identity, registrants must provide either a Massachusetts driver's license or state ID card number, or the last four digits of their Social Security number.[4] In addition, registrants

---

[2] As Congress explained in the NVRA, the Act is to be implemented by State and local governments "in a manner that enhances the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. § 20501(b)(2).

[3] *Mail-In Voter Registration Forms*, Sec'y of Comm., https://www.sec.state.ma.us/divisions/elections/languages/register-by-mail-forms.htm (last visited Feb. 6, 2026). Information from an official government website that is not subject to reasonable dispute is judicially noticeable. *Morales Posada v. Cultural Care, Inc.*, 554 F. Supp. 3d 309, 314 n.2 (D. Mass. 2021), *aff'd*, 66 F.4th 348 (1st Cir. 2023).

[4] If a registrant does not have any of those, they must write the word "none" and can either include a copy of acceptable identification with their application or will be required to show acceptable identification the first time they vote in a federal election. This applies to newly registered voters who register to vote by mail, in accordance with HAVA. 52 U.S.C. § 21083(b)(2).

must provide their full name, date of birth, physical home address, including zip code (not a P.O. Box), and mailing address (if different from their home address). Registrants may also provide their political party affiliation and phone number. A registrant who does not select a political party affiliation will be registered as "unenrolled." 950 Mass. Code Regs. § 57.04(3)(i). The same voter registration form is used to update or change voter information, including the voter's name, residence, address, or party affiliation.

Voters can register in-person, by mail, online, at the Registry of Motor Vehicles (RMV) or at other designated agencies such as MassHealth. Mass. Gen. Laws ch. 51, §§ 26, 33, 33A, 36, 42F, 42G, 42G ½, 44.[5] Registration at the RMV and MassHealth is automatic. If an applicant for services at the RMV or MassHealth has provided documentation showing citizenship, their name, address, and date of birth are automatically transferred to the Secretary's office and then provided directly to the appropriate local election official for processing. Mass. Gen. Laws ch. 51, § 42G ½(e). If an applicant has not provided documentation sufficient to show citizenship, they are provided with the opportunity to register using a NVRA-compliant form that requires the applicant to check a box indicating she is a United States citizen.

Once the local election official processes the voter registration application, the voter's updated information is added to the voter list. *Id.* §§ 42H, 46, 55.

### B.    VRIS: Massachusetts's Statewide Database of Registered Voters

Though federal law demands that states comply with general requirements regarding voter list maintenance, state law establishes how Massachusetts meets those requirements.

---

[5] If the information and signature of a person registering to vote online cannot be verified through the online application, they are notified that they are ineligible to submit their application online and are given the option to print an affidavit of registration, sign it, and mail or deliver the signed affidavit to their local election official. Mass. Gen. Laws ch. 51, § 33A.

Massachusetts maintains a Voter Registration Information System (VRIS) and state law and regulations require that certain information be maintained and updated in VRIS to ensure compliance with the NVRA and HAVA. *Id.* § 47C; 950 Mass. Code Regs. §§ 58.00 *et seq.*

Local election officials must enter into VRIS all information required to maintain and update the annual register of voters. Mass. Gen. Laws ch. 51, §§ 1, 47C; 950 Mass. Code Regs. § 58.03. This includes the name, residential address, party or political designation, and effective date of registration of all registered voters in their municipality; the designated agency at which the voter registered, or the method of voter registration; the name, address, and date of inactivity of all voters designated as inactive in their municipality; the number of inactive voters sent confirmation mailings pursuant to Mass. Gen. Laws ch. 51, § 37, and the number of responses received from voters.

