IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM FRANCIS GALVIN, in his Official Capacity as Secretary of State for the Commonwealth of Massachusetts,<br><br>Defendant(s). | Case Number: 1:25-cv-13816-LTS<br><br>Leave to File Response With Additional Pages<br>Granted March 2, 2026 |

**UNITED STATES' CONSOLIDATED MEMORANDUM IN OPPOSITION TO THE MOTIONS TO DISMISS BY DEF. GALVIN (DOC. 56), INTERVENOR-DEF. COMMON CAUSE, JANE DOE, INC. AND JUAN PABLO JARAMILLO (Doc. 49) AND INTERVENOR-DEF. NEW ENGLAND STATE AREA CONFERENCE OF THE NAACP AND THE MASSACHUSETTS ALLIANCE FOR RETIRED AMERICANS (Doc. 52)**

# TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................................. 1

II.  BACKGROUND ................................................................................................ 3

III. MOTIONS TO DISMISS ARE INAPPLICABLE TO TITLE III OF THE CRA AND
CANNOT CHALLENGE THE BASIS AND PURPOSE FOR THE DEMAND .................. 5

    A.   The Federal Rules of Civil Procedure are inapplicable to motions to compel under
Section 305 of the CRA. ................................................................................. 6

    B.   Title III of the CRA does not require allegations that the federal election records
demanded are needed to investigate race-based denial of voting rights. ................................ 11

    C.   Defendants cannot challenge the Attorney General's basis and purpose to investigate
Massachusetts's HAVA and NVRA compliance. .................................................... 14

    D.   Massachusetts's SVRL falls within Section 301's broad definition of "all records and
papers" relating to registration to vote in federal elections. ........................................ 19

IV.  THE UNITED STATES IS COMPLYING WITH FEDERAL PRIVACY LAWS .... 25

    A.   The United States is complying with the Privacy Act. .................................................. 25

    B.   The E-Government Act does not prevent the United States from obtaining data
supporting its HAVA and NVRA claims. ............................................................ 27

    C.   The Driver's Privacy Protection Act does not allow Secretary Galvin to deny the United
States list maintenance data. ....................................................................... 28

V. CONCLUSION ................................................................................................ 29

# TABLE OF AUTHORITIES

## Cases

*Ala. ex rel. Gallion v. Rogers*,
  187 F. Supp. 848 (M.D. Ala. 1960) ........................................................ passim

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
  570 U.S. 1 (2013).............................................................................................. 3

*Becker v. United States*,
  451 U.S. 1306 (1981)...................................................................................... 10

*Becker v. United States*,
  452 U.S. 912 (1981)........................................................................................ 10

*Becker v. United States*,
  452 U.S. 935 (1981)........................................................................................ 10

*Bostock v. Clayton Cnty., Ga.*,
  590 U.S. 644 (2020)........................................................................................ 13

*Coal. for Open Democracy v. Scanlan*,
  No. 24-CV-312-SE, 2025 WL 1503937 (D.N.H. May 27, 2025)................. 24

*Coleman v. Campbell*,
  208 F. Supp. 199 (S.D. Miss. 1962).............................................. 12, 15, 16

*Coleman v. Kennedy*,
  313 F.2d 867 (5th Cir. 1963) ................................................................. passim

*Donaldson v. United States*,
  400 U.S. 517 (1971)........................................................................................ 10

*Ebert v. Poston*,
  266 U.S. 548 (1925)........................................................................................ 13

*Ex Parte Siebold*,
  100 U.S. 371 (1879).......................................................................................... 3

*Foster v. Love*,
  522 U.S. 67 (1997)............................................................................................ 3

*In re Gordon*,
  218 F. Supp. 826 (S.D. Miss. 1963)................................................................ 7

*Judicial Watch v. Lamone*,
  399 F. Supp. 3d 425 (D. Md. 2019) ............................................................. 20

*Kennedy v. Lynd*,
  306 F.2d 222 (5th Cir. 1962) ................................................................. passim

*Project Vote v. Kemp*,
  208 F.Supp.3d 1320 (N.D. Ga. 2016) .......................................................... 20

*Project Vote/Voting for Am., Inc. v. Long*,
  682 F.3d 331 (4th Cir. 2012) ........................................................................ 21

*U.S. Term Limits, Inc. v. Thornton*,
  514 U.S. 779 (1995).......................................................................................... 3

*United States v. Ass'n of Citizens Councils of La.*,
  187 F. Supp. 846 (W.D. La. 1960)............................................................. 6, 7

*United States v. Benson*,
  Case No. 1:25-cv-01148-HYJ-PJG, 2026 WL 362789. (W.D. Mich. Feb. 10, 2026)........ passim
*United States v. Bisceglia*,
  420 U.S. 141 (1975)............................................................................................................ 6
*United States v. Georgia*, Case No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006) ............................ 21
*United States v. Great N. Ry. Co.*,
  343 U.S. 562 (1952).......................................................................................................... 13
*United States v. Markwood*,
  48 F.3d 969 (6th Cir. 1995) ................................................................................................. 8
*United States v. Mo. Pac. R.R. Co.*,
  278 U.S. 269 (1929).......................................................................................................... 13
*United States v. Morton Salt Co.*,
  338 U.S. 632 (1950)............................................................................................ 6, 9, 16, 24
*United States v. N. Carolina Bd. of Elections*, Case No. 5:25-cv-283 (E.D.N.C. Sept. 8, 2025). 17
*United States v. Oregon*,
  Case No. 6:25-cv-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026) ............................. 8, 9
*United States v. Powell*,
  379 U.S. 48 (1964)...................................................................................................... 6, 8, 9, 15
*United States v. Weber*,
  Case No. 2:25-cv-09149-DOC-ADS, 2026 WL 118807  (C.D. Cal. Jan. 15, 2026)................. 8

**Statutes**

18 U.S.C. § 2721 ........................................................................................................................ 28
18 U.S.C. § 2725 ........................................................................................................................ 28
26 U.S.C. § 7605(b) ..................................................................................................................... 9
42 U.S.C. § 2000e-2 .................................................................................................................... 12
42 U.S.C. § 3617 ........................................................................................................................ 12
42 U.S.C. §§ 3604-3606 .............................................................................................................. 12
44 U.S.C. § 3101 ........................................................................................................................ 26
5 U.S.C. § 552a(a)(1) .................................................................................................................. 26
52 U.S.C. § 10309 ...................................................................................................................... 12
52 U.S.C. § 20507 ............................................................................................................. 4, 22, 23
52 U.S.C. § 20701 ................................................................................................................. passim
52 U.S.C. § 20704 ...................................................................................................................... 22
52 U.S.C. § 20705 ........................................................................................................................ 2
52 U.S.C. § 21083 .................................................................................................................. 3, 23
52 U.S.C. § 21111 ........................................................................................................................ 4
52 U.S.C. §§ 10301-10306 ........................................................................................................... 12
52 U.S.C. §§ 20510(a) .................................................................................................................. 4
52 U.S.C. §§ 20701-20706 ........................................................................................................ 9, 12
52 U.S.C. §§ 20703 ................................................................................................................. passim
U.S. Const. art. I, §  4, cl. 1 ......................................................................................................... 3

