IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>           v.<br><br>WILLIAM FRANCIS GALVIN, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE COMMONWEALTH OF MASSACHUSETTS,<br><br>           Defendant. | CIVIL ACTION<br>NO. 1:25-CV-13816-LTS<br><br>(Leave to file granted 3/24/26) |

**BRIEF OF AMICUS CURIAE THE BIPARTISAN AMERICAN ELECTION PROJECT
IN SUPPORT OF DEFENDANT AND DEFENDANT-INTERVENORS
<u>LEAVE TO FILE GRANTED ON MARCH 24, 2026</u>**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................................ 1

INTEREST OF AMICUS CURIAE ................................................................................................ 2

BACKGROUND ............................................................................................................................. 2

ARGUMENT ................................................................................................................................... 5

    I.   The Constitution strikes a delicate but foundational balance between state and federal authority, including in the elections context. ..................................................................... 5

        A.      Federalism secures Americans' fundamental liberties. ......................................... 5

        B.      The Elections Clause exemplifies the Constitution's federalist structure. ............ 6

    II.  Applying federalism principles confirms that federal law does not authorize the United States' demand. ...................................................................................................................... 8

        A.      Title III's requirements do not encompass the electronic voter registration database the United States demands in this case. .................................................... 9

        B.      No federal law authorizes the United States' demand for voter data that must be kept private under Massachusetts law. .................................................................... 12

CONCLUSION .............................................................................................................................. 14

**<u>INTRODUCTION</u>**

This case presents a straightforward question with profound implications. Amid presidential aspirations to "nationalize" federal elections, the United States demands that the Commonwealth of Massachusetts surrender its complete, unredacted electronic voter registration database, including voters' full names, dates of birth, residential addresses, and partial Social Security numbers. And not just Massachusetts. The federal government has made similar demands across the country, attempting to override state privacy protections and interfere with state-administered elections on a national scale. It makes this demand under Title III of the Civil Rights Act of 1960—a statute enacted 66 years ago, before statewide computerized voter lists existed. The question is whether that statute authorizes the federal government's demand. It does not.

The text of Title III reaches records and papers that come into election officials' possession relating to applications, registration, and other acts requisite to voting. It does not reach a dynamic, state-created electronic database that is the product of ongoing list-maintenance activities rather than any individual voter's submission. The statute's context and purpose confirm this meaning: Title III was enacted to enable the federal government to determine whether States were unlawfully disenfranchising voters in the Jim Crow South, not to superintend or micromanage the voter-registration systems States have built to administer their elections. And none of the statutes the United States invokes displaces Massachusetts's laws safeguarding the privacy of its voters' sensitive personal information—not Title III, not the National Voter Registration Act, not the Help America Vote Act.

These conclusions follow not only from the statutory text but also from first principles. The Constitution divides power between the state and federal governments to secure Americans' liberty. It entrusts States with the primary responsibility for administering elections because state governments are closer to the people and more responsive to their needs. Congress's Elections

1

Clause authority operates against this backdrop, and courts must read federal election statutes to mean what they say—not stretch them to intrude where Congress did not mean to go. Least of all may the Executive conscript those statutes into a campaign to nationalize elections and topple the state authority the Constitution established.

The United States' demand exceeds what any federal statute authorizes.

## INTEREST OF AMICUS CURIAE

Public trust in the electoral process has been dangerously weakened by a flood of litigation, regulatory battles, polarizing rhetoric, and, at least since the 2020 election, a broader movement premised on the narrative that elections are untrustworthy, despite evidence to the contrary. The line between legitimate disagreements over election laws and anti-democratic challenges to longstanding constitutional principles and norms has too often come to be lost in these conflicts.

To help courts draw that line, lawyers affiliated with both the Democratic and Republican parties have formed amicus curiae The Bipartisan American Election Project ("BAEP"). Led by Bob Bauer and Ben Ginsburg, veteran election lawyers and the former bipartisan co-chairs of the Presidential Commission on Election Administration, BAEP is committed to reinforcing principled constitutional positions, defending democratic norms, and repelling efforts to obstruct the lawful casting and tallying of votes or undermine public confidence in election outcomes. This case involves just such an effort—and it is brought in the name of the United States itself.