### C.    Voter List Maintenance

Massachusetts uses several different methods to prevent duplication, confirm residence, and remove deceased or otherwise ineligible voters from the voter registration list to comply with the NVRA and HAVA. The primary tool used for list maintenance is the annual street list survey, which provides city and town clerks with a process by which they may make changes to address information in compliance with the NVRA and to "inactivate" voters whose eligibility cannot be confirmed. All residents of a city or town are contacted in January or February of each year to determine their residence as of the first of that year. Mass. Gen. Laws ch. 51, § 4. Any voter who does not respond to the annual street listing is sent a confirmation notice. If a voter fails to respond to the notice and fails to vote, or attempt to vote, in the next two biennial

elections, their name is removed from the list. *Id.* § 38.[6] [7]

A voter may not be deleted from the annual register of voters or the inactive voters list unless: (1) local election officials receive notice of a voter in their municipality's death; (2) local election officials receive a duplicate copy of an affidavit of registration from the registrars of another municipality; (3) local election officials receive a change of address notification from the RMV; (4) local election officials receive a written request from the voter confirming in writing that they have moved to another city or town; or (5) the voter has not responded to the confirmation mailing and has not voted in the next two biennial state elections following such notice. *Id.* Voters are sent a final notice of removal before being deleted or removed. *Id.* § 37A. Between October 29, 2022, to October 26, 2024, 93,758 deceased voters were deleted.[8]

Voters who are presently incarcerated for a felony conviction are not entitled to be registered voters in Massachusetts. Mass. Gen. Laws ch. 51, § 1. The Secretary's office receives notices of federal felony convictions from the United States Attorneys' offices around the country. The Department of Correction also provides lists of persons who are currently incarcerated for felony convictions. Mass. Gen. Laws ch. 54, § 25C(f).

---

[6] An inactive voter who does not respond to the notice and does not vote in the two biennial state elections following that notice, is deleted. Mass. Gen. Laws ch. 51, § 38. From October 2022 through October 2024, 120,203 voters were inactive and did not respond to the notice or take any action to be restored to the active list. 26,948 more voters were deleted after responding to a confirmation notice indicating that they no longer lived at the address at which they were listed as inactive.

[7] Between October 29, 2022 and October 26, 2024, 580,433 voters were made inactive and sent a confirmation notice. Many of those voters were subsequently restored to the active voting list by participating in an election, or by returning the confirmation notice stating they are still living at the same residential address in the city or town.

[8] U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report*, 185, (2025), https://www.eac.gov/sites/default/files/2025-07/2024_EAVS_Report_508.pdf

When local election officials process voter registration applications, VRIS notifies them if the information entered matches the first name, last name and date of birth of an existing voter registration record. The Secretary's office runs queries annually for potential duplicates.

## IV.    The United States's Demand for a Complete Voter Registration List

On July 22, 2025, the United States Department of Justice wrote to Secretary Galvin demanding, among other things, a "current electronic copy of Massachusetts' computerized statewide voter registration list … as required by Section 303(a) of the Help America Vote Act," including "all fields contained within the list." Compl. ¶¶ 18-19, ECF No. 1; Ex. 1 to Decl. of Eric Neff ("Neff Decl."), at 1, ECF No. 7-1. The letter demanded a response within 14 days. *Id.*, at 2. On August 7, the Secretary's office responded that the Secretary required additional time and expected to provide a response within 60 days. Neff Decl. Ex. 2 at 2, ECF No. 7-2. The United States responded on August 14, demanding production of the complete, unredacted voter registration list within a week, but permitting the Secretary until September 15 to comply with their other requests for information. *Id.*, Ex. 3, at 3, ECF No. 7-3. That letter specified that the request for the voter registration list was made "to assess your compliance with the list maintenance provisions of the NVRA." *Id.*, at 1. It also referenced the Justice Department's authority to enforce HAVA as well as the requirements of Title III of the Civil Rights Act of 1960 (the "CRA"). *Id.*, at 2. On August 28, the United States sent an email reiterating its request for the voter registration list. *Id.*, Ex. 4, ECF No. 7-4. Soon thereafter, the United States began filing lawsuits against other states seeking their voter registration lists.[9]

---

[9] *See United States v. Bellows*, No. 1:25- cv-00468 (D. Me. filed Sept. 16, 2025); *United States v. Oregon*, No. 6:25-cv-01666 (D. Or. filed Sept. 16, 2025); *United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal. filed Sept. 25, 2025); *United States v. Simon*, 0:25-cv-03761 (D. Minn. filed Sept. 25, 2025); *United States v. Scanlan*, No. 1:25-cv-00371 (D.N.H. filed Sept. 25, 2025); *United States v. Bd. of Elecs. of the State of N.Y.*, No. 1:25-cv-01338 (N.D.N.Y. filed Sept. 25,
(footnote continued)