**Rules**

82 Fed. R. Civ. P. 81 ................................................................................................................... 7

**Other Authorities**

82 Fed. Reg. 24147-01 (May 25, 2017) ........................................................................ 26

Civil Rights Act of 1960, P.L. 86-449 74 Stat. (1960) ............................................. 11, 12

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process
    (Aug. 2001) ............................................................................................................. 17

The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 (2002) ..................... 27, 28

The Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896 (1974) .......................................... 26

Plaintiff United States of America respectfully submits this consolidated Memorandum of Law in opposition to the Motions to Dismiss by: (1) Defendant Secretary of the Commonwealth of Massachusetts, William Francis Galvin ("Secretary Galvin") (Doc. 56); (2) Intervenor-Defendants Common Cause, Jane Doe, Inc. and Juan Pablo Jaramillo ("Common Cause") (Doc. 49) Intervenor-Defendants New England State Area Conference of the NAACP and the Massachusetts Alliance for Retired Americans ("Alliance Intervenors") (Doc. 52).[1] Collectively, Secretary Galvin and Intervenor-Defendants are referred to as the "Defendants." The United States submits this consolidated Memorandum, instead of three separate opposition briefs, to facilitate the Court's review of the duplicative and overlapping arguments made by the Defendants.

## I.    INTRODUCTION

The Attorney General of the United States brought this case as part of her investigation of Massachusetts's list maintenance practices under the Help America Vote Act ("HAVA"), and the National Voter Registration Act ("NVRA"). The United States sent correspondence to Secretary Galvin, requesting his cooperation in providing federal election records necessary to its assessment in a manner consistent with federal privacy law. Those efforts were met by Secretary Galvin's refusal to produce records as mandated by federal law and necessary to evaluate compliance with federal election laws. This action followed. Compl., (Doc. 1).

Title III of the Civil Rights Act of 1960 ("CRA") provides the principal statutory authority for the United States to immediately obtain federal election records including Massachusetts's statewide Voter Registration List ("SVRL"). Those provisions broadly authorize the Attorney General to compel production of "all records and papers" that "come into … possession" of the

---

[1] The combined brief complies with the total page limit for three separate opposition briefs to the pending Motions to Dismiss.  *See* LR 7(b)(4).

officers of election relating to registration or other acts requisite to voting in federal elections. 52 U.S.C. § 20701; *see also* 52 U.S.C. § 20705 (authorizing the Attorney General to bring an action to compel the production of federal election records demanded under Section 303 of the CRA). In that manner, Title III is unique because it is purely an investigative tool. As such, it enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).[2]

The CRA restricts the Court to a "severely limited" inquiry: (1) did the Attorney General make a written demand for federal election records stating the basis and purpose; (2) was that demand made to one or more "officer[s] of election" responsible for performing any act requisite to voting in federal elections including voter registration; (3) did the officer(s) of election fail or refuse to make the demanded federal election records "available for inspection, reproduction, and copying"; and (4) did the Attorney General make "a simple statement" to the Court that she satisfied the first three elements. 52 U.S.C. §§ 20703, 20706; *Lynd*, 306 F.2d at 226.

As discussed below in detail, the record before the Court demonstrates that the United States has satisfied each of these requirements. In contrast, Defendants have wholly failed to establish that there remains any "matter[] open for determination" which would provide a basis for the motions to dismiss. *Lynd*, 306 F.2d at 226. Therefore, the Motions to Dismiss (Docs. 49, 52, 56) should be denied, the United States' Motion to Compel (Doc. 6) should be granted and an

---

[2] Circuit caselaw addressing the CRA in any depth has been confined to courts within the Fifth Circuit in the early years following the CRA's enactment. The United States is unaware of any circuit courts disagreeing with the Fifth Circuit's approach to the CRA. Recently two District Courts in the Ninth Circuit and one District Court in the Sixth Circuit reached a contrary conclusion. However, those decisions are burdened by erroneous applications of the statute. *See infra* at 10-13, 16-18, and 22-23.

order compelling production of Massachusetts's SVRL and other responsive federal election records should be entered.

## II.    BACKGROUND

While the United States Constitution invests states with broad powers over the conduct of federal elections, it also explicitly authorizes Congress to override those state choices. The Elections Clause provides, "The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations…." U.S. Const. art. I, § 4, cl. 1. The Supreme Court has explained that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections … but only so far as Congress declines to preempt state legislative choices …. Thus, it is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States. *Foster v. Love*, 522 U.S. 67, 69 (1997) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832-33 (1995)) (citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Foster*, 522 U.S. at 69 (quoting *Ex Parte Siebold*, 100 U.S. 371, 384 (1879)); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7-9 & n.1 (2013) (discussing the breadth of the Elections Clause).

Congress enacted broad regulations over the conduct of federal elections in the three statutes at issue in this litigation. Title III of the CRA imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. HAVA requires states to implement a computerized SVRL and establish "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4).

Section 303 of HAVA mandates that every state "ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.* Section 8(i) of the NVRA requires states to make available "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…." 52 U.S.C. § 20507(i)(1). Only the United States, through the Attorney General, is authorized to compel records under Title III of the CRA and to enforce Section 303 of HAVA. *See* 52 U.S.C. §§ 20703, 20705 (CRA); 52 U.S.C. § 21111 (HAVA). The Attorney General likewise enforces the NVRA's requirement that all states maintain "accurate and current voter rolls" and remove ineligible voters in the conduct of federal elections. *See* 52 U.S.C. §§ 20510(a), 20507(b), 20507(a)(4).

On August 14, 2025, the Department of Justice sent Secretary Galvin, Massachusetts's chief elections officer, a letter requesting, *inter alia*, Massachusetts provide a current electronic copy of its SVRL ("August 14 Letter"). Mem. in Supp. (Doc. 7-3). As stated in the letter, the basis for the demand was Title III of the CRA codified at 52 U.S.C. §20701, *et seq,* and the purpose was to "ascertain Massachusetts's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* The letter informed Secretary Galvin that the list is subject to federal privacy protections, specifically Section 304 of the CRA. *Id.* It further informed Secretary Galvin that the statewide voter registration list could be produced via encrypted email or using the Department of Justice's secure file-sharing system. *Id.*

Secretary Galvin did not respond to the demand. On or about December 4, the Department contacted the First Deputy Secretary of the Commonwealth, who confirmed that Massachusetts

would not be providing the SVRL.  On December 11, 2025, the Attorney General then instituted these summary proceedings to compel production. Compl., (Doc. 1).

As explained in the attached second declaration of Eric Neff, the United States seeks these documents for one purpose only: to evaluate Massachusetts's compliance with the list maintenance provisions of HAVA and the NVRA, and if appropriate, to bring an enforcement action. 2d Decl. of Eric Neff ("2d Neff Decl.") ¶¶ 2-5. HAVA requires that "an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes" the applicant's driver's license number or if that is unavailable, the last four digits of the Social Security number ("SSN4"). 52 U.S.C. § 21083(a)(5)(A)(i). That information is necessary to identify duplicate registration records, registrants who have moved, registrants who have died, and those who are not eligible to vote in federal elections. 2d Neff Decl. ¶3.