## BACKGROUND

In the spring of 2025, the United States Department of Justice launched an unprecedented nationwide campaign to compel States to surrender their complete, unredacted electronic voter registration databases. In the year since, DOJ has sent demands to at least 48 States, with reported plans to extend those demands to all 50, seeking sensitive personal voter information, including

2

full names, dates of birth, residential addresses, and partial Social Security numbers.[1] The vast majority of States have refused to comply, citing state privacy laws that protect this information from disclosure.[2]

DOJ's stated purpose in this endeavor is to assess state compliance with the list maintenance requirements of the NVRA and HAVA. *See* ECF No. 1 (Compl.) ¶ 22. But the federal government's actions tell a different story. The Assistant Attorney General for Civil Rights has said the Department's efforts will result in the removal of hundreds of thousands of voters from state rolls.[3] The Department apparently aims to achieve this before the 2026 midterm elections.[4] The Attorney General herself wrote to Minnesota's Governor suggesting that federal immigration enforcement actions in that State might be moderated if it turned over its voter data—a staggering use of federal power as leverage to obtain information that States are under no legal obligation to provide.[5] The Federal Bureau of Investigation has seized 2020 ballots in Fulton County, Georgia,[6]

---

[1] *See* Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Mar. 9, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information; Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sep. 9, 2025).

[2] *See* Martinez-Ochoa, O'Connor & Berry, *supra*.

[3] *See* AAG Harmeet Dhillon (@AAGHarmeetDhillon), X (Dec. 18, 2025, at 9:24 AM ET), https://x.com/AAGDhillon/status/2001659823335616795 (asserting that "[y]ou're going to see hundreds of thousands of people in some States being removed from the voter rolls").

[4] *See United States of America v. Benson*, No. 26-1225 (6th Cir.), ECF No. 6-1 (United States' Emergency Motion to Expedite Briefing) at 15–16 (arguing that the Sixth Circuit should expedite the United States' appeal in another voter roll case to "permit Michigan to properly conduct an election this fall without the specter of noncitizen and other ineligible voters remaining on its voter rolls").

[5] *See* Nick Corasaniti, *Why is the Trump Administration Demanding Minnesota's Voter Rolls?*, N.Y. Times (Jan. 26, 2026), https://www.nytimes.com/2026/01/26/us/politics/minnesota-trump-voter-rolls.html.

[6] Nick Corasaniti & Richard Fausset, *Fulton County in Georgia Challenges the F.B.I.'s Seizure of 2020 Ballots*, N.Y. Times (Feb. 4, 2026), https://www.nytimes.com/2026/02/04/us/politics/fulton-county-fbi-raid-trump-gabbard.html.

and Maricopa County, Arizona.[7] Meanwhile, the President has called for Republicans to "nationalize" our elections[8] and "take over" voting procedures.[9] The President also has issued an executive order that purports to establish rules for mail-in voting and standards for the certification and decertification of voting equipment.[10]

This suit is one of more than two dozen that DOJ has filed against States refusing to comply with this demand. *See* ECF No. 54 at 6–7 (collecting DOJ press releases). Three federal courts have already dismissed the United States' parallel suits against California, Oregon, and Michigan, concluding that the federal government's demands exceed what Title III authorizes and that federal law does not preempt state privacy protections. *United States v. Weber*, — F. Supp. 3d —, No. 2:25-cv-09149, 2026 WL 118807, at \*20 (C.D. Cal. Jan. 15, 2026); *United States v. Oregon*, No. 6:25-cv-01666, 2026 WL 318402, at \*13 (D. Or. Feb. 5, 2026); *United States v. Benson*, —F. Supp. 3d —, No. 1:25-cv-1148, 2026 WL 362789, at \*9 (W.D. Mich. Feb. 10, 2026). This one should meet the same fate.

---

[7] Ronald J. Hansen, *Trump expands 2020 election probe to include Arizona 'audit' records*, Ariz. Republic (Mar. 9, 2026), https://www.azcentral.com/story/news/politics/elections/2026/03/09/trump-2020-election-probe-arizona/89069824007/.

[8] *See* Reid J. Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, N.Y. Times (Feb. 2, 2026), https://www.nytimes.com/2026/02/02/us/politics/trump-nationalize-elections.html.

[9] Nick Corasaniti & Richard Fausset, *Trump Wants to 'Take Over' Elections. These States Are Prime Targets*, N.Y. Times (Mar. 8, 2026), https://www.nytimes.com/2026/03/08/us/politics/trump-elections-fulton-county-ballots.html.