On December 12, 2025, the United States filed the complaint, asserting one count for violation of the CRA. ECF No. 1. The complaint was accompanied by a Motion to Compel and Memorandum in Support of the Motion to Compel. ECF Nos. 6, 7. Both the complaint and motion assert that the United States has made a valid demand for records under the CRA – namely, the information sought in the July 22 and August 14 letters – for which the United States had a valid basis and purpose. The stated basis and purpose for the request was "to ascertain Massachusetts's compliance with the list maintenance requirements of the NVRA and HAVA." Compl. ¶ 22, ECF No. 1; Mem. of Law in Supp. of Mot. to Compel, ECF No. 7, at 9-10.

As relief, the United States seeks an order directing the Secretary to provide an electronic copy of complete, unredacted statewide voter registration list with all fields within five days. Compl., ¶ 30(A)-(B).

---

2025); *United States v. Pennsylvania*, No. 2:25-cv-01481 (W.D. Penn. filed Sept. 25, 2025); *United States v. Benson*, No. 1:25-cv-01148 (W.D. Mich. filed Sept. 25, 2025).

After last year's lapse in appropriations concluded, the United States resumed filing lawsuits against states. *See United States v. DeMarinis*, No. 1:25-cv-03934 (D. Md. filed Dec. 1, 2025); *United States v. Hanzas*, No. 2:25-cv-00903 (D. Vt. filed Dec. 1, 2025); *United States v. Albence*, No. 1:25-cv-01453 (D. Del. filed Dec. 2, 2025); *United States v. Oliver*, No. 1:25-cv-01193 (D.N.M. filed Dec. 2, 2025); *United States v. Amore*, No. 1:25-cv-00639 (D.R.I. filed Dec. 2, 2025); *United States v. Hobbs*, No. 3:25-cv-06078 (W.D. Wash. filed Dec. 2, 2025); *United States v. Nago*, No. 1:25-cv-00522 (D. Haw. filed Dec. 11, 2025); *United States v. Griswold*, No. 1:25-cv-03967 (D. Colo. filed Dec. 11, 2025); *United States v. Aguilar*, No. 3:25-cv-00728 (D. Nev. filed Dec. 11, 2025); *United States v. Wis. Elecs. Comm'n*, 3:25-cv-01036 (W.D. Wis. filed Dec. 18, 2025); *United States v. Raffensperger*, No. 5:25-cv-00548 (M.D. Ga. filed Dec. 18, 2025), *refiled after dismissal as United States v. Raffensperger*, No. 1:26-cv-00485 (N.D. Ga. filed Jan. 23, 2026); *United States v. Matthews*, No. 3:25-cv-03398 (C.D. Ill. filed Dec. 19, 2025); *United States v. D.C. Bd. of Elecs.*, No. 1:25-cv-04403 (D.D.C filed Dec. 18, 2025); *United States v. Fontes*, No. 2:26-cv-00066 (D. Ariz. filed Jan. 6, 2026); *United States v. Thomas*, No. 3:26-cv-00021 (D. Conn. filed Jan. 6, 2026); *United States v. Beals*, No. 3:26-cv-00042 (E.D. Va. filed Jan. 16, 2026).

## ARGUMENT

**I.     The United States Has Failed to State a Claim Under the Civil Rights Act of 1960.**

**A.     The United States Has Not Stated a Plausible Purpose for its Demand.**

**1.     Assessing a State's Compliance With List Maintenance Is Not a Proper Purpose Under the Civil Rights Act of 1960.**