### III.    MOTIONS TO DISMISS ARE INAPPLICABLE TO TITLE III OF THE CRA AND CANNOT CHALLENGE THE BASIS AND PURPOSE FOR THE DEMAND

Defendants misapprehend the nature of a CRA claim by erroneously suggesting the Court should apply the Federal Rules of Civil Procedure to the demand for records under the CRA. They incorrectly maintain that Title III of the CRA applies to only discrimination claims. They ask the Court to ignore caselaw under the CRA and allow an impermissible challenge to the basis and purpose of the Attorney General's written demand. Likewise, they assert that the Court should undermine the Attorney General's enforcement authority by rewriting the congressional mandate in the CRA. In place of producing all election records requisite to voting in federal elections, Defendants invite the Court to narrow the mandate to encompass only publicly available records. For the reasons discussed below, the Motions to Dismiss by Defendants should be denied.

### A.    The Federal Rules of Civil Procedure are inapplicable to motions to compel under Section 305 of the CRA.

Defendants argue that the Federal Rules of Civil Procedure govern these proceedings. Galvin. Mot. To Dismiss (Doc. 56 at 1); Alliance Intervenors' Mem. of Law in Supp. (Doc 54 at 7); Common Cause Mem. in Supp. (Doc. 50 at 9). They repeat what the Fifth Circuit has described as "a basic misconception … concerning a Title III proceeding." *Lynd*, 306 F.2d at 225.

The "chief purpose" of Title III "is to facilitate the investigation of the records *before suit is filed*." *United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam) (emphasis added). "[T]he function sought to be exercised by the Attorney General is … purely investigative," *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), to evaluate "possible violations of a Federal statute," *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("*Coleman II*"). It does not require known violations of federal law. In that manner, Title III enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Lynd*, 306 F.2d at 228. Contrary to what the Defendants argue, no factual allegations of a substantive violation of federal law are required. Instead, "Congress has specifically committed the investigative responsibility to the Attorney General and has equipped [her] with machinery thought suitable for the effective fulfillment of that obligation" through Title III of the CRA.[3] *Id.* at 230. That approach makes sense.

---

[3] Title III invests the Attorney General with a power akin to a grand jury which "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Bisceglia*, 420 U.S. 141, 148 (1975). The Supreme Court has recognized that statutes that vested investigative powers in Executive Branch agencies provide such agencies with grand jury-like powers and latitude. *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 57 (1964) (recognizing that the IRS Commissioner has grand jury-like powers); *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (same with respect to the Federal Trade Commission). The investigative powers that the Attorney General derives from Title III fall comfortably within this paradigm.

The United States cannot be expected to effectively enforce federal election laws such as HAVA and the NVRA if the Attorney General is required to allege facts from federal election records that state officers of election have denied to her. *See id.* at 227 (the Attorney General's "right to records does not require that [she] show [she] could win without them").

The Attorney General's filing of an application for an order under Title III "is not the commencement of an ordinary, traditional civil action with all of its trappings." *Id.* at 225. It is "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Id.* In structuring the statute in this way, Congress has indicated that the Federal Rules of Civil Procedure are inapplicable. "Since it is a special statutory proceeding, it does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Id.* at 225-26; *see also Gallion*, 187 F. Supp. at 854 (comparing applications to compel to actions by the Securities and Exchange Commission in which procedural rules "are made specifically inapplicable to investigations"). The CRA differs from ordinary civil actions because its "chief purpose" is to facilitate *pre-suit* investigation. *See Citizens Councils*, 187 F. Supp. at 847. "There is no place for any other procedural device or maneuver," including the motions to dismiss presently before the Court, in response to a CRA claim. *Lynd*, 306 F.2d at 226; *see also* Fed. R. Civ. P. 81 (summarizing other federal claims to which the Federal Rules of Civil Procedure do not apply).

A recent decision issued by a District Court in the Sixth Circuit agreed with *Lynd* and rejected the arguments raised by Defendants. *See United States v. Benson*, Case No. 1:25-cv-01148-HYJ-PJG, 2026 WL 362789, at *7. (W.D. Mich. Feb. 10, 2026) , appeal filed, (6th Cir. Feb. 25, 2026) (No. 26-1225) (notice of appeal attached to 2d Neff Decl. as Ex. 7). Instead, the *Benson* court construed "a request for records under the CRA as a form of administrative subpoena." *Id.* (citing *Lynd*, 306 F.2d at 225 and *In re Gordon*, 218 F. Supp. 826, 826-27 (S.D.

Miss. 1963)). Therefore, "[m]ost of the Federal Rules of Civil Procedure are simply inapplicable…" *Benson*, 2026 WL 362789, at *7 (quoting *United States v. Markwood*, 48 F.3d 969, 982 (6th Cir. 1995)). The court acknowledged that "'a district court's role in the enforcement of an administrative subpoena is a limited one.'" *Id.* (citation omitted).

Two District Courts in the Ninth Circuit reached a different conclusion but erred in doing so. Both courts misread the Supreme Court's decision in *United States v. Powell*, 379 U.S. 48 (1964), to reject the Fifth Circuit's holding in *Lynd* that Title III of the CRA is a special statutory proceeding where the Federal Rules of Civil Procedure do not apply. [4] *Powell* applied the Federal Rules of Civil Procedure to an IRS administrative summons. There, the Supreme Court made the unremarkable observation that because section 7604(b) of the Internal Revenue Code ("IRC") "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply…" *Powell*, 379 U.S. at 58, n.18. However, the *Oregon* court applied a much broader construction of *Powell* than the Supreme Court intended.

The *Oregon* court found that *Powell* involved interpretation of "a similar statute" to Title III of the CRA, and the *Powell* Court's admonition that "the court may 'inquire into the underlying reasons for the examination [of records]'" therefore applied to the CRA. *Oregon*, 2026 WL 318402, at *8 (quoting *Powell*, 379 U.S. at 58 & n.18). Although the quoted language from *Powell* is correct, *see id.*, the *Oregon* court omitted any explanation that the quoted language referred to a

---

[4] *See United States v. Oregon*, Case No. 6:25-cv-01666-MTK, 2026 WL 318402, at **7-8 (D. Or. Feb. 5, 2026), appeal filed, (9th Cir. Feb. 25, 2026) (Notice of Appeal attached to 2d Neff Decl. as Ex 8); *United States v. Weber*, Case No. 2:25-cv-09149-DOC-ADS, 2026 WL 118807, at *8 (C.D. Cal. Jan. 15, 2026) (9th Cir. Feb. 25, 2026) (Notice of Appeal attached to 2d Neff Decl. as Ex. 9). The Alliance Intervenors cite extensively to *Weber* in their memorandum of law. *See* Alliance Intervenors' Mem. of Law in Supp. (Doc. 54). As discussed below, *Benson* addressed many of the legal errors in *Weber* that call into question whether *Weber* merits any consideration.