[10] *See* Exec. Order No. 14,248, *Preserving and Protecting the Integrity of American Election*, 90 Fed. Reg. 14005 (Mar. 25, 2025).

## ARGUMENT

**I.    The Constitution strikes a delicate but foundational balance between state and federal authority, including in the elections context.**

**A.    Federalism secures Americans' fundamental liberties.**

The Constitution "establishes a system of dual sovereignty between the States and the Federal Government," *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991), a design that was "adopted by the Framers to ensure the protection of 'our fundamental liberties,'" *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985) (quoting *Garcia v. San Antonio Metro. Trans. Auth.*, 469 U.S. 528, 572 (1985) (Powell, J., dissenting)). "[I]t was the insight of the Framers that freedom was enhanced by the creation of two governments, not one." *United States v. Lopez*, 514 U.S. 549, 576 (1995) (Kennedy, J., concurring). As James Madison explained, diffusing power between state and federal governments provides "a double security … to the rights of the people. The different governments will control each other; at the same time that each will be controlled by itself." The Federalist No. 51, at 270 (James Madison) (G. Carey & J. McClellan eds., 2001). Or as Alexander Hamilton put it, "[i]t may safely be received as an axiom in our political system, that the state governments will, in all possible contingencies, afford complete security against invasions of the public liberty by the national authority," with "[p]ower being almost always the rival of power." *Id.* No. 28, at 138–39 (Alexander Hamilton).

Our federalism, then, "is one of the Constitution's structural protections of liberty." *Printz v. United States*, 521 U.S. 898, 921 (1997). That is because it serves as "a check on abuses of government power." *Gregory*, 501 U.S. at 458. "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal

5

Government will reduce the risk of tyranny and abuse from either front." *Id*. And "[i]n the tension between federal and state power lies the promise of liberty." *Id.* at 459.

### B.    The Elections Clause exemplifies the Constitution's federalist structure.

The Constitution's Elections Clause is a feature of this federalist design. Its text provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const., art. I, § 4, cl. 1. The Elections Clause thus operates as "a default provision" that gives States the primary responsibility for administering congressional elections but authorizes Congress to supersede conflicting state laws. *Foster v. Love*, 522 U.S. 67, 68 (1997). It confers no authority on the Executive to regulate the times, places, or manner of elections.

The States' default authority under the Elections Clause is broad. The Clause empowers States "to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). "[I]n short," the Elections Clause empowers States "to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved," *id.*—that is, the fundamental right to vote.

The Framers deliberately located this "broad," "flexibl[e]" power in the States in the first instance. *Sharma v. Hirsch*, 121 F.4th 1033, 1037–38 (4th Cir. 2024) (Wilkinson, J.) (citing *Clingman v. Beaver*, 544 U.S. 581, 586 (2005)). "The Framers of the Constitution chose to entrust the states with administering elections because local governments are best acquainted with the situations of the people they govern." *Oregon*, 2026 WL 318402, at *1. "State governments

6

operated closer to the ground and could devise electoral regulations responsive to the different geographic and demographic character of their populaces." *Sharma*, 121 F.4th at 1038; *see also Arizona v. Inter Tribal Council of Ariz.*, 570 U.S. 1, 41 (2013) (Alito, J., dissenting) ("the States are closer to the people," so "the Framers thought that state regulation of federal elections would 'in ordinary cases . . . be both more convenient and more satisfactory'" (quoting The Federalist No. 59, at 360 (Alexander Hamilton) (C. Rossiter ed. 1961))). Furthermore, "local administration . . . allows for great individual input and accountability," *Oregon*, 2026 WL 318402, at *1 (quoting *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 715–16 (4th Cir. 2016))—core federalism values, *see Lopez*, 514 U.S. at 576 (Kennedy, J., concurring).

Given these interests, when Congress legislates under the Elections Clause, its statutes must be construed in light of the "historical purpose" of Congress's Elections Clause authority. *Sharma*, 121 F.4th at 1038. The Supreme Court repeatedly has explained that the Clause's "grant of congressional power was the Framers' insurance against the possibility that a State would refuse to provide for the election of representatives to the Federal Congress." *ITCA*, 570 U.S. at 8; *accord Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 815 (2015). Hamilton defended this power on the grounds that "'every government ought to contain in itself the means of its own preservation,' and 'an exclusive power of regulating elections for the national government, in the hands of the State legislatures, would leave the existence of the Union entirely at their mercy.'" *ITCA*, 570 U.S. at 8 (quoting The Federalist No. 59, at 362–63 (Alexander Hamilton) (C. Rossiter ed. 1961)). Yet, critically, he also viewed the authority granted Congress by the Elections Clause as a power of "last resort." The Federalist No. 59, at 305 (Alexander Hamilton) (G. Carey & J. McClellan eds. 2001).