As is apparent from its history, *see* above at pp. 1-3, the purpose of the Civil Rights Act of 1960 is to facilitate investigations into state and local officials' efforts to deny or restrict citizens' right to vote on the basis of race. *United States v. Oregon*, No. 6:25-cv-01666-MTK, ECF No. 73, at 20 (D. Or. Feb. 5, 2026) ("Oregon Opinion") ("[r]eading Title III's text within its larger statutory and historical context, and consistent with the case law and legislative history . . . the Court concludes that the 'purpose' required in a demand for records under Title III must relate to a purpose of investigating violations of individuals' voting rights.")[10]; *see Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962) ("The Title III proceeding is investigative in nature. Its purpose is to enable the Attorney General to determine whether *§ 1971 suits or similar actions* should be instituted. And it is to enable him to obtain evidence for use *in such cases* if and when filed.") (emphasis added). Here, the United States does not, and cannot, allege any such effort by Massachusetts officials, nor does it purport to be undertaking any such investigation. Instead, the United States proffers an alternative "purpose"—"to ascertain Massachusetts's compliance with the list maintenance requirements of the NVRA and HAVA," Compl. ¶ 22. That purpose is not within the scope of the Act. *See* Oregon Opinion at 20 (United States's stated purpose of investigating list maintenance "lacked any reference or relation to the purposes for which Title

---

[10] *Oregon* and *United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, __ F. Supp. 3d __, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026), are the first two merits decisions issued in the 24 cases, *see supra* n. 9, that the United States has filed across the country seeking to compel production of unredacted state voter lists. In both cases, the courts dismissed the United States's complaints with prejudice.

III was enacted"). The United States's utter failure to offer a "purpose" within the contemplation of the Act alone warrants dismissal of its complaint.[11] *Id.*; *Weber*, __ F. Supp. 3d __, 2026 WL 118807, at *9 ("The requirement that the Attorney General state their purpose and basis is not merely perfunctory—it is a critical safeguard that ensures the request is legitimately related to the purpose of the statute.").

The limited cluster of cases discussing Title III shortly after its enactment illustrate the sort of purposes that entitle the United States to inspect records under Title III. Of course, as the Fifth Circuit explained, "one of the clearest purposes of the Title III proceeding is to enable the Attorney General to assemble all of the voter record information within the time-reach of the statute relating to all persons as to whom there is a question concerning infringement or denial of their constitutional voting rights." *Kennedy*, 306 F.2d at 228; *see also Alabama ex. rel Gallion v. Rogers*, 187 F. Supp. 848, 852 (M.D. Ala. 1960) ("the entire history of the Act reflects that it was and is designed to provide a means of enforcing the basic federally guaranteed rights of citizenship (to vote)"), *aff'd sub nom. Dinkens v. Att'y Gen.*, 285 F.2d 430 (5th Cir. 1961); *United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962) ("[T]he government is entitled to have

---

[11] Contrary to the United States's apparent position, *see* U.S. Mem. at 6, this Court may review the propriety of the stated purpose for a records demand, despite the United States's apparent contrary position. *See* Oregon Opinion at 14–15 (rejecting United States's argument that Court may not evaluate sufficiency of stated purpose). Congress deliberately added to President Eisenhower's proposed legislation a requirement that the demand "must contain a statement of the basis and the purpose therefor." House Report at 6. If courts were powerless to review the statements of basis and purpose, Congress's decision to require a statement of purpose would be rendered a nullity. If any stated purpose—however outlandish, and whether or not election-related—sufficed to justify the demand, it is difficult to see why Congress would have bothered to include the requirement. Moreover, interpreting the 1960 Act to require the production of records for any purpose with no judicial oversight would call the Act's constitutionality into question, as it could be justified under the Elections Clause, U.S. Const. Art. I, § 4, or the Fifteenth Amendment, only if the purpose must be election-related. The constitutional avoidance canon counsels against such an interpretation. *See also infra* Part II (explaining that the Federal Rules of Civil Procedure apply to this case).

an order of the trial court authorizing it to inspect the voting records such as are here involved

upon the simple assertion by the Attorney General of the United States that there are reasonable

grounds for belief that *certain voters are being discriminatorily denied their voting rights* in a

given county.") (emphasis added). Thus, for example, where the Attorney General's demand was

"based upon information in the possession of the Attorney General tending to show that

distinctions on the basis of race or color have been made with respect to registration and voting

in your jurisdiction," a sufficient purpose was "to examine the aforesaid records . . . to ascertain

whether or not violations of Federal law in regard to registration and voting have occurred."