process expressly provided in the IRC that is missing from the CRA. The Supreme Court explained that judicial inquiry was appropriate where asked to enforce an administrative summons under the IRC to determine "if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Powell, 379* U.S. at 58. That inquiry was permitted because it was specifically authorized by section 7605(b) of the IRC, which prohibited the Government from subjecting a taxpayer "to unnecessary examination or investigations." *Id.* at 52-53 (quoting 26 U.S.C. § 7605(b)). However, no similar language limits the Attorney General's authority to compel records under the CRA. *See* 52 U.S.C. §§ 20701-20706. Nor does the CRA provide any process for officers of election to object to Title III proceedings being initiated against them. *See id.*

Moreover, even with language in the IRC limiting records to "necessary" investigations, the Supreme Court noted that strong deference is given to the Government to investigate, and "does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, *or even just because it wants assurance that it is not.*" *Powell*, 379 U.S. at 57 (quoting *Morton Salt*, 338 U.S. at 642-43) (emphasis added). *Powell* is completely consistent with *Lynd* and in no way restricts records demands under the CRA to the statutory limitations that Congress included in the IRC. [5]

---

[5] The *Oregon* decision similarly misread *Lynd* by reasoning "the Court doubts its applicability here where Plaintiff made an affirmative choice to file a complaint and proceed through ordinary litigation" instead of applying "directly to the court for the records." *Oregon*, 2026 WL 318402, at *8 n.1. *Lynd* does not say filing a pleading waives the expedited process under the CRA. Instead, as discussed above, the Fifth Circuit explained only that any pleadings that are filed do not need to "satisfy usual notions under the Federal Rules of Civil Procedure." 306 F.2d at 225-26.

In addition to *Powell*, the *Weber* court also referred to what it indicated was a decision of the United States Supreme Court. *See Weber* 2026 WL 118807, at *8 (citing "*Becker v. United States*, 451 U.S. 1306 (1981)"). That is incorrect. *Becker* was an order issued by the Circuit Justice on an application for a temporary stay. *See* 451 U.S. 1306 (1981) (Rehnquist, J., in chambers) (continuing temporary stay pending review by the Court). The subsequent history indicates that the stay was continued, 452 U.S. 912 (1981), and later vacated and denied, 452 U.S. 935 (1981), leaving it without any precedential authority.

Moreover, in *Becker*, which involved an administrative summons under the IRC, then-Justice Rehnquist specifically recognized that *Powell*'s reference to the Federal Rules of Civil Procedure applying to records demanded under the IRC was "not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and adversary hearing, if requested, is made available." *Becker*, 451 U.S. at 1308 (Rehnquist, J., in chambers) (quoting *Donaldson v. United States*, 400 U.S. 517, 528-29 (1971)). Justice Rehnquist distinguished between agency efforts "to take what is potentially income-producing property" from efforts to "merely require [the respondent] to produce evidence…." *Id.* at 1308. Although "the need for summary enforcement of IRS summonses is clear and justifies dispensing with Federal Rules" in the latter context (gathering evidence), "the need to proceed summarily is less clear, as is the justification for dispensing with otherwise applicable provisions of the Federal Rules" in the former context (seizing income-producing property). *Id.*; *see id.* at 1310-11. When it comes to requests for evidence, "[o]bviously the taxpayer cannot simply write his own ticket as to the manner in which relevant nonprivileged evidence shall be made available to the IRS." *Id.* at 1311. In other words, far from supporting Defendants' argument that the summary proceeding

does not apply to production of federal records under the CRA, Justice Rehnquist's opinion in *Becker* undercuts it.

Accordingly, the "usual notions under the Federal Rules of Civil Procedure" do not apply to the CRA's "special statutory proceeding" to compel production of federal election records. *Lynd*, 306 F.2d at 225-26; *see also Gallion*, 187 F. Supp. at 854 (same).

**B.    Title III of the CRA does not require allegations that the federal election records demanded are needed to investigate race-based denial of voting rights.**

Title III of the Civil Rights Act of 1960 is entitled "Federal Election Records." CRA § 301, Pub. L. No. 86-449, 74 Stat. 86 (1960). This "sweeping" obligation requires officers of election to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. Section 301 provides, in pertinent part, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of [a federal election] all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election…." 52 U.S.C. § 20701. Section 303 authorizes the Attorney General of the United States to compel any person "having custody, possession, or control of such record or paper" to make "available for inspection, reproduction, and copying … by the Attorney General or [her] representative." 52 U.S.C. § 20703.

Notwithstanding the CRA's plain language, Secretary Galvin argues that the only permissible basis for a Title III request is to "facilitate investigations into state and local officials' efforts to deny or restrict citizens' right to vote on the basis of race."  Galvin. Mem. in Supp. (Doc. 57 at 10).  Alliance Intervenors similarly contend that the CRA is limited to investigations of "question[s] concerning infringement or denial of …constitutional voting rights," despite the absence of any language in Title III supporting their position. Alliance Intervenors Mem. in Supp. (Doc. 54 at 9). Congress made clear in the CRA where it intended a remedy to be limited to racial

discrimination. *See e.g.* Section 601 of the CRA, P.L. No. 86-449, 74 Stat. 90 (applying Title VI of the CRA to violations of rights "on account of race or color") (codified as amended at 52 U.S.C. § 10101). That is consistent with express limitations Congress made to remedies in other civil rights statutes. *See*, *e.g.*, 42 U.S.C. § 2000e-2 (prohibiting employment practices "because of such individual's race, color…" in Title VII of the CRA of 1964); 52 U.S.C. §§ 10301-10306, 10309 (prohibiting discrimination "on account of race, color," or language minority status in the Voting Rights Act of 1965); 42 U.S.C. §§ 3604-3606, 3617 (prohibiting discrimination in housing or rentals "because of "race, color, … or national origin" in the Fair Housing Act of 1968). No such language limiting Title III of the CRA to voting rights violations based upon racial discrimination appears anywhere in the statutory text. *See* 52 U.S.C. §§ 20701-20706.

Moreover, in *Gallion* the court concluded "that the prescribed standard of Section 301 is *clear and unambiguous*." 187 F. Supp. at 855 (emphasis added). Specifically, Title III functions as "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd*, 306 F.2d at 225. The only language that is required in the Attorney General's demand is that it "was made for the purpose of investigating possible violations of a Federal statute." *Coleman II*, 313 F.2d at 868 (quoting "Senator Keating, one of the principal spokesmen for the bill in the Senate," at 106 Cong. Rec. 7767); *see also Coleman v. Campbell*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) ("*Coleman I*") (a sufficient purpose to examine federal election records is "to see if any Federal laws were violated").

Engrafting a requirement of racial discrimination that does not exist in Title III of the CRA would violate the statute's express congressional mandate, while also undermining the Attorney General's enforcement of requirements in HAVA and the NVRA that help protect voting rights. Where, like here, the language of an enactment is unambiguous, "the words employed are to be

taken as the final expression of the meaning intended." *United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269, 278 (1929). Well-established principles of statutory construction foreclose federal courts from rewriting a statute in a manner that better suits a litigant. As the Supreme Court explained, "[t]he judicial function to be exercised in construing a statute is limited to ascertaining the intention of the Legislature therein expressed. A *casus omissus* does not justify judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554-55 (1925). "[W]here the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed." *Mo. Pac.*, 278 U.S. at 278 (citations omitted). In that manner, the "judicial function [is] to apply statutes on the basis of what Congress has written, not what Congress might have written." *United States v. Great N. Ry. Co.,* 343 U.S. 562, 575 (1952). "After all, only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process…." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654-55 (2020).