Congress's Elections Clause authority, like that of the States, has limits. "[T]he Framers understood the Elections Clause as a grant of authority to issue procedural regulations, and not as a source of power to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 833–34 (1995) (concluding that a state congressional term limits measure exceeded Arkansas's Elections Clause authority). And for a century and a half, the Supreme Court has confirmed that Elections Clause legislation displaces state laws only as far the statutory text goes, and only to the extent the state and federal laws actually conflict. In *Ex Parte Siebold*, for example, the Court explained that, when Congress exercises its Elections Clause authority, "the action of Congress, *so far as it extends and conflicts with the regulations of the State*, necessarily supersedes them." 100 U.S. 371, 384 (1879) (emphasis added); *see also id.* at 392 ("[S]o far as [Congress exercises its power], *and no farther*, the regulations effected supersede those of the State which are inconsistent therewith." (emphasis added)). Courts should therefore "read Elections Clause legislation simply to mean what it says." *ITCA*, 570 U.S. at 14–15. Courts and litigants should not, in other words, "strain the intent and meaning of . . . election laws." *Sharma*, 121 F.4th at 1039.

## II.    Applying federalism principles confirms that federal law does not authorize the United States' demand.

Granting the United States' demand for Massachusetts's entire state voter registration list would require the Court to stretch federal statutes far beyond their reach. The United States invokes a "sweeping power to obtain these records" under Title III of the Civil Rights Act of 1960, for the asserted purpose of "ascertain[ing] Massachusetts's compliance with the list maintenance requirements of the NVRA and HAVA." ECF No. 1 (Compl.) ¶¶ 2, 22. But Congress has not authorized this federal incursion into the Commonwealth's election administration. This Court should reject it.

8

Secretary Galvin and the Intervenors have demonstrated why the United States' single claim under Title III falters at the threshold: the United States fails to state a valid "basis" or "purpose" for its sweeping demand for records, as Title III requires. 52 U.S.C. § 20703 (requiring that the Attorney General's written demand for "[a]ny record or paper required . . . to be retained and preserved" under § 20701 "contain a statement of the basis and the purpose therefor"); *see* ECF No. 57 (Galvin Mot. to Dismiss) at 13–15; ECF No. 54 (NAACP, et al. Mot. to Dismiss) at 9–16; ECF No. 50 (Common Cause, et al. Mot. to Dismiss) at 17–24. We do not repeat those arguments. Instead, we write to emphasize two additional points: first, the electronic voter registration database the United States demands here is not one of the "records or papers" that Title III covers; and even if it were, nothing in Title III (or the NVRA or HAVA) would require Massachusetts to produce voter information that state law protects as private.

Fundamental textualism and federalism principles lead to both conclusions. Statutes must be read to mean what they say, without straining their text to expand federal authority. And because the Constitution entrusts the States with primary responsibility for administering elections and safeguarding their citizens' sensitive personal information, that responsibility remains with Massachusetts absent a clear congressional command to the contrary, a command that appears nowhere in the text of the statutes the United States invokes.

### A.    Title III's requirements do not encompass the electronic voter registration database the United States demands in this case.

Title III requires election officials to retain and preserve, for 22 months following a federal election, "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. Upon a written demand that adequately states its "basis" and "purpose," "[a]ny [such] record or paper . . . [must] be made available for inspection, reproduction, and copying at the

9

principal office of [its] custodian by the Attorney General or his representative." *Id.* § 20703. Here, the Attorney General invokes these provisions to demand that Massachusetts hand over its "full, unredacted [state voter registration list]" as of July 2025. ECF No. 7 at 9. But by its plain terms, Title III does not authorize this demand for at least two independent reasons.

First, Title III covers "records and papers" that election officials "retain and preserve[] for a period of twenty-two months" after an election. 52 U.S.C. §§ 20701, 20703. Massachusetts's electronic voter registration list is not such a record. It is dynamic, "in a near-constant state of flux," due to list-maintenance activities. ECF No. 57 (Galvin Mot. to Dismiss) at 19. A July 2025 "snapshot" of the list therefore is not a "record of registration for, or voting in, the 2024 federal election"; it is a product of everything that has happened to the list since that election. It thus falls outside Title III's preserve-and-retain requirement entirely.