*Kennedy*, 306 F.2d at 229 & nn. 5, 6.

> ## 2. Even If Assessing Compliance with NVRA and HAVA Could Justify a Demand Under the 1960 Civil Rights Act, the United States's Demand Here Is Utterly Implausible.

Even were the United States able to use the Act to investigate the Secretary's compliance

with list maintenance requirements of NVRA and HVRA, that plainly is not the purpose of the

United States's request for the entire Massachusetts voter registration list, on one static date,

containing extensive personal identifying information. An understanding of how list maintenance

works demonstrates the facial implausibility of this stated purpose.

The NVRA requires states to "conduct a general program" of list maintenance that makes

a "reasonable effort" to remove deceased voters or voters who have moved from the rolls. 52

U.S.C. § 20507(a)(4). The NVRA requires states to implement a list maintenance program

program—and gives states broad discretion on how to do so[12]—but it does not require that a

state's voter list be 100% accurate at any given moment in time. Indeed, the NVRA protects

---

[12] *See* 52 U.S.C. § 21085 ("The specific choices on the methods of complying with the requirements of [HAVA] shall be left to the discretion of the State.").

registered voters and limits states' ability to immediately remove voters from its list. 52 U.S.C.

§ 20507(d) (prohibiting states from removing registrants due to a change in residence unless the

registrant (a) confirms the change in writing, or (b) has failed to respond to a notice or appeared

to vote for a two-year period). Examining Massachusetts's static voter registration list from a

particular date and time, as the United States demands, will not shed light on Massachusetts's

"general program" of list maintenance. Whether deceased voters or those who have moved out of

state are listed on a static copy of the list from a particular date does not indicate how the

Commonwealth is maintaining that list (and whether such voters are appropriately removed in

the future, consistent with the NVRA's requirements). In other words, the stated purpose of the

request (*i.e.*, "ascertain[ing] Massachusetts's compliance with the list maintenance requirements

of the NVRA and HAVA") does not match how the United States purports to achieve that

purpose (*i.e.*, obtaining Massachusetts's voter list from a single date, which would not elucidate

NVRA compliance).[13] This disconnect between the United States's stated purpose and the

information it is seeking undermines any plausibility that "ascertain[ing] Massachusetts's

compliance with the list maintenance requirements of the NVRA and HAVA" is "the purpose"

for the United States' request, as Title III requires.

Nor is there any reason why the United States would need every Massachusetts voter's

social security number, or driver's license number, to investigate hypothetical and undisclosed

concerns with Massachusetts's compliance with the NVRA and HAVA. Oregon Opinion at 20

---

[13] Because a copy of the list is a snapshot of a live database at a given moment in time, to actually assess a state's list maintenance activities would require comparing at least two such snapshots, taken at different points in time, armed with information about actual changes in voter circumstances or registration that occurred between those two points in time. Examining the list at a single moment in time tells one nothing about whether it is being promptly and accurately updated.

n.4 (noting that even if NVRA or HAVA compliance were valid purposes, United States had failed to "provide any reasonable explanation" for why sensitive voter data "in particular serves those purposes"). While HAVA requires that states require voters to provide a driver's license number or social security number (if they have one) with their voter registration application, viewing every single Massachusetts voter's driver's license number, social security number, or other identifying numbers, will not allow the United States to ascertain whether Massachusetts is complying with HAVA or the NVRA. As the Central District of California recognized, while such data would not be probative of HAVA or NVRA compliance, seeking it *en masse* from dozens of states is notably consistent with a federal plan to "compile a national database with millions of voters' private information." *Weber*, 2026 WL 118807, at *11–12; Oregon Opinion at 21–23. Such an undertaking is far beyond the scope of DOJ's authority and cannot be supported by Title III. *See id.*

As that court recently explained, "[i]t is not for the Executive, or even this Court to authorize the use of civil rights legislation as a tool to forsake the privacy rights of millions of Americans." *Weber*, 2026 WL 118807, at *1. Because the United States has made no attempt to connect its demand for Massachusetts's voter list and its residents' personal identifying information to any purpose related to alleged deprivations of the right to vote, and because there is a grave mismatch between the records the United States demands and its stated "purpose," the Court should dismiss the United States's complaint for failure to state a claim.