The *Benson* court rejected arguments that parallel those of the Defendants in this case, concluding that the CRA cannot be rewritten to restrict the statute's scope. The court first rejected *Weber*'s imposition of a temporal limitation on the CRA to only those statutes in effect when the Act became law. The court explained, "[t]here is no rule of statutory interpretation that prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes." *Benson*, 2026 WL 362789, at *8, such as the NVRA and HAVA. Turning to the argument that Title III of the CRA could only be used to investigate racial discrimination, *Benson* observed that

"the CRA's text includes no such limitation…" *Id.* Investigating list maintenance efforts under the NVRA fits neatly within the scope of Title III: "The CRA aids the Attorney General in assessing states' compliance with federal election law and protecting voting rights; the NVRA is a federal election law that protects voting rights." *Id.*

As a result, the United States respectfully submits that the Court must decline Defendants' invitation to rewrite the CRA to add a requirement of racial discrimination that simply does not exist in Title III. *See id.*

### C.    Defendants cannot challenge the Attorney General's basis and purpose to investigate Massachusetts's HAVA and NVRA compliance.

The CRA establishes a straightforward requirement for the Attorney General to make a written demand to officers of election for federal election records that articulates "the basis and purpose therefor." 52 U.S.C. § 20703. The United States has done that.  In the August 14 Letter the Attorney General made a written demand under Section 303 of the CRA for Massachusetts' federal election records, including its SVRL. For the basis, the letter began by referencing the NVRA and HAVA.  August 14 Letter (Doc. 7-3). After explaining why those statutes supported the request, the letter specifically cited Section 303 of the CRA, stating that "[p]ursuant to the foregoing authorities, including the CRA, the Attorney General is demanding an electronic copy of Massachusetts's complete and current [SVRL]." *Id.* It further explained that the purpose of the request "is to ascertain Massachusetts's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.*

Nevertheless, Defendants argue that the United States has failed to articulate a legitimate basis and purpose for the demand under Title III.  Defendants argue that the United States' demand is implausible and has failed to provide a factual basis for the election records it seeks. *See* Galvin, Mem. in Supp. (Doc. 57 at 12-15); Alliance Intervenors Mem. in Supp. (Doc. 54 at 8-15); and

Common Cause Mem. in Supp. (Doc. 50 at 10-17). As a threshold matter, the CRA does not allow these criticisms to derail the United States' demand for election records.

Defendants cannot use any "procedural device or maneuver," including the Defendants' motions to dismiss, to challenge or "ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Lynd*, 306 F.2d at 226. No discovery or other tools ordinarily available under the Federal Rules of Civil Procedure may be used to question or examine "the reasons why the Attorney General considers the records essential…" *Id.* "Questions of relevancy or good cause or other like considerations" that may be assessed under other statutes to which the Federal Rules of Civil Procedure are applicable "are completely foreign to the summary proceeding" under Section 304 of the CRA. *Id.* at 228; *see also Benson*, 2026 WL 362789, at *8 ("[T]he CRA does not allow courts to evaluate the substance of the DOJ's purported basis and purpose."). Congress vested the Attorney General with broad authority to obtain federal election records under Title III of the CRA. *See Coleman I*, 208 F. Supp. at 200-01. In sum, "the factual foundation for, or the sufficiency of, the Attorney General's" written demand under Section 303 "is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226; *cf. Powell*, 379 U.S. at 56 (explaining that there is no judicial oversight "to oversee the [IRS] Commissioner's determinations to investigate"). Defendants' motions to dismiss the CRA claim for not meeting an elevated showing of statement of "the basis and the purpose" fail under the plain language of the statute, as applied by federal courts.

Section 303's requirement that the written demand "contain a statement of the basis and the purpose therefor," 52 U.S.C. § 20703, "means only that the Attorney General [must] identify in a general way the reasons for [her] demand." *Coleman II*, 313 F.2d at 868 (citation omitted).

15

"Clearly a sufficient statement would be the assertion that the demand was made for the purpose of investigating *possible violations* of a Federal statute." *Id.* (emphasis added); *see also Coleman I*, 208 F. Supp. at 200 (the written demand need only indicate the records were needed "to see if any federal laws were violated"); *cf. Morton Salt*, 338 U.S. at 642-43 (same construction of administrative subpoena by the FTC). The United States satisfied that requirement by stating, "[t]he purpose of the request is to ascertain Massachusetts's compliance with the list maintenance requirements of the NVRA and HAVA." August 14 Letter (Doc. 7-3)

Even if the court allows the type of inquiry Defendants seek—and it should not—the United States can demonstrate that its purpose in requesting the unredacted SVRL is important to enforce the list maintenance provisions. HAVA requires that voter registration applicants provide a driver's license and SSN4 if they have one. *See* 52 U.S.C. § 21083(a)(5)(A)(i). The United States needs to verify that states are collecting these numbers by looking at an unredacted voter list. *See* 2d Neff Decl. ¶ 3. Congress had a very good reason for requiring this information on voter registration applications.

In 2001, the bipartisan National Commission on Federal Election Reform, with former Presidents Gerald R. Ford (Rep.) and Jimmy Carter (Dem.) serving as Honorary Co-Chairs, explained why adding driver's license information and the last four of the Social Security numbers for federal elections protected individual voters:

> Any state adopting a statewide voter registration system will confront the problem of uniquely identifying voters, figuring which Joseph Smith is the same as that Joe Smith. That is why, following the Michigan example, we recommend obtaining residential addresses, with the DMV and voter registration address required in identical form. An added identifier is desirable, given the various spellings and the clerical errors that frustrate reliance only on a given name and address. For this purpose some numeric identifier can be useful. Given the danger from overuse of entire Social Security Numbers as an individual identifier we suggest that states obtain

> the last 4 digits of this number as an added identifier [SSN4s]. The Federal
> Election Commission has made the same recommendation.

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process 32-33 (Aug. 2001) (excerpts provided as 2d Neff Decl., Ex. 6). Furthermore, the Commission noted that it was "estimated that 92% of all registered voters also have a driver's license," *id.* at 30, which strongly supported use of a driver's license number as a unique identifier for each voter who possessed one. The Commission recognized that "accuracy" of a statewide voter registration database "can mean access." *Id.* It explained, "[u]sed cumulatively, this information could improve the accurate exchange of information affecting voter eligibility and help avoid mistaken voter removals like those that occurred in Florida." *Id.* at 33. Congress heeded the Commission's finding that inaccurate voter databases can disenfranchise individual voters when it enacted HAVA in 2002. It explained how list maintenance and compliance with HAVA's identifying numbers helps protect an individual's right to vote: to "reduce the incidence of voters appearing at a polling place only to discover that no record of their registration can be found."[6] H.R. Rep. 107-329, pt. 1, at 36 (2001).