Second, and more fundamentally, an electronic "voter registration list is not a 'record' that 'c[a]me into [the State's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election.'" *Benson*, 2026 WL 362789, at *9. A federal court recently reached exactly this conclusion on nearly identical facts. *Id.* As that court explained, the phrase "come into [his] possession" "naturally refers to a process by which someone *acquires* an item from an external source," and that "Congress frequently uses . . . to refer to items that a person *obtains* rather than *creates*." *Id.* (collecting statutes). To "give effect to [this] phrase," as every court must, the court concluded it "refer[ed] to only those documents that state election officials *receive* from prospective voters." *Id.* (emphasis added).

The words that follow confirm this reading. "Application, registration, payment of poll tax, or other act requisite to voting in such election" all "refer[] to something that the voter submits or does as part of the registration process," clarifying that the statute covers "records that election

officials *receive*, rather than *create*." *Id.* And this reading is consonant with the statute's purpose, which is "to preserve voters' submissions to the State so that the federal government can determine whether the State is improperly rejecting voter applications" and illegally thwarting citizens' fundamental right to vote. *Id.*

Focusing on the statutory words "application" and "registration" yields the same interpretation: both are documents that a state *receives*, and application and registration records are distinct from a voter registration *list*. That is because a state's "voter registration list is not assembled purely from information in voter registration applications"; rather, "it includes information that election officials obtain about individual voters from other" sources. *Id.* at *10. As the Secretary explains, "Massachusetts uses several different methods to prevent duplication, confirm residence, and remove deceased or otherwise ineligible voters from the voter registration list to comply with the NVRA and HAVA." ECF No. 57 (Galvin Mot. to Dismiss) at 9. Among the list-maintenance tools Massachusetts employs are "the annual street list survey, which provides city and town clerks with a process by which they make changes to address information in compliance with the NVRA and to 'inactivate' voters whose eligibility cannot be confirmed"; "notices of felony convictions" that the Secretary receives "from the United States' Attorneys' offices around the country"; and "Department of Correction . . . lists of persons who are currently incarcerated for felony convictions." *Id.* at 9–10.

Moreover, recognizing a "distinction between applications and a voter list" is faithful to the purpose of Title III: "a voter application can be examined to determine whether it was unlawfully *rejected*, whereas a list of those who *successfully* registered to vote would be little help in such an investigation." *Benson*, 2026 WL 362789, at *10 (first emphasis added). That "a statewide computerized voter list was not foreseeable to the Congress of 1960" only bolsters the

conclusion that such a list is not a record that a State like Massachusetts must preserve or disclose under Title III. *Id.*

**B.    No federal law authorizes the United States' demand for voter data that must be kept private under Massachusetts law.**

Even if Title III reached Massachusetts's electronic voter registration list, it would not require the Commonwealth to disclose sensitive voter information that must be kept private under state law. Neither would the NVRA or HAVA, the other federal statutes that the United States deploys to justify its Title III demand. Again, to preserve the delicate balance between state and federal authority over elections, federalism and Elections Clause principles require courts to avoid interpretations that would strain the statutory text, create conflicts between state and federal law that simply do not exist, or otherwise aggrandize federal power at the States' expense. Here, nothing in the text of Title III, the NVRA, or HAVA suggests that they displace Massachusetts's voter-privacy protections. Indeed, reading these statutes to override state privacy law would require the Court to find that Congress silently preempted state voter-privacy protections—a result that inverts the federalism principles animating the Elections Clause. No canon of statutory interpretation permits this approach.

Massachusetts law safeguards the privacy of voters' data in numerous ways: it limits what voter information is a public record and to whom it is available; allows certain individuals "to have portions of their information withheld from disclosure"; and exempts from disclosure information "relating to a specifically named individual" when such disclosure "may constitute an unwarranted invasion of personal privacy." Doc. 57 (Galvin Mot. to Dismiss) at 21–25 (collecting statutes); *see also* ECF No. 54 (NAACP, et al. Mot. to Dismiss) at 16–17 (collecting additional statutes); ECF No. 50 (Common Cause, et al. Mot. to Dismiss) at 26 (collecting additional statutes protecting sensitive information).