**B.    The United States Has Failed to State any Basis for its Demand.**

In addition to failing to state a "purpose" justifying its demand, the United States has offered no "basis" whatsoever for its demand—a failure that independently requires dismissal. Even if the "purpose" of ascertaining a state's compliance with the NVRA's and HAVA's list maintenance requirements were a valid one under the 1960 Act (and it is not), the United States

must also offer a "basis" for its demand rooted in a suspected violation of those requirements. *See* Oregon Opinion at 17 (interpreting "basis" in Title III "to mean a factual basis for investigating a violation of a federal statute"); *cf. Lynd*, 306 F.2d at 229 n.6 (noting that the stated "basis" of the Attorney General's request was "information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction"). The United States has offered no suggestion that Massachusetts's list maintenance practices are out of compliance with NVRA or HAVA, nor could it plausibly do so. Accordingly, this attempt to transform the 1960 Act into a mechanism for "a fishing expedition of voter records in any state looking for concerns, without identifying a single issue with the state's policies beforehand," *Weber*, 2026 WL 118807, at *9, must be dismissed.

### C.    Even With a Valid Basis and Purpose, the CRA Would Not Entitle the United States to Massachusetts's Statewide Voter Registration List.

The Complaint should be dismissed for the additional reason that even if the United States had stated a proper basis and purpose for its demand, an electronic copy of Massachusetts's entire voter registration list as of 2025 is well outside the clear statutory scope of the federal election records the United States may demand to inspect or copy under 52 U.S.C. § 20703.[14] The Act does not confer upon the United States *carte blanche* to demand any election-related information. Instead, the record-retention provision of the Act requires states to retain, for any election for federal office within the past 22 months, "all records and papers which come into [the officer of election's] possession relating to any application, registration,

---

[14] Even when the United States is entitled to information under the CRA, that information need only be made available for inspection. *See Greater Birmingham Ministries, Inc. v. Secretary of State for Ala.*, 105 F.4th 1324, 1332 (11th Cir. 2024) ("electronic production is neither public inspection nor photocopying; it is an entirely different method of disclosure").

payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. Section 20703, in turn, requires the state to "make available for inspection, reproduction, and copying" any such "record or paper" that the state is required to retain under § 20701, to facilitate the United States's investigation into discriminatory voting practices, *see* pp. 2–3 above.

A complete copy of the Massachusetts electronic voter registration list as of the date of the United States's demand—July 22, 2025—is plainly not a record "relating to any application, registration, payment of poll tax, or other act requisite to voting in" the 2024 election, the only election for federal office that occurred within 22 months of the United States's demand. *See* 52 U.S.C. § 20701. By virtue of the very list maintenance activities the United States purportedly wants to assess, the electronic voter registration list is in a near-constant state of flux as voters are added, deleted, or modified. A static copy of that list is merely a snapshot of the list at the moment in time at which it is generated; it is not a record of registration for, or voting in, the 2024 federal election, which the United States may permissibly demand to "inspect, reproduc[e], or cop[y]" under 52 U.S.C. § 20703. Consequently, even if the Court were to find the United States's stated basis and purpose for its request to be adequate, which it is not, the information the United States seeks is not a "record or paper" "relating to any application, registration, payment of poll tax, or other act requisite to voting" in the 2024 election, and the United States's requested relief should be denied. *See* 52 U.S.C. § 20703.