Defendants' contention that the demand needs to include a factual basis showing an *extant* violation of federal law, fails for the reasons discussed above. *See supra* Part III(A) (describing why the investigative nature of a demand under Title III forecloses any requirement that a specific

---

[6] Recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny. 2d Neff Decl. ¶¶ 12-14. In 2025, North Carolina election officials admitted that the state "maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5)." *United States v. N. Carolina Bd. of Elections*, Consent J. & Order at 4 (E.D.N.C. Sept. 8, 2025) (attached as 2d Neff Decl., Ex. 4). As a result of the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709. *See N. Carolina Bd. of Elections*, Defs.' 2d Status R. at 2 (E.D.N.C. Jan. 30, 2026) (attached as 2d Neff Decl., Ex. 5).

allegation of a violation of federal law be included in that demand). Instead, a reference to the statutory basis for making the demand, namely the CRA, suffices.

Even if a factual basis was required why the records are needed, the Attorney General did so in her August 14 Letter, in which she wrote:

> [T]he electronic copy of the statewide Voter Registration List ("VRL") must contain *all fields*, including the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA")[1] to register individuals for federal elections.
> .

August 14 Letter (Doc. 7-3) (emphasis in original). The accompanying footnote explained that when Congress charged the Attorney General with HAVA enforcement, it "plainly intended that DOJ be able to conduct an independent review of each state's list…." *Id.* at n.1.

Also, contrary to what Common Cause and the Alliance Intervenor's contend through third-party hearsay, the records the United States is seeking to compel under the CRA are not intended to create a national voter database.  Common Cause Mem. in Supp. (Doc 50 at 3-6); Alliance Intervenors' Mem. in Supp. (Doc. 54 at 4-8, 18).  Rather, the records sought from Massachusetts are necessary to perform an individualized assessment of the State's efforts to comply with HAVA and the NVRA.[7] 2d Neff Decl. ¶ 5. The extent of the litigation necessary to obtain those records, in this case and in others, reflects a coordinated effort to impede federal enforcement of those statutes in every state.

---

[7] When the Civil Rights Division performs this individualized assessment, the State's SVRL is compartmentalized and maintained by the Civil Rights Division separately from the SVRL of any other State. The maintenance, use, and destruction of those records is in full compliance with the requirements in the CRA, Privacy Act, and all other federal laws governing the records. Neff Decl. ¶ 6.

**D.    Massachusetts's SVRL falls within Section 301's broad definition of "all records and papers" relating to registration to vote in federal elections.**

The scope of federal election records covered by Title III of the CRA is broadly established by Congress. Section 301 of the Act provides that the retention and production requirements apply to "*all records and papers*" which "come into … possession" of an officer of election "relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election "for a period of twenty-two months" from the date of any federal election. 52 U.S.C. § 20701 (emphasis added). This language is unequivocal in its breadth.

Indeed, federal courts that have applied Section 301 have concluded that Congress meant what it said in the statute. It does not exclude production of electronic records or the SVRL, as Secretary Galvin argues. *See* Galvin, Mem. in Supp. (Doc. 57 at 15-16). One court explained in detail why a similar effort to impede the Attorney General's enforcement of federal election laws failed:

> There is nothing uncertain about that part of the Act requiring preservation and production of all records and papers which are in the possession of an election official … if those records and papers relate to the acts requisite to voting…. Regardless of when these records came into the possession of the election official, under Section 301 they must be retained and preserved for a period of twenty-two months 'from the date of any general, special, or primary election …' if they relate to acts requisite to voting in such election.

*Gallion*, 187 F. Supp. at 855 (quoting 52 U.S.C. § 20701). In *Lynd*, the Fifth Circuit likewise recognized that "the papers and records" covered by Section 301 "have been specifically identified by Congress." 306 F.2d at 226. This requirement "is sweeping." *Id.* It applies to "all records and papers," as the statute provides, *id.*, and cannot be circumvented in the manner that the Defendants suggest.

The *Benson* court read Section 301 much more narrowly and denied production of a SVRL finding the statute applies "only to documents that people *submit* to the State as part of the voter

registration process, not a document like the voter registration list that is *created* by state officials." *Benson*, 2026 WL 362789, at *9 (emphasis added). The defendants do not make that argument here. The United States respectfully disagrees with the *Benson* court, and no other federal court has adopted such a limitation. Moreover, today many – and likely even most – voter registration applications are only in electronic form in a SVRL.[8] Such a reading would effectively carve out vast numbers of federal election records, which was plainly not the intention of Congress in passing such "sweeping" legislation. *Lynd*, 306 F.2d at 226.[9]

Moreover, federal courts have rejected similar attempts to limit the scope of voting records under other statutes. In *Judicial Watch v. Lamone*, the defendants argued that a "voter list is not a 'record' under Section 8(i)" of the NVRA, and even if it was, Maryland law allowed election officials to "limit the production of voting-related records more strictly than the NVRA." 399 F. Supp. 3d 425, 434 (D. Md. 2019). The court rejected that contention. It explained that Maryland misunderstood the requirements of the NVRA and the plaintiff was entitled to the registered voter list because "a 'voter list' is simply a partial compilation of voter registrations" encompassed by the Act. *Id.* at 442. The court also was persuaded that the "focus on the information sought" was significant "rather than the particular language used to characterize that information." *Id.* at 440 (citing *Project Vote v. Kemp*, 208 F.Supp.3d 1320, 1329 (N.D. Ga. 2016) (court rejected

---

[8] According to the data that Massachusetts reported to the U.S. Election Assistance Commission, it is doubtful that hundreds of thousands of federal voter registration records exist in any medium other than electronic form. A large percentage of voter registration transactions were reported as being through the motor vehicle department, online, and in-person. *See* U.S. Election Assistance Comm'n, Election Administration and Voting Interactive Data, *available at https://www.eac.gov/research-and-data/studies-and-reports/eavs-data-interactive* (last visited Feb. 26, 2026).

[9] Even the *Benson* court expressed some discomfort at its conclusion, acknowledging that it was possible that "the distinction between voter registration applications and voter registration lists is overly pedantic…" 2026 WL 362789, at *10.

defendant's argument that plaintiff could not obtain voter list)); *see also Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 337 (4th Cir. 2012) (finding "all records" under Section 8(i)(1) included voter registration records).

The United States has successfully pursued matters, including in litigation, to obtain statewide voter registration lists under Title III of the CRA in the past. For example, in two of those matters against Georgia and Texas, the United States obtained the SVRLs, including drivers' license numbers and SSN4s, to evaluate compliance with the NVRA, including that Act's list maintenance requirements.[10] To ascertain whether a jurisdiction engages in practices that violate federal law (whether HAVA, the NVRA, the Voting Rights Act or any other one), the Attorney General needs to examine both applications to register to vote *and* the final voting rolls, including the electronic SVRL, so as to assure herself that the applications are being properly processed and that reasonable list maintenance efforts have been practiced. *See* 2d Neff Decl. ¶ 4. Limiting the Attorney General's ability to anything other than *all records* would make it nearly impossible for her to carry out the duties assigned to her by Congress.