Nothing in Title III displaces these protections. The statutory text communicates no congressional intent to supersede these state-law privacy protections. Nothing in the statutory text suggests that it forbids keeping private data private. And the few cases in this area point in the opposite direction: *Kennedy v. Lynd* determined that Title III encompasses only "public records which ought ordinarily to be open to legitimate reasonable inspection," and not "confidential, private papers and effects" like the private voter data the United States seeks here. 306 F.2d 222, 231 (5th Cir. 1962); *accord Weber*, 2026 WL 118807, at *9; *see* ECF No. 54 (NAACP, et al. Mot. to Dismiss) at 17; ECF No. 50 (Common Cause, et al. Mot. to Dismiss) at 20.

The NVRA likewise leaves the Commonwealth's privacy protections in place. As the First Circuit held just two years ago, "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information" in a state voter list. *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024). "Nor does the NVRA prohibit the redaction of personal information that can be particularly sensitive in certain circumstances," as with individuals "subject to criminal investigation." *Id.*

HAVA, meanwhile, does not preempt Massachusetts's privacy laws because it "does not contain any disclosure provisions in its statutory text." *Weber*, 2026 WL 118807, at *15; *Oregon*, 2026 WL 318402, at *6 ("HAVA contains no record disclosure provision."). A statute that does not require disclosure *at all* cannot require *unredacted* disclosures notwithstanding state-law.

Reading Title III, the NVRA, and HAVA not to preempt Massachusetts's privacy laws isn't just faithful to their text. It also advances the federalism principles that inform the Constitution's diffusion of election authority among the federal government and the States. As explained at the outset, federalism aims to "ensure the protection of 'our fundamental liberties.'" *Atascadero State Hosp.*, 473 U.S. at 242; *see* The Federalist No. 51, at 271 (James Madison) (G.

13

Carey & J. McClellan eds., 2001) (by dividing power, "a double security arises to the rights of the people"). And among the central values it advances are keeping government responsive and accountable to the people. *See Gregory*, 501 U.S. at 459; *Lopez*, 514 U.S. at 576 (Kennedy, J., concurring). Through its laws, Massachusetts safeguards its citizens' privacy and thus their liberty, and it is from Massachusetts that its citizens must expect that protection. Absent a clear congressional command to dismantle those guardrails—and none exists—our federalist Constitution demands that they remain intact.

Finally, there is an additional and independent reason to avoid reading federal law to require disclosure of sensitive voter information: doing so would risk burdening the constitutional right to vote. The right to vote derives from the First and Fourteenth Amendments, *Norman v. Reed*, 502 U.S. 279, 288 (1992), and it is burdened not only by outright exclusion from the polls but also by more insidious efforts to deter its exercise. Requiring voters to disclose private data to the federal government as a condition of registration creates precisely such a burden. Regardless of voters' party preference, "the risk of having one's personal information misused will deter people from registering to vote," so reading the relevant statutes to mandate such disclosure would risk rendering them unconstitutional. *Benson*, 2026 WL 362789, at *3–4. Because courts should "interpret ambiguous statutes to avoid rendering them unconstitutional," *United States v. Davis*, 588 U.S. 445, 463 n.6 (2019), this concern is yet another reason to reject the United States' demand. Massachusetts's privacy protections are not an obstacle to federal law; they safeguard the fundamental right to vote that federal election law exists to protect.

## CONCLUSION

A 66-year-old statute, enacted before computerized voter lists existed, does not compel the Commonwealth of Massachusetts to surrender millions of voters' sensitive personal information to the federal government. The United States' unsustainable interpretation of the statute, advanced

14

in the context of a move to "nationalize" federal elections, flouts basic constitutional principles.

The Motions to Dismiss should be granted, and the Motion to Compel should be denied.

Dated: March 24, 2026

Respectfully submitted,

*/s/ Andrew G. Pappas*
Andrew G. Pappas, *pro hac vice*
Mary R. O'Grady, *pro hac vice*
John S. Bullock, *pro hac vice*
Kimberly I. Friday, BBO # 660544
OSBORN MALEDON, P.A.
2929 North Central Ave., 20th Floor
Phoenix, Arizona 85012-2793
(602) 640-9000
apappas@omlaw.com
mogrady@omlaw.com
jbullock@omlaw.com
kfriday@omlaw.com

*Attorneys for Amicus Curiae*
*Bipartisan American Election Project*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served this 24th day of March, 2026, with a copy of this document via the Court's CM/ECF system.

*/s/ Andrew G. Pappas*

15