**D.    Privacy Concerns and State and Federal Law Mandate the Redaction of Personal Information.**

Even to the extent that any data is appropriately demanded by the United States, that information must be redacted to protect sensitive personal information. Though the NVRA does not specify when redaction is required, "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information"; indeed, "it does not

require the disclosure of sensitive information that implicates special privacy concerns." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) (internal citations and quotations omitted); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 733–39 (S.D. Miss. 2014) (concluding NVRA does not prohibit redaction of "highly personal and sensitive information").[15] Title III does not alter that analysis, because "Title III was not conceived by Congress to provide access to 'confidential, private papers and effects'" but rather to give "access to 'public records which ought ordinarily to be open to legitimate reasonable inspection.'" *Weber*, 2026 WL 118807, at *9 (quoting *Kennedy*, 306 F.2d at 231); *see also* Oregon Opinion at 24 (citation omitted). Redaction of personal information is both warranted and necessary if the voter list is to be provided to the United States.

   1.   **Other Federal Statutes Prohibit Disclosure of Information Covered by the United States's Demand.**

   The United States's demand for complete, unredacted voter records also fails to comply with the requirements of three different federal statutes. The Privacy Act, 5 U.S.C. § 552a, permits federal agencies to collect and maintain records containing individually identifiable information only under certain circumstances. 5 U.S.C. §§ 552a. Significantly, the Privacy Act

---

[15] Courts across the country have agreed that the NVRA does not mandate the disclosure of personal information protected under state or federal law. *See, e.g.*, *N.C. State Bd. of Elections*, 996 F.3d 257, 264, 267 (4th Cir. 2021); *Pub. Int. Legal Found., Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1015–16 (D. Alaska 2023); *Pub. Int. Legal Found. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022), *clarified on denial of reconsideration*, No. 20-cv-03190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022); *Pub. Int. Legal Found. v. Boockvar*, 431 F. Supp. 3d 553, 561–63 (M.D. Pa. 2019). Indeed, in the context of the NVRA's Public Disclosure Provision, Section 8(i), the United States has itself agreed – across administrations – that concerns about disclosure of personally identifiable information are legitimate. U.S. Br. as Amicus Curiae, *Bellows*, *supra* (No. 23-1361), 2023 WL 4882397, at *27–*29; U.S. Br. as Amicus Curiae, *Pub. Int. Legal Found. v. Sec'y Com. of Pa.*, 136 F.4th 456 (3d Cir. 2025) (Nos. 23-1590, 23-1591), 2023 WL 7486717, at *28–*29) (same); U.S. Br. as Amicus Curiae, *Project Vote v. Long*, 682 F.3d 331 (4th Cir. 2012) (No. 11-1809), 2011 WL 4947283, at *25–*26 (same).

prohibits federal agencies from maintaining records "describing how any individual exercises rights guaranteed by the First Amendment" in most circumstances, and requires that such agencies comply with procedural requirements before maintaining, collecting, or using a group of records searchable by individual. 5 U.S.C. § 552a (a)(3), (a)(5), (e)(4), (e)(7), (f).

The Complaint does not allege that the United States has complied with the procedural requirements of the E-Government Act, Pub. L. No. 107-347, § 208, 116 Stat. 2899, 2921–23 (2002), which requires the United States to conduct a privacy impact assessment (PIA) before it collects information about 10 or more people that "includes any information in an identifiable form permitting the physical or online contacting of a specific individual." *Id.* § 208(b).

Complying with the United States's demand for voter data also would violate the Driver's Privacy Protection Act (DPPA), 18 U.S.C. § 2721 *et seq.*, because the electronic voter registration list contains personal information that was obtained in connection with a "motor vehicle record" and then provided in connection with voter registration. When a Massachusetts resident applies for, renews, or replaces a driver's license, permit, or identification card, they are offered the opportunity to register to vote, if they are qualified to do so. G.L. c. 51, § 42G ½; 950 Code Mass. Regs. 57.06. The DPPA's prohibition on disclosure of this information by the RMV applies equally to the Secretary of the Commonwealth and any others who receive information initially gathered in connection with a motor vehicle record. 18 U.S.C. §§ 2721(b)(1), (c).