### E. The United States is entitled to Massachusetts's unredacted federal election records, including its SVRL.

Section 303's language provides that "[a]ny record or paper required by [Section 301] to be retained and preserved shall" upon written demand by the Attorney General or her representative stating the basis and purpose, "be made available for inspection, reproduction, and

---

[10] *See* Compl., *United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006), (Doc. 1). The Court entered a consent decree in the Georgia case requiring production of the SVRL. *See Georgia*, *supra*, at (Doc. 4) (filed Oct. 27, 2006). The Texas matter was resolved by a Memorandum of Understanding. *See* U.S. Dep't of Just., Mem. of Understanding between the United States and Texas (May 13, 2008), *available at* https://www.justice.gov/media/1173461/dl?inline (last visited Feb. 27, 2026). For the Court's convenience, the three documents are provided herein as Neff Decl., Exs. 1-3.

copying….” 52 U.S.C. § 20703. “The incorporated standard of [Section 301] is sweeping.” *Lynd*, 306 F.2d at 226. The question is only “open for determination” by the Court if “a genuine dispute… arises as to whether or not any specified particular paper or record comes within this broad statutory classification of ‘all records and papers … relating to any … act requisite to voting’….” *Id.*

Nevertheless, Defendants ask the Court to legislate limitations conspicuously absent from Title III. Secretary Galvin cites state and federal statutes governing privacy of voter registration records to support his argument that only a publicly available version of Massachusetts's SVRL is required. *See* Galvin, Mem. in Supp. (Doc 57 at 16-17). Intervenors make similar arguments. Alliance Intervenors Mem. in Supp. (Doc. 54 at 15-18); Common Cause Mem. in Supp. (Doc. 50 at 17-20). The statutory text of Title III itself makes clear that the records that must be produced under the CRA are not limited to only those that are public. Section 304 of the CRA explicitly requires the nondisclosure of records produced to the Attorney General under the Act:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. Section 304's privacy protection only has meaning if the records covered by the CRA include non-public information. Yet, Defendants ignore the plain language of Section 304 and ask the Court to do the same by rewriting the CRA to exclude all non-public records and information. Congress rejected the position that they advance by its broad reference to “all records and papers…” 52 U.S.C. § 20701. In sharp contrast, where Congress intended to require a smaller class of records to be produced in a statute, it has said so. *See* 52 U.S.C. § 20507(i) (providing in the NVRA that voter records to be produced to the public for assessment of list maintenance “shall

include lists of the names and addresses" of voters sent confirmation notices and any responses).

To put it succinctly: Section 301 means what it says in requiring production of "all records and papers" relating to registration to vote in a federal election, including Massachusetts's SVRL. 52 U.S.C. § 20701. As *Lynd* made clear, "All means all." 306 F.2d at 230. Therefore, the argument by Defendants that non-public records are excluded fails as a matter of law.

The United States will strictly abide by the statutory limitations in Section 304 and other federal privacy laws. The unredacted SVRL and other responsive federal election records can certainly be produced to the United States consistent with these federal protections through a protective order.[11] *See Lynd*, 306 F.2d at 230.

Finally, if the Defendants' position were to be adopted, it would eviscerate Title III. The Attorney General can only meaningfully investigate and enforce list maintenance requirements under HAVA and the NVRA by having access to the voter identification numbers required by federal law. For each voter, that includes their driver's license number, their SSN4, or other HAVA identifying number. *See* 52 U.S.C. § 21083(a)(5)(A). As explained above, that information is necessary to identify duplicate registration records, registrants who have moved, and registrants who have died, or who are otherwise no longer eligible to vote in federal elections.[12] *See supra*

---

[11] Consistent with this approach to address any reasonable privacy concerns without impeding the Attorney General's authority to enforce federal law, the United States offered several states a memorandum of understanding, or MOU, memorializing these requirements. *See* Neff Decl. ¶ 16. As of February 27, 2026, thirteen states have provided their SVRLs without any MOU. *Id.* Two states have agreed to provide their SVRL under the terms of the MOU. *Id.* Three other states have indicated their intention to provide the SVRLs in the near future. *Id.*

[12] *See generally* 52 U.S.C. § 20507(a)(4) ("In the administration of voter registration for elections for Federal office, each State shall – (4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of – (A) the death of the registrant; or (B) a change in the residence of the registrant…"); 52 U.S.C. § 21083(a)(4) ("The State election system shall include provisions to ensure that voter registration

Part III(B). There is no question that enforcement of the list maintenance requirements of HAVA and the NVRA are for "the purpose of investigating possible violations of a Federal statute." *Coleman II*, 313 F.2d at 868; *cf. Morton Salt*, 338 U.S. at 642-43 (confirming compliance with federal law is a legitimate purpose).

The data the United States has requested under the CRA is the same that twenty-five states (including Massachusetts) and the District of Columbia routinely share through the Electronic Registration Information Center, ("ERIC"), to facilitate their compliance with federal list-maintenance requirements.[13] Similarly, private parties have been granted access to even more detailed voter data than what the United States has requested where necessary to bring actions to enforce federal rights. *See Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937, at *2 (D.N.H. May 27, 2025) (ACLU compelled production of "[a] copy of the New Hampshire statewide voter database and all documents concerning the use of the statewide voter database, including instruction manuals or other guides concerning the data fields contained in the database and their correct interpretation."), *appeal dismissed*, No. 25-1585 (1st Cir. July 2, 2025).

Accordingly, the United States is entitled to reproduction and copying of Massachusetts's unredacted electronic SVRL under the unambiguous language of Section 303 of the CRA. *See* 52 U.S.C. § 20703; *Lynd*, 306 F.2d at 226; *see also Gallion*, 187 F. Supp. at 855-56 (granting the Attorney General "an order to require the production of records for inspection, reproduction and copying…").

---

records in the State are accurate and are updated regularly, including… (A) A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters….").

[13] *See* ERIC, ERIC Overview, *available at* https://ericstates.org/ (last visited Feb. 24, 2026).

### IV.    THE UNITED STATES IS COMPLYING WITH FEDERAL PRIVACY LAWS

Defendants make a variety of arguments that privacy laws require dismissal of the United States' efforts to compel production of Massachusetts's federal election records. *See* Galvin, Mem. in Supp. (Doc 57 at 17-19) and Alliance Intervenors Mem. in Supp. (Doc. 54 at 18-20). Those arguments are misguided at best. The United States does not dispute that the requirements of the Privacy Act and Section 304 of the CRA apply here, and it is complying with those requirements. The First Amendment does not prohibit the collection of voter information by the United States to assess compliance with HAVA and the NVRA. The requirement for a Privacy Impact Assessment under the E-Government Act does not apply to the investigation of Massachusetts's list maintenance practices being conducted by the United States under HAVA and the NVRA. Likewise, the Driver's Privacy Protection Act does not limit the United States' ability to conduct list maintenance activities. Each of these arguments will be addressed briefly in turn.