### 2. Assessing Compliance with NVRA and HAVA Does Not Require that State Privacy Laws Be Ignored.

Consistent with federal law, state law similarly protects the personal information of Massachusetts voters. Mass. Gen. Laws ch. 51, § 47C requires the Secretary to maintain a central registry of voters, but specifies that the names and addresses contained in that registry are not a matter of public record and are only available to certain parties, none of which is the United

States. Moreover, certain individuals are entitled to have portions of their information withheld from disclosure. *Id.* § 4(d), (e); *id.* § 44. And information "relating to a specifically named individual, the disclosure of which may constitute an unwarranted invasion of personal privacy" is exempt from the definition of public records under the Massachusetts Public Records Law. *Id.* ch. 4, §7(26)(c). The United States has not demonstrated that its stated purpose of assessing Massachusetts' compliance with NVRA's and HAVA's list maintenance requirements could not be fully vindicated with redacted information—and, as noted above, the NVRA itself permits redaction of sensitive personal information in compliance with state law.

## II.    The Motion to Compel Must Be Denied Because the Complaint Fails to State a Claim for Records under Title III of the Civil Rights Act.

Because the United States's Complaint should be dismissed for failing to satisfy Title III's statutory requirements, the Court should deny the United States's Motion to Compel. When "a demand is made pursuant to section 20703 of [Title 52]," the Civil Rights Act confers jurisdiction on the district courts to compel production of records covered by the Act "by appropriate process." 52 U.S.C.A. § 20705. But, as explained *supra* Part I, no sufficient demand has been made within the meaning of section 20703. Absent a statutorily-sufficient demand, there is no basis for an order compelling production of records.

In any event, the Act does not except this case from the Federal Rules of Civil Procedure. Where a statute grants the court jurisdiction to enforce an investigatory demand "by appropriate process" but "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964) (citation omitted); *see also* Oregon Opinion at 14–15 (rejecting United States's argument that court cannot evaluate sufficiency of complaint and applying Rule 12(b)(6)); *Weber*, 2026 WL 118807, at *8 ("Title III cannot transform an election records request

by the federal government from an ordinary civil action into an action comparable to an order to show cause. . . . Nothing in the text of Title III requires a special statutory proceeding or any abbreviated procedures."); *see also* Fed. R. Civ. P. 1, 81(a)(5) (Federal Rules of Civil Procedure apply to "proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute.").

The United States bears the burden to establish that it has satisfied the statutory requirements to obtain the records it seeks before the Court can compel the Secretary to produce any records, and the Secretary is entitled to rebut the United States's prima facie case. *See Powell*, 379 U.S. at 57–58 (to obtain judicial enforcement of summons, agency must "show that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the [agency's] possession, and that the administrative steps required by the [statute] have been followed"); *see also Sugarloaf Funding, LLC v. U.S. Dep't of the Treasury*, 584 F.3d 340, 346 (1st Cir. 2009) (once agency makes prima facie showing, burden shifts to defendant to "disprove" prima facie requirements, or show that enforcement is "an abuse of process," e.g., "was issued in bad faith for an improper purpose") (citation and quotation omitted). Title III does not deprive the Secretary of the opportunity to dispute the sufficiency of the United States's request, nor does it deprive this Court of the power and obligation to ensure that the statutory requirements are met.

## **CONCLUSION**

For these reasons, the Court should dismiss the Complaint with prejudice and deny the Motion to Compel Production of Records Pursuant to 52 U.S.C. § 20701 *et seq.*

Respectfully submitted,

WILLIAM FRANCIS GALVIN, in his
official capacity as Secretary of the
Commonwealth of Massachusetts,

By his attorneys,

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

*/s/ Anne Sterman*
Anne Sterman, BBO No. 650426
Phoebe Fischer-Groban, BBO No. 687068
*Assistant Attorneys General*
Vanessa A. Arslanian, BBO No. 688099
*State Trial Counsel*
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2524
anne.sterman@mass.gov
phoebe.fischer-groban@mass.gov
vanessa.arslanian@mass.gov

## <u>CERTIFICATE OF SERVICE</u>

I, Phoebe Fischer-Groban, Assistant Attorney General, certify that this document, filed through the Court's ECF system, will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants by first-class mail on February 6, 2026.


*/s/ Phoebe Fischer-Groban*
Phoebe Fischer-Groban
Assistant Attorney General