#### A.    The United States is complying with the Privacy Act.

Secretary Galvin argues that the United States must comply with the Privacy Act, and the United States is doing so. Not surprisingly, however, there is no requirement in federal law requiring that the United States plead its compliance with the Privacy Act in every complaint it brings in which it may obtain records that contain personally identifiable information. Rather, the Privacy Act and Section 304 of the CRA simply require that when protected information is obtained, it must be securely stored and not be subject to unauthorized dissemination or use.

The voter information that the United States is collecting is maintained according to the Privacy Act protections explained in the Department of Justice, Civil Rights Division's Privacy Policy, which it has published online. The full list of routine uses for this collection of information, which include investigations and enforcement actions, can be found in the Department of Justice's

systems of records notices ("SORN"), most of which are identified with their citations in U.S. Dep't of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25, 2017), listed in a table at pages 24,148 to 24,151.

The statutes cited for routine use include the NVRA, HAVA, and the Civil Rights Act of 1960, as described in note 16 of the Department of Justice's Privacy Policy. The United States made its requests pursuant to those statutes. August 14 Letter (Doc. 7-3). The records in the system of records are kept under authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

To the extent that Defendants are concerned about the transport of such data to the United States, the Department of Justice uses a secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). That system implements strict access controls to ensure that each user can only access their own files and is also covered by SORNs.

Moreover, the Privacy Act does not bar the disclosure of Massachusetts's SVRL to the United States, as Secretary Galvin contends. Galvin, Mem. in Supp. (Doc. 57 at 17-18.)  The Privacy Act regulates federal agencies' collection, maintenance, and disclosure of information within their own systems of records—it does not restrict the ability of state actors to share information with federal agencies. The statute's plain language confirms that it applies only to federal "agencies" as defined in 5 U.S.C. § 552a(a)(1), meaning "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government…." State and local entities fall outside that definition. The Privacy Act erects "certain safeguards for an individual against an invasion of personal privacy," Pub. L. No. 93–579, § 2(b), 88 Stat. 1896 (1974), only within the scope of federal agency record systems. There is no basis for Secretary Galvin to fail or refuse to disclose

26

information to a federal agency for law enforcement purposes, particularly here, where the United States is complying with the provisions of the Privacy Act.

**B.      The E-Government Act does not prevent the United States from obtaining data supporting its HAVA and NVRA claims.**

Secretary Galvin next argues that the demand for production of Massachusetts's SVRL and other federal election records violates the E-Government Act. According to Secretary Galvin, the Voting Section is required to conduct a "privacy impact assessment," or "PIA," before initiating investigations of each state's compliance with HAVA and the NVRA.  Galvin, Mem. in Supp. (Doc. 57 at 18). Again, neither the E-Government Act nor interpretative case law support Secretary Galvins' assertion.

The E-Government Act neither authorizes dismissal of this case nor limits the United States' ability to bring suit. The E-Government Act is not applicable to the United States' enforcement of HAVA and the NVRA. The United States is not initiating a new process whereby it is contacting individuals for information as contemplated by Pub. L. No. 107–347, § 208(b)(1)(A)(ii)(II), which "includes any information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government." The request is made to Secretary Galvin to provide a voter registration list Massachusetts already maintains pursuant to federal law to analyze its federally required list maintenance. The SVRL would be kept on a system for which

a Privacy Impact Assessment has been done.[14] Only when a new system is established—not when each new data request is made—is a Privacy Impact Assessment required.[15]

Applying the E-Government Act to enforcement of voting statutes would lead to an absurd result in which thousands of Privacy Impact Assessments would have to be done whenever the Voting Section gathers any voter data to enforce the Voting Rights Act, HAVA, NVRA, or the Uniform and Overseas Citizens Voting Act. Nothing in the E-Government Act or the purpose of the privacy provision in the Act suggests it was meant to encompass the enforcement provisions of all voting laws where voter data is examined. *See* Pub. L. No. 107–347, § 208(a).

### C.    The Driver's Privacy Protection Act does not allow Secretary Galvin to deny the United States list maintenance data.

Secretary Galvin's contention that dismissal is warranted because the Attorney General's demand violates the Driver's Privacy Protection Act ("DPPA") also fails.  Galvin. Mem. in Supp. (Doc. 57 at 18).  The DPPA generally prohibits the disclosure of "personal information" obtained by a state Department of Motor Vehicles in connection with a motor vehicle record. *See* 18 U.S.C. §§ 2721(a), 2725(1), (3), (4). Nonetheless, the statute explicitly contains exceptions that permit certain governmental uses. Under 18 U.S.C. § 2721(b)(1), disclosure is allowed "for use by any government agency … in carrying out its functions," including law enforcement or other

---

[14] An Initial Privacy Assessment (IPA) Determination was issued on October 12, 2012, showing that no Privacy Impact Assessment is required for the Justice Consolidated Office Network (JCON) system where personal identifying information associated with the United States' CRA demand is stored. *See* 2d Neff Decl. ¶ 17.

[15] When the Civil Rights Division began using ServiceNow (SNOW), a FedRAMP High-compliant Software as a Service (SaaS) cloud-hosting provider offering a suite of natively integrated applications designed to support Information Technology Service Management (ITSM), resource management, and shared support services, it prepared a Privacy Act Assessment ("PIA") as required by the E-Government Act. *See* Office of Privacy & Civ. Liberties, DOJ Privacy Impact Assessments, *available at* https://www.justice.gov/opcl/doj-privacy-impact-assessments (last visited February 27, 2026).

regulatory enforcement purposes. This statutory language demonstrates that the DPPA was not intended to block all government access to DMV records.

The DPPA's prohibition is clearly not implicated in the present case. The Department of Justice is a government agency performing a statutorily mandated function—verifying voter registration records and associated list maintenance activities by state and local entities. Under the governmental-function exemption in § 2721(b)(1), the United States' use of DMV-provided information is permissible, even though the information originates from a motor vehicle record. Transfers of DMV data to government agencies for official functions, including voter registration administration, are therefore consistent with the DPPA and fall squarely within the statute's exceptions.

### V. CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Motions to Dismiss by Secretary Galvin (Doc. 56), Alliance Intervenors (Doc. 52), and Common Cause (Doc. 49) be denied.

Dated: March 2, 2026

        Respectfully submitted,

        HARMEET K. DHILLON
        Assistant Attorney General
        Civil Rights Division

        ROBERT J. KEENAN
        Acting Deputy Assistant Attorney General
        Civil Rights Division

        ERIC V. NEFF
        Acting Chief, Voting Section

        */s/ Christopher J. Gardner*
        CHRISTOPHER J. GARDNER
        BRITTANY E. BENNETT

Trial Attorneys, Voting Section
Civil Rights Division
4 Constitution Square
150 M Street, Room 8.141
Washington, D.C. 20002
Christopher.Gardner@usdoj.gov
Brittany.Bennett@usdoj.gov
Tel. (202) 704-5430
Attorneys for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2026, a true and correct copy of the foregoing document was served via the email to all counsel of record.

/s/ Christopher J. Gardner
CHRISTOPHER J. GARDNER
Trial Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430